```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
              NORTHERN DIVISION AT ASHLAND
                 CASE NO. 15-cv-62-DLB


JAMES YATES, ET AL.,      )DEPOSITION TAKEN ON BEHALF
                          )     OF THE PLAINTIFFS
          PLAINTIFFS      )        BY:  NOTICE
                          )
VS.                       )
                          )
KIM DAVIS, individually,  )
                          )WITNESS
          DEFENDANT       )KIMBERLY JEAN DAVIS



            * * * * *      * * * * *



             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF KENTUCKY
             NORTHERN DIVISION AT ASHLAND
              CIVIL NO. 0:15-cv-00046-DLB


DAVID ERMOLD AND          )DEPOSITION TAKEN ON BEHALF
DAVID MOORE,              )    OF THE PLAINTIFFS
                          )       BY:  NOTICE
          PLAINTIFFS      )
                          )
VS.                       )
                          )
KIM DAVIS,                )
                          )WITNESS:
          DEFENDANT       )KIMBERLY JEAN DAVIS
```

The deposition of KIMBERLY JEAN DAVIS was taken by the plaintiffs before TAMELA T. LEWIS, Certified Court Reporter and Notary Public in and for the State of Kentucky at Large, at 451 Chair Avenue, Lexington, Kentucky, on Thursday, January 21, 2021, commencing at the approximate hour of 9:15 a.m.

Said deposition was taken pursuant to notice previously filed, pursuant to the Federal Rules of Civil Procedure, in the above-styled action now pending before the United States District Court.

```
 1                           APPEARANCES

 2

 3        ON BEHALF OF PLAINTIFFS ERMOLD AND MOORE:

 4               Mr. Joseph D. Buckles
                 Buckles Law Office, PLLC
 5               149 North Limestone
                 Lexington, Kentucky 40507
 6

 7               Mr. Michael J. Gartland
                 DelCotto Law Group, PLLC
 8               200 North Upper Street
                 Lexington, Kentucky 40507
 9

10        ON BEHALF OF PLAINTIFFS YATES AND SMITH:

11               Ms. Rene Heinrich
                 The Heinrich Firm, PLLC
12               526 York Street
                 Newport, Kentucky 41071
13

14               Mr. W. Kash Stilz, Jr.
                 Roush & Stilz, P.S.C.
15               19 West Eleventh Street
                 Covington, Kentucky 41011
16

17          ON BEHALF OF THE DEFENDANT:

18               Mr. Horatio Mihet
                 Mr. Roger K. Gannam
19               Liberty Counsel
                 Post Office Box 540774
20               Orlando, Florida 32854

21

22        *  *  *  *  *          *  *  *  *  *

23

24

25
```

```
 1                          INDEX

 2    Caption......................................1 - 2

 3    Appearances.......................................3

 4    Index.............................................4

 5    Examination by Mr. Buckles...................5 - 90

 6    Examination by Ms. Heinrich................91 - 128

 7    Reporter's Certificate..........................129

 8    Signature Page..................................130

 9

10             * * * * *           * * * * *

11

12                        EXHIBITS

13    Exhibit Number 24................................33
         ("Dear Senator Robertson")
14

15    Exhibit Number 25................................43
         (06/26/15 from Governor Beshear to Kentucky
16       County Clerks

17    Exhibit Number 26................................64
         (07/08/15 letter to Governor Beshear from Davis)
18

19    Exhibit Number 27...............................106
         (Marriage License - James Yates and William Smith)
20

21

22             * * * * *           * * * * *

23

24

25
```

1          <u>KIMBERLY JEAN DAVIS,</u>

2 having been first duly placed under oath, was examined

3 and deposed as follows:

4                  <u>EXAMINATION</u>

5 <u>BY MR. BUCKLES:</u>

6 Q          All right.  Ms. Davis, my name is Joe

7 Buckles.  I'm an attorney.  I represent David Ermold

8 and David Moore.  And we briefly met beforehand,

9 but --

10 A          Forgive me for not remembering.

11 Q          That's fine.  Well, I -- we've never met

12 before today to the best of my knowledge.

13 A          Okay.

14 Q          But we briefly talked whenever I came in

15 and introduced myself.

16          This is an odd deposition.  Have you ever

17 given a deposition before?

18 A          I don't know if I have or not.

19 Q          Okay.  If you had, this would be a weird

20 one in that there's two cases going on at the same

21 time.  So at some point I'll bow out and jump back in

22 and another attorney representing a different set of

23 plaintiffs will jump in.

24 A          That's fine.

25 Q          The general rules of a deposition, your

1   attorney's probably already told you, but there's a

2   written transcript.

3   A          Uh-huh.

4   Q          So naturally in communication we talk over

5   each other and it's not rude.  It's polite.  We give

6   verbal feedback.  For purposes of today, we probably

7   should be very clear to make it as easy as possible

8   and make the transcript clear.

9   A          Yes.

10  Q          If two people are talking, it's difficult

11  for her to figure out which record to type.

12  A          Yes, sir.

13  Q          And the second thing is, when we make

14  uh-huh or huh-uh vocalizations, it's more difficult

15  for the record to determine if it's an affirmative or

16  a negative answer.  So if you could just do your best

17  to say yes or no, it'll make everything easier.

18  A          Yes, sir.

19  Q          I'm a kid.  You don't have to say "Sir,"

20  but I do appreciate it.  It makes me feel special this

21  morning.  So --

22             Now, I -- I represent David Ermold and

23  David Moore.  I'm an attorney.  I doubt there's

24  probably anything I could say today to convince you of

25  a different perspective on any of these issues.  I

1    doubt there's anything you could say that could

2    convince me otherwise.  But I -- this is my one and

3    only opportunity to ask you questions.

4              You have counsel, and the rules and ethics

5    say I can't pick up the phone and call you.  I have to

6    have your lawyers here, and that's why we're sitting

7    here and this is -- this is my opportunity.  So I just

8    ask you to have some patience because I have to ask

9    questions because this is all I've got.

10             Do you understand that?

11   A         I do, yes.

12   Q         Okay.  And then if at any point you don't

13   understand my question -- it'll probably happen --

14   just say you don't understand.  If you answer, I'm

15   going to assume that you do, in fact, understand my

16   question.

17   A         I will do that.

18   Q         All right.  So could you please state your

19   name for the record.

20   A         Kimberly Davis.

21   Q         Okay.  Do you have a middle name?

22   A         I do.  It's Jean, but I go by -- I use my

23   maiden name Bailey as my middle name.

24   Q         Okay.  And where do you live?

25   A         I live at 7935 US Highway 60 East,

1    Morehead, Kentucky.

2    Q          Okay.  And that's in Rowan County?

3    A          It is.

4    Q          All right.  And so you say you don't know

5    if you have or have not given a deposition before; is

6    that correct?

7    A          I don't -- I don't think I have.  I mean,

8    I've testified.

9    Q          Okay.  On how many occasions have you

10   testified?

11   A          Twice, I believe.

12   Q          Okay.  And so when was the first time?

13   A          It would be in probably August, early

14   August, at Kenton County, I believe, and then later at

15   a hearing in Boyd County in September --

16   Q          Okay.

17   A          -- of 2015.  Both of those were in 2015.

18   Q          Okay.  Now, being an attorney, they give me

19   access to CourtNet so I -- when I'm taking your

20   deposition, I type in your name, see all -- you know,

21   any court records.

22              There's a case, Kimberly Davis versus

23   Madonna Black.  Do you know anything about that?

24   A          That was a small claims case of a lady that

25   used to rent a -- a mobile home off of me back in the

```
 1    '90s.

 2    Q         Okay.

 3    A         And she skipped out on rent and damages.

 4    Q         I think she was a stripper.

 5    A         She was.  But she had a little boy --

 6    Q         Okay.

 7    A         -- and I had a soft heart and wanted to

 8    help her have a place to live so --

 9    Q         And so I guess -- I mean, not that I -- I

10    gotcha the first time today.  You say you've testified

11    twice.  You might have testified in that case too, I

12    guess?

13    A         Well, yeah.  It was probably -- it was a

14    small claims court.

15    Q         Okay.  But they made you raise your right

16    hand and you gave --

17    A         Oh, well, yeah.

18    Q         -- testimony?

19    A         I thought you were just talking with this.

20    Q         Oh, yeah.  I'm not talking -- have you ever

21    given a deposition in any case ever in your entire

22    life?

23    A         Well, I don't know if I gave a deposition,

24    but I did go before a judge --

25    Q         Okay.  Fair enough.
```

```
 1   A           -- in that case.  And I also have another
 2   small claims case --
 3   Q           Okay.
 4   A           -- that was in September of -- I think it
 5   was last year.  It started in '18.
 6   Q           Okay.
 7   A           No.  Actually it started in '19.  It was on
 8   a -- I paid a gentleman to do some work at my home --
 9   my home, and he damaged my septic tank so I had to
10   have it replaced, and he didn't pay for the damages.
11   So I had to take him to the small claims court also.
12   Q           Okay.  What was the outcome of that case?
13   A           I got a judgment, but I have no money.
14   Q           Okay.  Now, with regard to the Madonna
15   Black case, did you ever recover money in that case?
16   A           No.
17   Q           Okay.  And it looks like there was, like,
18   postjudgment interrogatories that were done or
19   something?
20   A           Yeah, but I never got anything back.
21   Q           Okay.  So other than those two lawsuits, I
22   guess you've also -- at some point in this matter, you
23   filed a third-party complaint against Steve Beshear
24   and Wayne Onskt, O-n-s-k-t; is that correct?
25   A           Yes.
```

1  Q          Okay.  Outside of those three cases, have

2  you initiated any other lawsuits?

3  A          No.

4  Q          Okay.  All right.  Oh.  Did you graduate

5  high school?

6  A          Yes.

7  Q          What high school?

8  A          Rowan County Senior High School.

9  Q          Okay.  Do you have any education after high

10  school?

11  A          I do.  I have a nursing degree.

12  Q          Okay.  From where?

13  A          It's a -- an LPN degree from the Rowan

14  Vocational and Technical College.

15  Q          Okay.

16  A          It's now MTCT, I think.

17  Q          Is that an associate's degree?

18  A          It's a two-year degree that's crammed into

19  a one-year stint of schooling.

20  Q          Okay.  And I know a fair bit about you so

21  I'm not going to play dumb here and we'll try to just

22  move things --

23  A          Sure.

24  Q          -- along.

25            You -- you did some nursing, it looks like,

```
 1  in the '80s --
 2  A         I did.
 3  Q         -- is that correct?  All right.
 4            Generally, where did you work?
 5  A         At the Morehead Clinic.
 6  Q         Okay.  Is that the only place you worked
 7  during that time?
 8  A         Uh-huh.
 9  Q         All right.  And then you maybe left that
10  somewhere in the late '80s -- 1988?
11  A         I did.  In 1988, I had a -- a premature --
12  I have a son that would have been 33 in March.  So
13  when I had him, I did not go back to nursing.  It was
14  just too hard.
15  Q         Okay.  And then you -- you took up a job
16  with your mother?
17  A         She asked me -- she needed some help
18  filing, and so -- she saw I was grieving and she asked
19  me if I could come and help her and that that would
20  try to help me, and so I started filing and just went
21  from there.
22  Q         Okay.  Who is your mother?
23  A         My mother is Jean Bailey.
24  Q         All right.  And what's her position in
25  1988?
```

```
 1   A          She was the county clerk then.

 2   Q          When did she become the county clerk?

 3   A          I believe in -- she got elected in '78 and

 4   took office in '79.

 5   Q          Okay.  And then is it correct you worked

 6   from '88 until 2004 in the clerk's office, or is that

 7   not true?  I don't --

 8   A          No.  I worked up there until 2014 with her

 9   until I got elected and took office in 2015.

10   Q          Whoever typed these notes --

11   A          Made a boo-boo?

12   Q          Yeah.

13   A          I'm sorry.

14   Q          I'm the only employee in my office.  So

15   there's no -- we'll find that person --

16   A          That happens.

17   Q          -- and -- and put something in --

18   A          That happens.

19   Q          -- their permanent file.

20   A          Okay.

21   Q          All right.  So you worked from '88 till '14

22   as a deputy clerk?

23   A          I did.

24   Q          And never missed any time during that?

25   A          I had children.  Missed, you know, for
```

```
 1   having them, and I think I had the flu one time and
 2   missed like two or three days but --
 3   Q          Okay.  And then why did your -- did your
 4   mother retire?
 5   A          She did.
 6   Q          Okay.  And you ran for Rowan County Clerk
 7   in 2014?
 8   A          Yes.
 9   Q          So you won your election?
10   A          I did.
11   Q          Okay.  And the primary?
12   A          Yes.
13   Q          And then you took over the roles of the
14   office?
15   A          Yes.
16   Q          And what's it like to go from deputy clerk
17   to clerk?
18   A          Well, you know, I thought I would be
19   prepared because I had 27 years of experience, but the
20   role that you step into as clerk is so much different
21   than the role as a deputy because all decisions and
22   all that weight of budget and the employees and the
23   public and -- and reports, all that stuff just rests
24   solely on my shoulders.
25              So as -- as much as I thought I was
```

1   prepared, you know, there was a lot of stuff still

2   that was new and fresh that I had to learn and had to

3   master with reporting and stuff like that because I

4   did most everything else.

5   Q        Okay.  So you had a working knowledge?

6   A        Yes, very much so.

7   Q        Okay.  But the new role of making decisions

8   was new to you?

9   A        Some of the roles.  I was -- you know, I

10  was over the front-line deputies.  I was their

11  supervisor, you know.  But it was just different

12  because I -- I wasn't a co-worker anymore.  I was

13  their boss.  And those are the same people that I

14  worked side-by-side with every day.  So when you step

15  out of that co-worker into a -- a boss kind of seat,

16  you know, it just makes it a different relationship

17  that you have with them.

18  Q        It changes the dynamic?

19  A        It does.

20  Q        Okay.  Now, can you help me understand how

21  many deputies there are and what the office maybe

22  looks like in 2013 and -- and then 2014?  And then

23  ultimately I'm interested in what it looks like in

24  2015 because that's what we're here today about.

25  A        Right.

1    Q          So how many employees held over from the

2    previous administration?

3    A          All.

4    Q          How many employees are there?

5    A          There was -- there was probably five that

6    held over -- or six.  There was a little part-time

7    girl that would work.  And then my son came to work

8    for me.  And then I had a -- a girl that was working

9    for my mother.  She was actually sick.  She was also

10   supposed to work for me, but she never could get back

11   to work because of her health.  So I think there was

12   about seven.

13   Q          Okay.  And only one new hire, and that

14   would be your son?

15   A          Yes, immediate -- when I first took office.

16   Now, in '16 I hired another new lady, but that was,

17   you know, later.

18   Q          Okay.  What's your son's name?

19   A          Nathaniel Davis.

20   Q          Is it fair to say he jumped into your role

21   in --

22   A          No.

23   Q          -- in 2013?

24   A          Not at all.

25   Q          Okay.

```
 1    A          No.

 2    Q          He started from the bottom?

 3    A          Yes.

 4    Q          All right.  So who would be -- well, strike

 5    that.

 6               In 2013, were you the number one person in

 7    the office assisting your mother?

 8    A          I was.  I was -- my title was chief deputy.

 9    Q          Okay.  So who became chief deputy in 2014?

10    A          That would be Roberta Earley.  In 2015 she

11    became -- when I took office she became --

12    Q          Oh, wait.  So you were elected in 2014, but

13    didn't --

14    A          Didn't take office till January 5th of

15    2015.

16    Q          Okay.  And then Roberta -- what was her

17    last name?

18    A          Earley.

19    Q          Earley.

20    A          E-a-r-l-e-y.

21    Q          Okay.  Is she still with the office today?

22    A          She is.

23    Q          Is she still -- I mean, do you know if

24    she's still the deputy?

25    A          I think she is.
```

```
 1   Q          Okay.

 2   A          I don't know.

 3              MR. MIHET:  Remember to let him

 4          finish his questions.

 5              WITNESS:  Okay.  I'm sorry.

 6              MR. MIHET:  It's easy to

 7          anticipate what he's going to ask, but

 8          for the record --

 9              WITNESS:  Okay.

10              MR. MIHET:  -- you've got to let

11          him finish.  Okay?

12              WITNESS:  Okay.  Yes.

13              Sorry.

14              MR. BUCKLES:  I accept your

15          apology.

16   Q          So as far as you know -- strike that.

17              The entire tenure of your service, was

18   Roberta Earley the chief deputy?

19   A          For the four years that I was clerk, yes.

20   Q          Okay.  And, to the best of your knowledge,

21   is she chief deputy now?

22   A          I think she is, but I can't say for

23   certain.

24   Q          Okay.  Now, what is the role of the Rowan

25   County Clerk's Office?
```

```
 1   A          It is kind of like a passthrough collection

 2   agent for county, state, and federal agent --

 3   agencies.  We collected taxes of many kinds:  Vehicle

 4   taxes, personal property taxes, delinquent real estate

 5   taxes, franchise taxes, prepared those tax bills,

 6   licensed vehicles, held elections, voter registration,

 7   issued marriage license, hunting license, occupational

 8   license, a solicitor's license, going out of business

 9   license, license vehicles, transfers, titles, recorded

10   deeds, mortgages, land records, liens, wills.  I think

11   that's about it.

12   Q          Do you also answer the phone and say "No,

13   we're not the circuit court clerk's"?

14   A          Oh.

15   Q          "You've got to call across the street"?

16   A          Too many times.

17   Q          How many times a day?

18   A          At least 100.

19   Q          Okay.  All right.  Well, I -- there's a

20   book that I think you wrote and it says on Page 3 --

21   I'll read the quote.

22              "We're a one-stop shop for Rowan County's

23   23,000 residents, handling all kinds of legal records

24   including deeds, mortgages, wills, voter registration,

25   motor vehicle licensing and, of course, marriage
```

```
 1   licenses."
 2             Is that a -- is that an accurate statement?
 3   A        Yes.
 4   Q        Okay.  So, in that, you-all serve Rowan
 5   County's 23,000 residents?
 6   A        Yes, and many other residents that are
 7   outside our county.
 8   Q        Okay.  And I don't -- I was educated in
 9   Kentucky and a couple of times sounds like you were
10   too.  Do you know why Kentucky has so many counties?
11   A        I have no clue, sir.
12   Q        Okay.  120 counties --
13   A        Uh-huh.
14   Q        -- seems excessive to me.  But I guess it
15   does put a courthouse pretty close to many residents.
16   Is that fair?
17   A        I would suppose.
18   Q        All right.  And so I -- from the passage in
19   the book and what you're telling me, it's kind of --
20   it's -- the "one-stop shop" is what it says for Rowan
21   County residents to do their business.  Is that fair?
22   A        Yes.
23   Q        And that would include vehicle license,
24   hunting licenses, and marriage licenses?
25   A        Yes.
```

```
1    Q            Okay.  All right.  And so this might be a

2    dumb question.  But who's in charge of the Rowan

3    County Clerk's Office?

4    A            The clerk.

5    Q            Okay.  And that's the elected clerk?

6    A            Yes.

7    Q            All right.  And that was you in 2015?

8    A            Yes.

9    Q            And all the way until your term expired?

10   A            Yes.

11   Q            When did you -- when did you leave office?

12   A            I retired December 31, 2018.

13   Q            So from January -- early January of 2015

14   until late 2018 you were the boss?

15   A            I was the clerk.

16   Q            But as the clerk, you're in charge?

17   A            For that office, yes.

18   Q            You were the Rowan County Clerk's Office?

19   A            Uh-huh.  Yes.

20   Q            So, I mean, you -- you hired people?

21   A            I did.

22   Q            Okay.  You fired people?

23   A            I did.

24   Q            You addressed the policies of the office;

25   is that correct?
```

```
 1   A          Yes.

 2   Q          I guess you would reprimand employees for

 3   doing --

 4   A          Yes.

 5   Q          -- incorrect things?  All right.

 6              And with regard to the role of the deputy

 7   clerk, does the deputy clerk do any of those things?

 8   A          What?  Decide policy and reprimand or --

 9   Q          Yeah.  Let's just go -- do -- does the

10   deputy clerk hire?

11   A          No.

12   Q          Does the deputy clerk fire clerks?

13   A          No.

14   Q          Does the deputy clerk reprimand employees?

15   A          A supervisor -- a front-line supervisor

16   would -- could be able to reprimand a -- a deputy

17   if -- if there was cause, and then they would come to

18   me.

19   Q          Okay.  What's the difference between a

20   front-line supervisor and a deputy clerk?

21   A          A deputy clerk is just a -- someone that

22   some -- a customer will come up and that individual

23   would take care of their license and their transfers

24   and their titles and stuff.

25              A supervisor would carry a -- a higher
```

```
 1    authority as far as, like, if there was an irate

 2    customer, that they would diffuse and deescalate the

 3    situation.  They would step in and try to kind of

 4    smooth things out and -- and get some -- get -- get

 5    the issue resolved.

 6    Q         Okay.  Who was the supervisor -- front-line

 7    supervisor in 2015?

 8    A         I don't think I actually had one at that

 9    time.

10    Q         Okay.  Who was the -- did you ever have a

11    front-line supervisor?

12    A         Yes.

13    Q         Okay.

14    A         It was Christy Plank.  She was a dealer

15    clerk and she had the most knowledge of titles and

16    vehicle information, stuff like that so --

17    Q         And when did Christy Plank come on to your

18    office?

19    A         She was there when I took office.

20    Q         Okay.  When was she elevated to a position

21    of front-line supervisor?

22    A         Probably around 2016, '17.  I really --

23    Q         Okay.  And where in the organizational

24    chart does front-line supervisor relate to deputy

25    clerk?  Is the front-line supervisor below the deputy
```

1   clerk?

2   A        Well, no, they would be above.

3   Q        Okay.  I guess I'm really confused now.

4   A        So you would have me, the clerk.

5   Q        Okay.

6   A        My chief deputy, the front-line supervisor,

7   and then the deputy clerk.

8   Q        I gotcha.  So I -- I skipped a word.  And

9   the chief deputy is above the front-line --

10   A        Yes.

11   Q        -- supervisor?  Okay.

12         Do you know if you had any employment

13   issues during your term of Rowan County Clerk?

14   A        No.  I had good employees and, you know,

15   you deal with each personality on an individual basis,

16   and that's just how you do it.

17   Q        Well, did you have, like, formal employee

18   files?

19   A        I have -- yes.

20   Q        Okay.  Do you recall, as you sit here

21   today, putting any sort of negative or adverse

22   employment reference in anyone's file?

23   A        No.  Well, I had one little girl that

24   abused the internet and she was put on a PIP.  And --

25   and she continued so I had to let her go.  But she

1    didn't issue marriage licenses.  She was a back light.

2    She worked back in the fault doing -- she was working

3    on some chattel work for me --

4    Q        Okay.

5    A        -- title lien statements and stuff like

6    that.

7    Q        So in your entire tenure, that's the only

8    adverse employment action you took?

9    A        Yes.

10   Q        Okay.  And then, I guess, sort of implicit

11   in that answer is, did you have any problem employees

12   other than that one?

13   A        No.

14   Q        Okay.  So everyone did what you said?

15   A        Yeah.  They were good employees.

16   Q        Okay.  Now, with regard to those employment

17   decisions -- and you said something.  I think PIP.

18   How do you -- how do you know how to deal with

19   employees just because you got more votes than the

20   next guy?  Is there some sort of, like, welcome kit

21   that tells you how to do your job or --

22   A        No.  I mean, just years of experience and,

23   you know, you have to do what's best for the office

24   and -- and you have to consider all employees.

25   Q        Okay.  So there was no general guide on how

```
 1   to be --

 2   A          We have an administrative code.

 3   Q          Okay.  Is that what would have the PIP?

 4   A          Yes.

 5   Q          Okay.  And as far as the administrative

 6   code, I mean, it -- can you -- what does that look

 7   like?

 8   A          That's a document about that thick

 9   (gestures) that describes what's expected of an

10   employee, what their duties will entail, their

11   vacation, their sick time, how it's accrued, if

12   disciplinary action had to be taken.  It even talked

13   about if there was an issue with drugs or alcohol.

14   Talked about personal protection.  And then they had

15   to read it and sign it and, you know, say that they

16   understood, and that was put in their personnel file.

17   Q          Okay.  Who drafted that document?

18   A          It was one that -- it was similar to the

19   one that the state had, but I went online and looked

20   at it and tweaked it to make it what I needed to

21   reflect, you know, like with our personal days or our

22   sick days and vacation and stuff like that.  So I made

23   it -- I took a template and then made it fit and apply

24   to the office.

25   Q          Okay.  I guess, do you have access to that
```

```
 1   document still?

 2   A          Maybe at home.

 3   Q          Okay.  And what would it be called, like,

 4   if I was to --

 5   A          It's --

 6   Q          -- send your lawyers an email and say "Hey,

 7   can I get that thing Ms. Davis was talking about?

 8   It's called a" --

 9   A          I think the current clerk is actually using

10   the same one that I had.  But it is -- it's just an

11   administrative code, and it's actually on file with

12   the Rowan County Fiscal Court because I had to place a

13   file with them also -- a copy of it.

14   Q          Do you know if it's reviewed by anybody?

15   A          No.

16   Q          Okay.  All right.  Now, you took an oath of

17   office; is that correct?

18   A          I did.

19   Q          All right.  And that was the same oath --

20   oath of office they made me take whenever I became a

21   lawyer in Kentucky, I think.

22                   MR. MIHET:  Is there a question?

23                   MR. BUCKLES:  I'm slow.  It takes

24              me forever.  I'm getting fast, though.

25                   MR. MIHET:  Okay.
```

1   Q        All right.  That oath of office says that

2   you will support the Constitution of the United States

3   and the Constitution of this Commonwealth; is that

4   correct?

5   A        It is.

6   Q        All right.  Do you recall taking that oath?

7   A        I do.

8   Q        All right.  Is there anything in the oath

9   that stood out to you at the time or stands out now as

10  being particularly important to you?

11  A        Yeah.  I think at the end of it she said,

12  "So help you God."

13  Q        Okay.  And so why is that significant to

14  you?

15  A        Because that is my life.

16  Q        Okay.  And they capitalize the G in God.

17  Do you -- or do you recall -- or was it spoken to you?

18  A        It was spoken.

19  Q        Okay.  All right.  But you did take that

20  oath?

21  A        I did.

22  Q        And you sincerely tried to follow that

23  oath?

24  A        I did.

25  Q        Okay.  Now, at some point in your work as

1   Rowan County Clerk there became an issue -- or at

2   least you anticipated an issue about gay marriage.  Is

3   that a fair statement?

4   A           I knew the Obergefell decision was going to

5   be heard by the supreme court.

6   Q           Okay.

7   A           So, yes, it was very much in my mind and on

8   my heart.

9   Q           Okay.  When did you know that that was

10  going to happen or did you think that was going to

11  happen?

12  A           When I took office, we went to -- my -- my

13  son and I went to our first training, and it was on

14  January 21st at a clerks convention and -- or the

15  legislative meeting, and I got placed on a committee

16  to -- with other deputy -- with other clerks to form a

17  committee on the Obergefell decision and how same-sex

18  marriage could affect the clerk's office.

19              And when I came back from that meeting, on

20  the 23rd of January I sat down at my computer and I

21  got the email addresses of all the legislatures, our

22  senators and our representatives, and I fashioned an

23  email to them asking them to -- while there was still

24  time, to get a bill on the floor that would offer

25  clerks like myself that had a religious-held belief on

```
1   what marriage was to offer an accommodation to those

2   clerks so that they did not have to be -- you know,

3   compromise their -- their faith in lieu of, you know,

4   if the decision was -- was for Obergefell.

5   Q        Okay.  And you said Obergefell decision.

6   But this happened January 21st, thereabouts, of 2015

7   before the decision was rendered?

8   A        Yes.

9   Q        Okay.  So you were anticipating this

10  problem before it exists?

11  A        Yes, because they had, you know, advertised

12  on the news that it was going to be heard and, you

13  know, that it was something that was in the forefront

14  of my mind and --

15  Q        Okay.  Now, I think I've got just a -- a --

16  this -- this thing says "Dear Senator Robertson."  I

17  don't know who Senator Robertson is.  Do you know who

18  he is?

19  A        He is in the Ashland and Grayson area.

20  Q        Okay.  Is he your senator?

21  A        No, he's not.

22  Q        Okay.  And I guess -- did you send a letter

23  to every single --

24  A        Every single one.

25  Q        Reggie Thomas got one?
```

```
1    A          I sent them all.  Some -- his was an
2    individual one.  I don't know why.  But some of them
3    were sent in a group.  But all the ones that I could
4    get from the LRC website, I sent this exact same
5    letter to each and every one.
6    Q          Okay.  Now, I pulled this.  It's a dead
7    giveaway I pulled it off PACER because of the thing at
8    the top.  But outside of the gibberish at the top,
9    does that look about like the letter that you sent --
10   A          Yes.
11   Q          -- Senator Robertson?
12              And the content of that letter, is that the
13   same content that was sent to every single senator?
14   A          Yes.
15   Q          Okay.  So this is missing sort of the hints
16   that help me understand the date and time and beginning
17   and end.  And it doesn't really have an email address
18   or a date.  It doesn't have a signature.
19              But just so I understand, this is the
20   entire message you sent?
21   A          Yes, it looks like it.
22   Q          Did you sign it or type your name?
23   A          I probably did, yeah.
24   Q          Okay.  But it's not on this.  But it's
25   still -- the content's the same?
```

```
 1    A         Yeah, looks the same.

 2    Q         And then I can tell from the context it was

 3    before there was a decision.

 4    A         Right.

 5    Q         But do you know what date you sent this?

 6    A         This was done January 23rd.

 7    Q         Okay.

 8    A         I'm pretty -- pretty positive.

 9    Q         And that's 2015?

10    A         2015, yes.

11    Q         I guess we'll eventually get to this later.

12    But why did the legislature need to act?

13    A         Because there's no accommodation.  If the

14    Obergefell decision went that it would give gay

15    couples and lesbian couples a right to marry, there

16    was no -- there was no accommodation addressed.  There

17    was no accommodation available.  Because as a clerk,

18    you know, that's -- we issue the license.

19    Q         Okay.  So there's no accommodations for the

20    clerk?

21    A         Right.

22    Q         Okay.  And that's why the legislature

23    needed to do something?

24    A         Yes.  It had to be a legislative thing

25    because the statutes that run the clerk's office
```

```
 1    are -- they're -- you know, they're legislative.
 2    They're the ones that can enact and change and -- and
 3    control those.
 4    Q          Okay.  I guess, what would happen if the
 5    legislature didn't act?
 6    A          What happened.
 7    Q          Okay.
 8                    MR. BUCKLES:  And we're on -- is
 9               this 24?
10                    MR. GARTLAND:  I think you're up
11               to twenty -- 23 -- 24.
12                    MR. BUCKLES:  That's it.
13                    REPORTER:  This will be 24.
14                    MR. BUCKLES:  We'll use your copy.
15               Great.
16                    And that'll be --
17                    REPORTER:  Okay.
18                    MR. BUCKLES:  -- 24, and that's an
19               email sent January 23, 2015.
20                    (Said document is filed with this
21               transcript and marked Exhibit Number 24
22               for purposes of identification.)
23    Q          All right.  Now, how did you -- strike
24    that.
25                    Between the decision being published on
```

1    January 23, 2015, did you take any other action that

2    would relate to gay marriage or problems that might be

3    on the horizon?

4    A          The committee -- we just -- we -- we fasted

5    every Wednesday and we prayed about the situation.  We

6    were, you know, commune -- in communication at the

7    meetings, the -- the clerks monthly meetings.  They

8    would ask for updates and, of course, if there's, you

9    know, nothing -- nobody wanted to do anything to help

10   us solve the issue that maybe could arise.

11   Q          Okay.  Did you do anything else before the

12   publishing of the decision?

13   A          Not that I can recall.

14   Q          Okay.  Do you recall when the decision was

15   published?

16   A          June 26, 2015.

17   Q          Okay.  And how did you determine that it

18   was published?  How did you know?

19   A          Well, actually, I knew that the supreme

20   court was hearing the arguments that day, so I had the

21   TV on in our office, had it on CNN just kind of, you

22   know, trying to keep an eye on it.

23   Q          Okay.  So you were actively watching to see

24   what opinions would come out?

25   A          I wasn't actively watching.  I was working.

 1    And if I would walk through, I would stand at the TV,

 2    you know, coming through but --

 3    Q        Okay.  But, like, outside of, like March,

 4    did you-all ever have the TV on --

 5    A        Yeah.

 6    Q        -- in your office?

 7    A        Always.

 8    Q        Always had the TV on?

 9    A        Uh-huh.

10    Q        Okay.  But did you take particular notice

11    to care about what was going on in Washington DC that

12    day?

13    A        No.

14    Q        And I might have not been listening.  When

15    did you find out?  Do you know the exact time or

16    about?  Was it the morning or afternoon?

17    A        It was June 26th as soon as CNN announced

18    it.

19    Q        Okay.  Your book says like 10:00 a.m.  Does

20    that sound about right?

21    A        That's probably -- I think it was -- it was

22    in the morning, but I couldn't recall the exact hour.

23    Q        Okay.  And so what did you -- so what did

24    you do after you found out the decision was made?

25    A        I felt like -- it's hard to explain.

```
 1   Q          Well, I don't understand, so I guess --

 2   A          I know you don't.

 3   Q          -- that's why I'm trying to --

 4   A          So let me explain.

 5   Q          -- trying --

 6   A          I'll try.

 7   Q          Yeah.  I don't mean to be rude about it,

 8   but I don't --

 9   A          Yeah.

10   Q          -- I -- I imagine -- I don't doubt it's

11   difficult for you and -- but it's -- I've never been a

12   county clerk and so this isn't -- that's why I'm --

13   that's why I asked the question, I guess.

14   A          Okay.  My job as county clerk was very

15   important to me.  Forgive me.  I love it.  I was good

16   at it.  I got up every morning, was at work early,

17   stayed late, put in probably 60 hours or more a week

18   doing it.

19              And when this decision came down from the

20   supreme court, it addressed the -- the issue, yes, of

21   gay right marriage -- gay marriage rights, but it did

22   not address the issue or -- or talk about or discuss

23   giving someone like me who issues marriage license an

24   accommodation because of my religious beliefs.  I just

25   felt like I was mashed up against a wall, no place to
```

1  go, and I had two choices.

2  Q        And what were your two choices?

3  A        The two choices I had was to deny my God

4  and what I know is true and right in my heart and in

5  my life or follow a supreme court order.

6  Q        I mean -- and I don't -- I obviously am an

7  attorney for David Ermold and David Moore and -- but I

8  recognize there's another option.

9        There's at least three options there.  One

10  would be to resign.  I mean, did you ever give that --

11  that idea any merit?

12  A        I didn't think I could resign for the

13  simple fact that the people had just elected me and I

14  didn't think I should have to because there's

15  accommodations that are offered to every religion out

16  there for different situations.  You know, if a Muslim

17  doesn't want to do a certain thing or if a Jew doesn't

18  want to handle pork or -- you know, there's a lot of

19  different accommodations and our constitution calls

20  for accommodations, the Kentucky Constitution calls

21  for accommodations for religious reasons.  And I

22  didn't understand why that would not apply to me.

23  Q        Okay.

24  A        And that's what I sought from the very

25  beginning.

1  Q        And were you granted an accommodations?

2  A        After the fact, the -- the Governor-elect

3  changed the form that removed my name -- the county

4  clerks' names and the authorization, and then I'm fine

5  because I'm no longer the authorizing agent of that

6  license; the state is.

7  Q        Okay.

8  A        I wish it was as black and white as what

9  you think it seems, but it wasn't.

10  Q        You say that the constitution allows for

11  accommodations.  Where does the constitution allow for

12  accommodations?

13              MR. MIHET:  Objection.  Calls for

14          a legal conclusion.

15              You may answer, if you can.

16  A        The First Amendment, for one, gives me the

17  right to free exercise of my religion, does it not?

18  Q        Well --

19              MR. MIHET:  You can't ask him

20          questions.

21  Q        Well, I mean, do you know what the First

22  Amendment says?  Have you read the First Amendment?

23  A        I have.  I don't know it word-for-word,

24  sir.

25  Q        Okay.  Do you know the first word in it?

1    It's congress.  So you believe -- believe the First

2    Amendment gives you the right to practice -- well, you

3    tell me.

4            What does the First Amendment provide you

5    with in regard to your free exercise of religion?

6                MR. MIHET:  Objection.  Asked and

7            answered and calls for a legal

8            conclusion.

9              You may try to answer, if you can.

10   A      The First Amendment allows me the right to

11   practice my religion with the freedom of -- just the

12   freedom to do that.

13   Q      Okay.  So if -- if I am pro life and that's

14   a religious belief that I hold and my federal

15   government gives tax dollars to execute people on

16   death row, can I withhold paying taxes because I

17   disagree with that?

18                MR. MIHET:  Objection.  Calls for

19            a legal conclusion.

20   A      I guess if you wanted to try it, you

21   probably could.

22   Q      Okay.  But is that the free exercise of

23   religion, I guess?  I mean, does our government do

24   things that interfere with things that we might hold

25   dear in our heart but we have to do it because it's

1    part of being a civil society?

2                        MR. MIHET:  Objection.  Calls for

3                        a legal conclusion.

4    A        The constitution is here to protect all

5    rights.

6    Q        Okay.  From infringement from the

7    government.  And I guess my question to you, as Rowan

8    County Clerk, are you the government in your capacity

9    as Rowan County Clerk?

10                       MR. MIHET:  Objection.  Calls for

11                       a legal conclusion.  Also object to the

12                       form.

13   A        I was a part of a collective government,

14   yes, as an elected official.

15   Q        What is the collective government?  I don't

16   understand.

17   A        That would be all county offices, county

18   attorney, county judge, PVA, county sheriff, myself,

19   coroner, all the magistrates.

20   Q        And you-all are the government?

21   A        For that county, the elected officials.

22   Q        Okay.  And then so does that county -- the

23   individual members of that collective get to establish

24   the religion that Rowan County follows?

25                       MR. MIHET:  Objection to form.

```
1                    Calls for a legal conclusion.

2    A          No.

3    Q          Okay.

4    A          That's up to each individual.

5    Q          But I guess if certain individuals

6    represent the county collective, then they're -- you

7    understand the problem there?  At some point if you're

8    just -- you get more votes, you're like -- your

9    religion gets to win.  Is that how it works in your

10   understanding?

11                    MR. MIHET:  Objection to form.

12                    Calls for a legal conclusion.

13   A          Sir, I was elected as the county clerk.  I

14   was a good deputy, I was a good chief deputy, and I

15   was a good clerk.  I just happen to be a Christian.

16   Q          Okay.  So I take it from your testimony and

17   your position that you have been victimized by the

18   supreme court?

19                    MR. MIHET:  Objection to form.

20                    Argumentative.

21   A          I'll tell you what I feel that I was.  I

22   don't feel the -- the issue -- when the Supreme Court

23   handed down their decision, yes, they gave gay and

24   lesbian couples the right to obtain a marriage

25   license, but it did not touch, talk about, or even
```

```
1    discuss when their right to marry collided with my
2    right to hold true to what I believe.  That's what it
3    did.
4    Q          Okay.
5    A          They came and collided together and there
6    was no remedy written.  There was no remedy given.
7    Q          Okay.  And I'm going to put the cart before
8    the horse.  But in that collision and ultimately you
9    denying my clients a marriage license, did you put
10   your beliefs ahead of their right to have a marriage
11   license?
12                    MR. MIHET:  Objection to form.
13   A          I don't think so, and I'll tell you why.
14   When your client, Mr. Ermold and Mr. Moore, came into
15   my office to seek a marriage license, he asked me --
16   Mr. -- Mr. Ermold asked me why I could not give him a
17   marriage license, and I proceeded to tell him why I
18   could not.
19                    And I told him that in the beginning God
20   spoke everything into existence.  I believe that.  But
21   when it came to a man, he reached in the dust of the
22   ground and he formed him in his own image and he
23   breathed the breath of life into him.  He saw that it
24   was not good for man to be alone so he put him in a
25   deep sleep and he made him a woman and he told them to
```

1    be fruitful and multiply.  That was when marriage came

2    into existence.  And I can't change what I believe.

3              Mr. Ermold got so mad.  He told me, "Don't

4    preach to me."

5              And I said, "I'm not preaching.  You asked

6    me why I could not give you a license.  And I can't."

7    Q         Okay.  Mr. Ermold and Mr. Moore went --

8    well, strike that.

9              Did you receive a letter from Steve Beshear

10   on June 26, 2015, in your capacity as Rowan County

11   Clerk?

12   A         Yes.  He sent this to every clerk.

13   Q         Okay.  Did you read it?

14   A         I did.

15   Q         Okay.  Is this a true and accurate copy of

16   it?

17   A         It seems to be.

18   Q         Okay.

19                   MR. BUCKLES:  We'll call that 25.

20                   (Said document is filed with this

21              transcript and marked Exhibit Number 25

22              for purposes of identification.)

23   Q         I'll give you another exhibit so we can --

24   and that's the same version.

25              And did you read that and understood what

```
 1   it meant -- or at least what Governor Beshear's

 2   position was on gay marriage?

 3   A          Oh, yeah.

 4   Q          Did you agree with the letter?

 5   A          No.

 6   Q          Okay.  What did you do in relation to the

 7   letter or to the policy or the decision as it relates

 8   to issuing the marriage license in Rowan County?

 9   A          We stopped issuing a license to everybody.

10   Q          Why did you do that?

11   A          Well, for one, I didn't want to discriminate

12   against anybody because that's not my nature.  And,

13   secondly, the supreme court had said that our

14   constitution wasn't right and it needed to be

15   addressed, and I think that can only be done through

16   legislation and that's why I had proposed to the

17   legislators in January to do something.

18   Q          Okay.  Was it your decision to institute

19   that policy in Rowan County?

20   A          It was.

21   Q          Was it anyone else's decision?

22   A          No.

23   Q          Did you discuss it with anyone else?

24   A          I prayed a lot about it, sir.

25   Q          Okay.  So I guess beyond --
```

```
1    A          Me and the Lord.

2    Q          -- beyond talking to the Lord, did you talk

3    to anyone else about it before you issued the policy?

4    A          Beside the other clerks that were in my --

5    that committee that we had.  We had all discussed what

6    we were going to do --

7    Q          Okay.

8    A          -- if something happened, you know --

9    Q          Who were the members of that --

10   A          -- because we were all --

11   Q          -- of that committee?

12   A          It was Wolfe County Clerk, Casey County

13   Clerk -- it was Casey Davis, Chris Wall, Lynn

14   Hasslebrock and Chris -- he's the Montgomery County

15   Clerk.  I can't remember his last name -- and then

16   myself.

17   Q          Okay.  Did you talk to any of those

18   individuals on June 26th of 2015?

19   A          I honestly can't remember.

20   Q          Okay.  Do any of those individuals -- do

21   they create Rowan County Clerk policy?

22   A          No.

23   Q          Okay.  So as -- as we sit here, besides

24   discussions with the Lord, I mean, it's your policy?

25   You're the only person that made it?
```

```
1    A          Yes.

2    Q          Okay.  And what gave you the authority to

3    make that?

4                     MR. MIHET:  Objection.  Calls for

5                a legal conclusion.

6    A          My beliefs, not wanting to harm anybody,

7    not wanting to discriminate.  I felt it was the only

8    fair thing to do until we could get an accommodation.

9    Q          Okay.  And that policy, what was the date

10   it was created?

11   A          I spoke to my deputies the 26th after we

12   closed.

13   Q          2015?

14   A          (Witness nods affirmatively.)

15   Q          Is it fair to say it was direct relate --

16   reaction to the Obergefell --

17   A          Yes.

18   Q          -- decision?

19   A          But they knew that we -- we had talked

20   about it before, about the decision, but not -- not

21   what would happen.

22   Q          Okay.  Was there any protest from any of

23   the deputy clerks?

24   A          No.

25   Q          Do you recall any conversations you had
```

1    with them at all about it?

2    A          No, just other than, as of right now Rowan

3    County won't be issuing any more marriage license to

4    anybody.

5    Q          Okay.  Did they question you why?

6    A          No.

7    Q          Okay.  Did the policy go into effect on the

8    26th or on the --

9    A          27th.

10   Q          -- the 27th?

11   A          That next day.

12   Q          Okay.  Why was that?

13   A          Because I had talked to my deputies after

14   we had closed probably and just told them effective,

15   you know, from now on.  So the 27th is when it really

16   took effect.

17   Q          All right.  Now, do you recall how -- how

18   many instances my clients came to get a marriage

19   license from you?

20   A          I think I personally talked to them maybe

21   two -- two times that I remember.  The first time they

22   came in they went to Missy, and then the second time

23   that I remember seeing them.

24   Q          Now, let's just go through it with -- with

25   actual dates and specifics.

```
 1   A          Okay.  I won't be able to remember dates.

 2   Q          The comp -- the amended complaint says on

 3   July 6, 2015, they entered the Rowan County Clerk's

 4   Office.  And do you know that to be accurate?

 5   A          I couldn't tell you the date, sir.

 6   Q          Okay.

 7   A          I remember what I had on.

 8   Q          Okay.

 9   A          But I don't remember the date.

10   Q          All right.  Do you have any knowledge that

11   it wouldn't be July 6th?

12   A          If they said it was the 6th, it probably

13   was the 6th, sir.

14   Q          Okay.  And you said they talked to Missy?

15   A          She was directly -- she sat right directly

16   when you come into the door.

17   Q          I gotcha.

18   A          She worked right up front.

19   Q          And Missy was your employee?

20   A          Yes.

21   Q          She was a front-line --

22   A          She was a deputy, uh-huh.

23   Q          Okay.  And did you -- prior to that, did

24   you tell Missy of your policy of not issuing marriage

25   licenses?
```

```
 1   A          Yes.  She knew and all the deputies knew.

 2   Q          Okay.  And what did Missy say, if you know?

 3   A          She said, "Okay."

 4   Q          Okay.  With regard to Ermold and Moore,

 5   what did she say?

 6   A          She told them, I do believe, that we

 7   weren't issuing license.

 8   Q          Okay.  And do you approve of that statement?

 9   A          Yeah.

10   Q          Okay.  I mean, is that consistent with

11   policy that you created?

12   A          Yes, that we weren't issuing any license.

13   Q          Okay.  And, as you sit here today, do you

14   think that Missy appropriately handled that situation?

15   A          Yeah, as best she could.

16   Q          Okay.  Did they ask to speak to you on that

17   day?

18   A          They did.

19   Q          Did you speak to them?

20   A          I did.

21   Q          Okay.  And do you -- what do you recall

22   about that conversation?

23   A          I remember him waiving the Obergefell

24   decision in my face and slapping it down in front of

25   me on the counter and said, "Read it.  Read it.  I
```

1   have the" -- "we have the right, and I want to know

2   why you won't give us a marriage license."  He said,

3   "Tell me why."

4           And that's when I proceeded to tell him

5   what I had told you earlier.  And he got mad and he

6   told me not to preach to him and that he wanted a

7   license.

8           And I told him -- I said, "Sir, if what

9   you're trying to accomplish is to get a marriage

10  license," I said, "you can go to any of the

11  surrounding counties and you can get a marriage

12  license today."

13          And -- but he didn't want to hear that.  He

14  wanted me to issue him a license and he wanted -- he

15  wanted to get it from my office.

16          And I just told him -- I said, "I'm sorry,

17  but we are not issuing licenses today."

18  Q       Okay.  What is the statutory requirement to

19  receive a marriage license?

20  A       Kentucky state statute still says that it

21  must be between one man and one woman.

22  Q       But what do you need to show up with?  15

23  bucks?  Or what's the --

24  A       35.50.

25  Q       35.50?

```
 1   A          Uh-huh.

 2   Q          Do you have to not be cousins or is that --

 3   A          Can't be greater than second cousins and

 4   have to be a certain age and --

 5   Q          Okay.  Did you ask them if they had the

 6   financial resources or did you ask them --

 7   A          No, because --

 8   Q          -- about their relation?

 9   A          Huh-uh.

10              MR. MIHET:  Try and let him finish

11                  his question first.

12              WITNESS:  Oh, I'm sorry.

13   Q          And do you know if Missy asked them if they

14   had the fee or the -- if they were too closely

15   related?

16              MR. MIHET:  Objection.  Calls for

17                  speculation.

18   A          I don't know.  I can't answer for her.

19   Q          Is it the policy to ask if you meet the

20   requirements for a marriage license before issuing it?

21   A          No, not unless there's something obvious,

22   like, age.  If someone looked real young, we would ask

23   for proof of age.

24   Q          Okay.  And this is just a tangent.  In,

25   say, February of 2015, two people, a man and a woman,
```

1    come to get a marriage license in Rowan County, you

2    wouldn't ask them if they were closer than second

3    cousins or you --

4    A        We ask -- the question is actually on the

5    form itself.  "Are you related?"

6    Q        Okay.

7    A        So that's a part of the application

8    process.

9    Q        Okay.  So did you get that process out with

10   David Ermold and David Moore?

11   A        No.

12   Q        Okay.  Now, they returned again on

13   August 13th of 2015.  Do you recall that date?

14   A        If that's the date they said they came.

15   Q        You'd have no reason to dispute --

16   A        I have no --

17   Q        -- that date?

18   A        -- reason to dispute, no.

19   Q        You were the Rowan County Clerk on that

20   date?

21   A        Yes.

22   Q        All right.  Do you recall if you were there

23   on that date, the second occasion?

24   A        I couldn't tell you.  Unless I was at a

25   meeting, I was there in my office.

```
 1    Q         Do you work every day?

 2    A         Yes.

 3    Q         Did you ever take any vacations?

 4    A         No.  Very seldom ever.

 5    Q         Okay.  Sick days?

 6    A         (Witness shakes head negatively.)

 7    Q         You have to verbalize an answer.

 8    A         Oh.  No.  Sorry.

 9    Q         Okay.  So if it was -- if the office was

10    open, you were there?

11    A         Yes, sir.

12    Q         Unless you were at a specific meeting?

13    A         Yes.

14    Q         Okay.  So on August 13, 2015, they were

15    denied a license.  Is that accurate?

16    A         If that's what they testified to, I would

17    assume that would be correct.

18    Q         Okay.  Do you recall which clerk they

19    talked to?

20    A         Maybe Brian.  I don't know.

21    Q         Okay.  Who's Brian?

22    A         He's the gentleman who sits next to Missy.

23    Q         Okay.  And is he a deputy clerk?

24    A         He is.

25    Q         A front-line deputy clerk?
```

```
 1    A          Yes.

 2    Q          All right.  Did he issue them a license on

 3    that date?

 4    A          No.

 5    Q          Why not?

 6    A          We still had not received an accommodation

 7    and we still had -- nothing had been tended to by our

 8    legislature and we just -- we continued our policy.

 9    Q          Okay.  The policy you created?

10    A          Yes.

11    Q          And Brian faithfully carried out that

12    policy on August 13, 2015, at your direction?

13    A          If they went to him and -- yes.

14    Q          Okay.  Okay.  What about on September 1,

15    2015?  The amended complaint says "Plaintiffs

16    attempted to get a marriage license from Davis on

17    September 1, 2015, and the license was denied."

18               Do you recall that date?

19    A          That would be after the injunction had

20    expired --

21    Q          Okay.

22    A          -- is that correct?

23    Q          September 1, 2015.  I don't --

24    A          Because it ran out, I think, on

25    August 31st.
```

```
 1    Q          Just if -- if you don't know, you don't
 2    know.  But the complaint says --
 3    A          I would assume that would be true.
 4    Q          Okay.  And so it says they attempted to get
 5    a marriage license and were denied.  Do you recall
 6    that date?
 7    A          I -- I think I do.  I remember that day.
 8    Q          All right.  Do you know who assisted them
 9    on that date?
10    A          They went to a -- to a place that didn't
11    have a deputy, and I stepped in -- maybe Missy was
12    there at the time also.  But they wanted to speak to
13    me so I -- I talked to them.
14    Q          Okay.  And what was that conversation
15    about?
16    A          They did a lot of yelling at me and were
17    very mad because I was still not issuing a marriage
18    license to any couples.  And they made fun of my hair,
19    the way I dressed, and they asked me whose -- under
20    whose authority was I not issuing a license.  And I
21    said under God's authority.  And he told me --
22    Mr. Ermold -- "I don't believe in your God."  And I
23    said, "Sir" -- best I remember -- "we're not issuing a
24    license today."
25    Q          And that was the extent of that
```

```
 1    conversation?

 2    A          The best I can remember, sir.

 3    Q          Okay.  Now, plaintiffs were finally issued

 4    a marriage license on September 4, 2015, by Rowan

 5    County Deputy Clerk Brian Mason.  And do you recall

 6    September 4, 2015?

 7    A          Yeah.  I was in jail then.

 8    Q          Okay.  All right.  Well, let me jump back

 9    to the previous question, September 1, 2015, where

10    they had a discussion with you and they were -- they

11    don't believe in the same God or -- or something like

12    that.

13               Did you deny the license based upon the

14    policy you created?

15    A          I did.  There was no accommodations

16    available for me.

17    Q          Okay.

18    A          I had asked.  There was nothing.

19    Q          And then so this is where we were

20    discussing the rock and a hard place situation by not

21    issuing the license.  I mean, you -- you had to pick

22    your faith and your belief over their fundamental

23    right to marry.  Is that --

24    A          No.  What I --

25                         MR. MIHET:  Objection.  Objection
```

```
 1                     to form.  Calls for a legal conclusion.
 2                     WITNESS:  Can I answer?
 3                     MR. MIHET:  If you can.
 4     A        What I did -- you have to understand this
 5     has never been a gay and lesbian issue for me ever.  I
 6     have gay friends.  I have lesbian -- I've laid hands
 7     on them and I've prayed for them for God to heal their
 8     bodies.  It's never been a gay or lesbian issue for
 9     me.
10               I simply wanted to be able to do my job and
11     not have to compromise what I believe in.  There
12     should have been an accommodations that was available
13     for me from the very beginning.  I asked.  I begged
14     for it.  I beseeched them to do something so that this
15     would not happen.
16               So, for me, it was a very clear heaven or
17     hell issue.  You may think that that's ludicrous and
18     that's okay.  That's yours to think.  But, for me, it
19     was a heaven or hell issue because if I live by the
20     tenets of the Bible and believe the Word of God is --
21     my moral compass is -- is led by that.  For me, I
22     couldn't -- there was no way.
23     Q        Okay.  So as it relates to the heaven or
24     hell issue, I mean, what -- what did you choose?
25     Heaven or hell?
```

```
 1    A          I choose to obey God.

 2    Q          So heaven?

 3    A          Yes.

 4    Q          Okay.  What was the hell decision just so I

 5    understand?

 6    A          The hell decision would be to capitulate to

 7    their demands even though I knew it wasn't right and

 8    to let my name be affixed to a license or an

 9    application that would say that they were

10    authorized -- that they met the requirements of what a

11    marriage is.

12    Q          Okay.  So "Capitulate to their demands."

13    Who are the "their"?

14    A          To the demands that Mr. Ermold and

15    Mr. Moore were asking of me.

16    Q          But also Mr. Beshear?

17    A          Sure.

18    Q          And at least five people in robes?

19    A          Yes.

20    Q          So you chose to deny the license over their

21    wish to get married?

22    A          I chose to stand for what I believe, which

23    is natural marriage, not so much -- I wasn't against

24    them, but I stood for natural marriage.

25    Q          I understand.  And I'm not trying to -- I'm
```

```
 1   just trying to -- on the issue of -- you say "heaven
 2   or hell."  And so heaven is following your belief.
 3   Hell is doing what the supreme court, Governor
 4   Beshear, Mr. Ermold --
 5   A        Uh-huh.
 6                  MR. MIHET:  Let him finish.
 7   Q        So my question is, you had a choice to do
 8   what you believe is right in your -- based upon your
 9   moral compass or do what the law said needed to be
10   done, and you picked your belief over that.  Is this a
11   fair assessment?
12                  MR. MIHET:  Objection to form.
13                  Mischaracterizes the testimony and
14                  calls for a legal conclusion.
15                  Go ahead, if you can.
16   A        I chose to obey God.
17   Q        That's not the question.  Heaven or hell.
18   You picked heaven --
19   A        I did.
20   Q        -- is what you said.  Okay.
21            And so if we remove the heaven or hell
22   labels, heaven is following your beliefs, hell is
23   following the legal requirements, you chose your
24   religious beliefs over the legal requirements?
25                  MR. MIHET:  Objection to form.
```

```
 1                     Asked and answered.  Mischaracterizes

 2                     the witness's testimony.

 3                          MR. BUCKLES:  It's never been

 4                     answered.  I guess that's my issue.  I

 5                     just want the question answered.

 6    Q          When you say "heaven or hell," I get it.

 7    It's catchy.  I want to know -- outside of that

 8    nomenclature, you picked your beliefs over the

 9    requirements of the law.  Simple question.  Is that

10    correct?

11                          MR. MIHET:  Objection.  Asked and

12                     answered.  Form.  Calls for a legal

13                     conclusion.

14    A          You know, my main goal in life is to make

15    heaven my home.  So I chose to stand for what I

16    believe in --

17    Q          Okay.

18    A          -- over something -- a law that was

19    contrary to what I believed in.

20    Q          Still not really answering my question.

21    All I want -- you chose your beliefs over the

22    requirements of the law; is -- is that correct?

23                          MR. MIHET:  Objection.  Calls for

24                     a legal conclusion.  Asked and

25                     answered.
```

1   A         I chose to stand for what I believe in over

2   what was contrary to that.

3                   MR. MIHET:  Counsel, that --

4                   you've asked the question many times.

5                   That's her answer.  If you don't like

6                   it, you don't like it.  But she's not

7                   going to give you a different answer if

8                   you ask the question another five

9                   times.

10                   MR. BUCKLES:  I don't believe

11                   she's asked the -- she's answered the

12                   question.

13                   MR. MIHET:  She has.  I think

14                   we're approaching harassment at this

15                   point.

16                   MR. BUCKLES:  Okay.

17   Q         Did any of your deputies ask for an

18   accommodation from the policy to not issue licenses?

19   A         Did they ask for an accommodation from me

20   so that they could issue the license?

21   Q         Yes.

22   A         No.

23   Q         Did any deputy -- or strike that.

24             I said "deputy."  I meant to just say

25   employee, generally.  If I say "deputy," I think of

```
 1   just --

 2   A         It covers --

 3   Q         -- any employee --

 4   A         -- all of them.

 5   Q         -- that worked in your office -- say, "I

 6   think you got this policy wrong"?

 7   A         No.

 8   Q         Okay.  Did they say, "I have a different

 9   feeling about this"?

10   A         Brian Mason was the only one that said he

11   would be willing and able and would issue the license,

12   but he was with me 100 percent to get the accommodation

13   because he didn't want me to violate myself either or

14   violate my conscience.

15   Q         How did he communicate that to you?

16   A         With his words.

17   Q         Do you know on what day or in about what

18   time frame?

19   A         No.  No.  I couldn't tell you an exact day.

20   Q         Okay.  Do you know where he told you?  Was

21   it in --

22   A         In my office.

23   Q         Okay.  Was it before you went to jail?

24   A         I can't recall, sir.

25   Q         Did you make a note in any file or in any --
```

```
1    A        No.

2    Q        Now, you sent a letter -- a letter to

3    Governor Beshear on July 8, 2015; is that correct?

4    A        Yeah.  There was a bunch of clerks that

5    sent it.

6    Q        I guess my question is, did you send a

7    letter on --

8    A        I did, yes.

9    Q        -- July 2015?

10             MR. MIHET:  Let him finish.

11   Q        Is this a copy of the letter?

12   A        It's on my letterhead, yes.  It's my

13   signature, yes.

14   Q        Okay.  What was the purpose of this letter

15   to Governor Beshear?

16   A        Asking him to call a special session so

17   that we could get any -- a -- an accommodation.

18   Q        Okay.  And why did you think that the

19   special session was necessary?

20   A        Because without a special session, the

21   issue would never be resolved.  Clerks like myself

22   that had deeply held religious convictions were still

23   going to be faced with this issue of affixing their

24   name to a license for a marriage that wasn't how we

25   believed marriage is.  By what the -- you know, what
```

1    the Word of God says, a natural marriage.

2    Q        Okay.

3                    MR. BUCKLES:  We'll label this --

4                identify this as Number 26.

5                    (Said document is filed with this

6                transcript and marked Exhibit Number 26

7                for purposes of identification.)

8    Q        Did you read the Obergefell decision?

9    A        I did.

10   Q        Okay.  What do you take from it?

11   A        I don't know.  It was just a -- I thought

12   the dissents were pretty clear.

13   Q        In what way were the dissents pretty clear?

14   A        Well, what they said was going to happen

15   did happen, that the perceived right that was given

16   into the 14th Amendment with this decision would clash

17   with the First Amendment right.  I'm just speaking out

18   of just --

19   Q        Sure.

20   A        I know that's not, you know, how they

21   actually worded it, but -- and, you know, that's

22   exactly what happened.

23   Q        Okay.  As Rowan County Clerk, what did you

24   interpret the supreme court ruling to do to your job?

25                    MR. MIHET:  Objection to form.

```
 1                    Calls for a legal conclusion.
 2   A           It -- it put me in a place that I didn't
 3   want to be.  You know, I've been painted out to be a
 4   whole lot of things:  Nasty, mean, and vile.  I've
 5   been called everything under the sun, had death
 6   threats.  And even now, you know, I don't -- it put me
 7   in a place where I feared for my life, my family.  It
 8   put me in a place where I had to tell good friends
 9   that I could not issue them a marriage license.
10   Q           I guess my question is, did the Obergefell
11   create the fundamental right for gay couples to marry?
12                    MR. BUCKLES:  Objection to form.
13                    Calls for a legal conclusion.
14   A           It said they did have the right to marriage,
15   but it did not address the fact that there would be
16   people like me.  It didn't tell where they could go
17   get their license, who would be issuing those license,
18   and it didn't address someone like me who loved their
19   job, who begged for an exemption or a -- an
20   accommodation.  Yeah, it told them they could get a
21   license.
22   Q           Okay.  And you understood that to be the --
23   the impact of the decision?
24                    MR. MIHET:  Objection.  Asked and
25                    answered.  Form.  It calls for a legal
```

```
 1              conclusion.
 2   A          That decision changed my life forever.  I
 3   don't care what anyone does in their home.  I don't
 4   care.  I just didn't want to be a party to it.  I
 5   didn't want to have my name on it.  I didn't want to
 6   have my authorization on it.
 7                   MR. BUCKLES:  I think we'll take a
 8                   break if it's a good time and then
 9                   we'll at least be probably in a
10                   position where we can change hands or
11                   wrap it up shortly after.
12                   (A break was taken.)
13   Q          All right.  Ms. Davis, did you ever
14   confront Mr. Moore or Mr. Ermold about their
15   qualifications for getting a marriage license?
16                   MR. MIHET:  Object to the form.
17   A          I didn't confront them at all.  They were
18   very confrontational with me.  I just -- I tried to be
19   as kind as I could and in the same time to, you know,
20   let them know that I could not issue -- they were
21   not -- we were not issuing a license to anybody at
22   that time until an accommodations could be received.
23   Q          Did you consider the hardship to Mr. Moore
24   or Mr. Ermold when making your policy?
25                   MR. MIHET:  Objection to form.
```

```
 1   A          I -- I told them that, you know, if what
 2   they were trying to accomplish was to get a marriage
 3   license -- I gave them options, you know, but they
 4   didn't -- they didn't want those.
 5   Q          I guess my question is, did you consider
 6   the hardship to them when making your policy?
 7                     MR. MIHET:  Objection.  Asked and
 8                answered.
 9   A          I didn't know that they themselves would be
10   the ones there in front of me, so, no, I guess I
11   didn't.  You know, I didn't know who was going to be
12   standing in front of me asking for those license.  So
13   when you ask me if I have considered their hardship --
14   Mr. Ermold and Mr. Moore's -- no, because I had never
15   seen them before.  I had never met them before.
16   Q          Okay.  Did you consider the hardship to
17   other individuals in Rowan County when making your
18   policy?
19                     MR. MIHET:  Objection.  Asked and
20                answered.
21   A          I didn't really think it would be a
22   hardship if they could go to the next county over, if
23   what they were trying to get was a -- a marriage
24   license.  If it was -- you know, if that was their
25   main objective.
```

```
 1   Q          So you didn't consider the hardship?
 2                    MR. MIHET:  Objection.  Asked and
 3               answered.  Misstates and
 4               mischaracterizes the witness's just
 5               prior testimony.
 6   Q          Is that correct?  You didn't consider --
 7                    MR. MIHET:  Same objection.
 8   Q          -- the hardship?
 9   A          Like I answered before, I didn't think
10   there would be an inconvenience or a hardship if what
11   they were trying to achieve -- if any of the couples
12   that were trying to achieve could go to the following
13   count -- could go to another county -- a neighboring
14   county until I could get an accommodations.
15   Q          Okay.  You indicated that gay marriage
16   conflicts with your biblical understanding of
17   marriage.  What is that biblical --
18                    MR. GARTLAND:  Tenets.
19   Q          "The tenets of the Bible" is your
20   testimony.  My co-counsel's reminding me of the quote.
21               What are the tenets of the Bible with
22   relation to marriage?
23   A          That marriage is between one man and one
24   woman for life.
25   Q          Okay.  Are those all the tenets of marriage
```

1    in the Bible that you rely on?

2    A         It says that a --

3                    MR. MIHET:   Objection to form.

4    A         Says that a -- a man shall -- they'll leave

5    their family and they'll cling to each other and

6    become one with his wife.

7    Q         Okay.  And then -- so you said -- "for

8    life" was the last part of the phrase --

9    A         Yes.  And I --

10   Q         -- you said.

11   A         -- do need to make a clarification for the

12   record and on the record since you have approached

13   this subject.  I -- when you were talking about court

14   proceedings earlier about giving testimony or

15   depositions or whatever, I -- I have been involved in

16   some family court.

17   Q         Okay.

18   A         And I want that on -- on the record.

19   Q         Okay.

20   A         Please.

21   Q         So we can go back to that.  I'm not so

22   concerned about that in particular, but I am as it

23   relates to the tenets of the Bible, you know.  And so

24   I guess we're talking about divorce.  Is that --

25   A         Yes.

```
1    Q          Okay.  And so a tenant of marriage -- a
2    biblical tenant of marriage is married for life, which
3    would not include divorce?
4    A          Right.  There are certain grounds for
5    divorce in the Bible.  It gives the grounds of
6    fornication and adultery.
7    Q          Any others?
8    A          I mean, there's, you know, if a -- an
9    unbelieving spouse wants to stay with his wife, he can
10   if you're unequally yoked.  I mean, there's just
11   different -- it's talking about spiritually.
12   Q          Okay.  So do you inquire into marital
13   status of people -- well, strike that.
14              When you were Rowan County Clerk, did you
15   inquire into those biblical grounds with relation to
16   whether or not to issue a marriage license?
17   A          If you're asking me if divorce would cause
18   me not to issue someone a license, no, it did not.
19   But the question of how many previous marriages have
20   you had is on the license itself.
21   Q          Okay.  But as far the biblical tenets?
22   A          Usually, those -- before Obergefell
23   decision came down, it was never an issue.  They were
24   always a man and a woman standing in front of me.
25   Q          Okay.  But you wouldn't ask --
```

```
1    A          No.

2    Q          -- the man or woman if they had previously

3    had a marriage end in unfaithfulness of a partner

4    or --

5    A          No.  We asked how many previous marriages.

6    That was on the -- the actual license itself.

7    Q          Okay.  So there are aspects of the biblical

8    tenets that you didn't inquire about?

9                    MR. MIHET:  Objection to form.

10   A          On the application itself for marriage the

11   question reads "How many previous marriages?"  And we

12   didn't ask.  That's not my business.

13   Q          Why is it not your business?

14   A          Because it doesn't state on the license or

15   the application how many ended in divorce because of

16   fornication, how many ended in divorce because of

17   adultery, how many ended in divorce because of, you

18   know, whatever.

19   Q          But you are authorizing the marriage

20   license; correct?

21   A          Right, between one man and one woman.

22   Q          Okay.  But could have ended without --

23   could be a second marriage that didn't end under

24   biblical terms.  Would that cause --

25   A          That's between --
```

```
 1    Q           -- the heaven and hell issue --
 2                     MR. MIHET:  Let him finish his
 3              question.
 4                     WITNESS:  Okay.  Sorry.
 5    Q           Is that a heaven or hell issue for you?
 6    A           That's between the -- the individuals and
 7    God.  That is a man and a woman who -- their marriage
 8    could not survive for one reason or the other.  My
 9    issue was with the one man and one woman definition is
10    how -- the natural marriage.
11    Q           So is there parts of the Bible that discuss
12    annulment or divorce or what?
13    A           It talks about bills of divorcement.
14    Q           Okay.  But you don't really care for
15    purposes of being the Rowan County Clerk how the
16    divorce happened?
17    A           No.
18    Q           And you'd never asked anyone about that?
19    A           No.
20    Q           Your only issue is that two men can't get
21    married because it doesn't meet your belief --
22                     MR. MIHET:  Objection.
23    Q           -- your Christian belief?
24                     MR. MIHET:  Objection to form.
25              Misstates the witness's testimony.
```

1    A          The Bible calls -- that marriage is a -- I

2    mean, even our state stat -- our state constitution

3    calls that marriage is recognized as between one man

4    and one woman.

5    Q          Okay.  So with regard to your own divorces,

6    did you get those annuled?

7    A          No.  They were divorce and marriage before

8    I got in church.  They were before I started living

9    for the Lord.

10   Q          Okay.  And I guess you believe in

11   forgiveness as part of your religious belief?

12   A          Most definitely, sir.

13   Q          And as you previously said with regard to

14   couples -- a man and a woman who would get married

15   under terms that might not meet the strict biblical

16   definition that that's between them and God.  Is that

17   a fair statement?

18   A          A man and a woman, yes.

19   Q          Okay.  Can a man and a man get married and

20   take that up with God or is that -- in your belief?

21                    MR. MIHET:  Objection to form.

22   A          The Bible plainly states that marriage is

23   between one man and one woman.

24   Q          Okay.  And so that's unforgivable, to be a

25   homosexual?

```
 1                    MR. MIHET:  Objection to form.

 2              Argumentative.

 3   A          Listen, every person knew Mr. Ermold,

 4   Mr. Moore, Mr. Yates and Mr. Smith -- everybody in

 5   this world were created in God's image.  They were

 6   fearfully and wonderfully made.  It doesn't -- you

 7   know, I can love a soul and hate the sin.  Being a

 8   homosexual doesn't make Mr. Ermold or Mr. Moore or

 9   Mr. Yates or Mr. Smith bad people, just -- we are all

10   sinners.

11              And, you know, I just -- I just wanted a

12   simple accommodations.  I didn't -- I didn't want any

13   of this.  I didn't ask for any of this.  I just -- I

14   think everybody is -- everybody is redeemable.

15   Everybody.

16   Q          Okay.  Who was the Rowan County Attorney in

17   2015?

18   A          That would be Cecil Watkins.

19   Q          Okay.  Did you discuss these issues with

20   Mr. Watkins?

21   A          I did.

22   Q          All right.  Did you write about them in

23   your book?

24   A          He came down and we talked, and he told me

25   that he --
```

1   Q        That's -- we'll get there.  But I -- my

2   question is, did you write about your discussions with

3   Mr. Watkins in your book?

4   A        I think there was some mention that he had

5   came down to my office and we had talked.

6   Q        Okay.  So tell me what you and Mr. Watkins

7   talked about.

8                    MR. MIHET:  To the extent that

9                    there was a -- a waiver in the book, we

10                   will contend it's a limited waiver.  So

11                   if you want to show her what's in the

12                   book and ask her if that's what she

13                   talked about, she can do that.  But

14                   she's not going to go beyond what's --

15                   what's already been disclosed.

16  Q        Well, do you recall what's written in the

17  book about --

18  A        The -- the main thing I recall --

19                   MR. MIHET:  Do you recall what's

20                   written in the book is the question --

21  A        Uh-huh.  Yes.

22                   MR. MIHET:  -- about that.

23  Q        All right.  What way do you -- as it

24  relates to only what's in the book -- I guess we'll

25  start with this question.

```
 1                    Was Mr. Cecil Watkins your attorney?

 2                         MR. MIHET:  Objection.  Calls for

 3                    a legal conclusion and also form.  You

 4                    mean personally? as a county clerk?

 5                         MR. BUCKLES:  All of the above.  I

 6                    don't know.  I don't know her

 7                    relationship to Mr. Watkins.  That's

 8                    why I asked the question.

 9                         MR. MIHET:  Okay.

10   A         He was the attorney for the county.

11   Q         The county attorney?

12   A         Uh-huh.

13   Q         An elected position?

14   A         It is.

15   Q         All right.  What is your understanding of

16   the role of the Rowan County Attorney?

17   A         To oversee legal issues that dealt with the

18   fiscal court along with providing legal -- I guess

19   legal advice to county officials and county

20   businesses.

21   Q         Okay.  And was the Rowan County Clerk's

22   office part of that Rowan County official business --

23   A         Yes.

24   Q         -- that he would provide legal advice for?

25   A         Yes.
```

```
1    Q        Okay.  And so he gave you legal advice as
2    county attorney?
3    A        Yes.
4    Q        And so to the extent that you recall what's
5    written in the book, what -- what did he tell you?
6    A        He told --
7                     MR. MIHET:  I want you to only
8                     answer this question if you're
9                     absolutely sure that what you're about
10                    to say has already been disclosed in
11                    the book, and I don't want you to go
12                    into anything that's beyond what's in
13                    the book.
14                    Are you comfortable that you can
15                    do that, Ms. Davis?
16                    WITNESS:  Yes.
17                    MR. MIHET:  Okay.  Go ahead.
18   A        He told me that he had talked with the
19   attorney general.  He told me that I had to issue the
20   license and that KACo, our insurance provider, was
21   going to drop me like a hot potato, pretty much.
22   Q        Okay.  So did he advise you the law
23   required you to issue a license?  Is that -- or is
24   that not --
25                    MR. MIHET:  Objection.  Form.
```

1    A        I can't remember exactly if he told me word

2    for word that "Kim, you have to issue the license."

3    Q        Okay.

4    A        I'm -- I'm sure he probably did because

5    that's --

6    Q        Well, I'm reading on Page 14.  "You've got

7    to issue marriage licenses, because it's the law."

8    A        Yeah.

9    Q        Or excuse me.  I misspoke.  "...because

10   that's the law, he announced."

11            Is that accurate?

12   A        If it's in there, yes.

13   Q        Okay.  He advised you that it's the law for

14   you to issue marriage licenses?

15   A        Yes.

16   Q        Did you follow his legal advice?

17   A        No.

18   Q        With regard to this book, when did you

19   write this book?

20   A        That was an ongoing process maybe in two --

21   started in early 2018 maybe.

22   Q        Okay.  I've never written a book before.

23   What's the process like?

24   A        I did a lot of talking.

25   Q        Okay.  To who?

```
 1    A          To Mr. Aman, John Aman.

 2    Q          Okay.

 3    A          We did a lot of talking.

 4    Q          Did you talk to a Mat Staver?

 5    A          I did.

 6    Q          All right.  Did you sit in front of a

 7    computer and type?

 8    A          No.

 9    Q          Okay.  Did you get out a pen and paper and

10    write?

11    A          No.

12    Q          You just dictated?

13    A          Yes.

14    Q          All right.  Is there a review process and

15    editorial process in the book?

16                        MR. MIHET:  Objection.  Form.

17    A          I didn't -- I wasn't -- I don't know how

18    writing books actually works.  John and I talked.  He,

19    like, interviewed me and we talked and he would send

20    me proofs and we would go through and so --

21    Q          Have you read the book?

22    A          Just -- just yesterday.

23    Q          Okay.

24    A          It's the first time.

25    Q          All right.  Do you agree with everything
```

1    that's said in the book?

2    A        Yeah.  I think there was one statement in

3    there -- it said that there was a -- a letter or a

4    press release that was released that I had given, but

5    it never actually was released to the public.

6    Q        Okay.  So that --

7    A        But other than that, I think it's --

8    Q        It's 100 percent accurate?

9    A        Yeah.

10                MR. MIHET:  Objection to form.

11   Q        All right.  Now, it costs $29.95.  Have you

12   made money from the sale of the book?

13   A        No.

14   Q        Okay.

15   A        I've not seen the first penny.

16   Q        So are you expected to see pennies?

17   A        I don't -- you know, I don't know.

18   Q        What was the purpose of writing the book?

19   A        For me the purpose was to let people know

20   the side that the media wasn't telling, because the

21   media absolutely ate me alive and enjoyed it.  And I

22   wanted people to know that I wasn't who the media was

23   portraying me as.  I'm not some homophobe that hates

24   gay and lesbian people.  I have -- some of my dearest

25   friends are gays and lesbians.  And I -- I wanted

1    people to know who Kim Davis was.

2    Q          Okay.  How many media interviews do you

3    think you've given since 2015?

4    A          I couldn't tell you.

5    Q          Is it a lot?

6    A          Major media interviews, I did Fox and ABC,

7    small ones like at Voter Value Summit, and there was a

8    book thing I went to.  I've done interviews with, you

9    know, some people on the radio, just little stuff.

10   Q          Maybe CNN.  Did they do an interview at the

11   jail, or did that not happen?

12   A          They may have been there and they may

13   have -- you know, I did the -- the press release where

14   I went out front in my office the day I -- the day I

15   came back to work after I got released from jail.

16   There was that.  But as far as CNN doing an actual

17   one-on-one interview, I don't -- I can't remember.  It

18   was -- honestly, I don't.

19   Q          Okay.  Have you been paid for any

20   interviews?

21   A          For any -- no.

22   Q          Have you been reimbursed for any expenses

23   for any interviews?

24   A          No.

25                        MR. MIHET:  Objection to form.

```
 1                   You mean like travel expenses or --

 2                   MR. BUCKLES:  I said anything.

 3                   MR. MIHET:  Okay.

 4    A         Not for interviews, no.

 5    Q         Okay.  Have you been reimbursed for travel

 6    expenses for anything?

 7    A         I have.

 8    Q         Please explain.

 9    A         Well, it was like honorariums where you

10    speak.  I went to Chicago and I spoke at a Romanian

11    Pentecostal Convention of about 10,000 people and they

12    gave me an honorarium.  And then I went to somewhere

13    in Virginia.  I can't really remember where it was,

14    just to be honest.  It was a church, I think, or maybe

15    some sort of -- I don't even remember.  And I think

16    they gave me $200.

17    Q         Okay.  How much did you get for the

18    Chicago --

19    A         They --

20    Q         -- Romanian --

21    A         They gave me $2,000 for my travel and

22    expenses.

23    Q         Okay.  Did they pay for the plane ticket?

24    A         We drove.

25    Q         Okay.
```

```
 1    A          We drove our car.

 2    Q          Did they pay for the hotel room?

 3    A          They did.

 4    Q          Okay.  What about the -- Virginia?  Did

 5    they pay for the travel?

 6    A          We were there one day and I think we

 7    actually came home and left that same -- that same day

 8    because we went early that morning.

 9    Q          Okay.  Now, you met the Pope?

10    A          I did.

11    Q          Okay.  Do you remember what day you met the

12    Pope?

13    A          It was September 24th of 2015.  The reason

14    I can remember that because it's my dad's birthday.

15    Q          Okay.  Where -- in what city did you meet

16    the Pope?

17    A          Washington.

18    Q          Washington, DC?

19    A          Uh-huh.

20    Q          How did you get to Washington, DC?

21    A          I flew.  That was on a trip from -- we flew

22    to Philly.  Then to -- up to New York and did the

23    Megyn Kelly -- maybe Megyn Kelly interview with Fox.

24    And then Mat Staver and I flew down to DC.

25    Q          Okay.  Who paid for those plane tickets?
```

```
 1   A          I would assume my counsel did.

 2   Q          Okay.  Have you paid any --

 3   A          I don't know.

 4   Q          -- money to your counsel?

 5   A          I have not.

 6   Q          Okay.  Have you received any charitable

 7   donations or any GoFundMe pages or anything of that

 8   sort?

 9   A          I don't have a GoFundMe page.  Every money

10   and check that I got I sent to my counsel.

11   Q          Okay.  Do you recall how much you received?

12   A          No.  I mean, it was coming in letters at

13   work, cards, just -- and I didn't -- I didn't keep

14   track of it.  I just put it in an envelope and sent it

15   to them.

16   Q          Like, whose name would be on the check?

17   A          It would be my name.  I would endorse it

18   and give it to them.

19   Q          Okay.  And do you recall how many letters

20   that you --

21   A          No.  But, I mean, I've got boxes and boxes

22   of letters.  I don't know which of them had, you know,

23   checks in them.  Honestly, I couldn't tell you.

24   Q          Do you recall what the largest check was?

25   A          No, honestly I don't.  I got several checks
```

1    that were fake checks that were made out to me in a --

2    not a very nice way, but those were just fake and I

3    just ripped them up and threw them away.

4    Q          Okay.  Do you recall who sent those?

5    A          I had all that stuff and -- yeah.  But it

6    just -- it was just, you know, people being mean.

7    Q          It wasn't Mr. Moore or Mr. Ermold, was it?

8    A          No.

9    Q          Okay.  Why would you send money to your

10   counsel if they're pro bono?

11   A          Because it -- they were representing me pro

12   bono and they take -- I knew that they probably were

13   expending a lot of money in my -- my counsel and, I

14   mean, that's where it needed to go.

15   Q          Okay.  How many flights have you flown in

16   preparation of -- so you recall -- you stated that you

17   flew with Mr. Staver.

18              How many times have you flown in relation

19   to your legal representation of the case or meeting

20   the Pope or anything as it relates to this case?

21                    MR. BUCKLES:  Objection to form.

22   A          So we would have flown with Mr. Staver

23   from -- the one trip to -- it was kind of like a

24   roundabout thing to Philly then up to New York and

25   then down to DC.  That was all one trip.  And then

```
1    Mr. Mihet and I flew to Romania.

2    Q        Okay.  Now, were you flying commercial

3    planes or was this --

4    A        Yes.

5    Q        -- private travel?

6    A        Huh-uh.  No.  It was commercial.

7    Q        To Romania?

8    A        It was commercial.

9    Q        Okay.  And then to Philly?

10   A        Uh-huh.

11   Q        All that was commercial?

12   A        Yes.

13   Q        Okay.  And those are the only two times

14   you've flown in relation to this?

15   A        That I can recall, yeah.

16   Q        Who paid for your expenses while you were

17   in Romania?

18                        MR. MIHET:  Objection.  Calls for

19                speculation.

20   A        I honestly don't know, sir.

21   Q        Okay.  Did you pay for your expenses?

22   A        No.

23   Q        Okay.  And did you pay for your plane

24   travel?

25   A        No.
```

```
 1    Q          Did you receive any honorarium or per diem?

 2    A          No.  I did get reimbursed for the purchase

 3    of a passport.

 4    Q          Okay.  Anything else?

 5    A          Not that I can recall.

 6    Q          Did anyone else attend that trip with you?

 7                    MR. MIHET:  Objection to form.

 8    A          To Romania?

 9    Q          Yes.

10    A          Mr. Mihet.

11    Q          Okay.  But no members of your family?

12    A          No.

13    Q          What about the trip to Philadelphia or

14    Washington?

15    A          My son Nathan flew up with me to Philly and

16    then I met Mat there and we flew to D -- to New York

17    and then Mat flew with me from New York to DC.

18    Q          Okay.  Did Nathan pay for his ticket?

19    A          No.

20    Q          Do you know who paid for his ticket?

21    A          I don't.

22    Q          Was it you?

23    A          No.

24    Q          Okay.

25                    MR. BUCKLES:  Just give me a
```

```
 1              second.
 2                   (Counsel confer.)
 3  Q         Just one last little bit.  The checks that
 4  were sent from you to Liberty Counsel, did you owe
 5  them any money?
 6                   MR. MIHET:  Object.
 7  A         No.
 8                   MR. MIHET:  Objection.  Calls for
 9                   a legal conclusion.
10  Q         Are you reimbursing them for anything when
11  you send those checks?
12                   MR. MIHET:  Objection.  Calls for
13                   speculation.  Calls for a legal
14                   conclusion.
15  A         No.  I just simply thought that was the
16  right thing to do.  They were representing me pro
17  bono, and people were sending me money to help pay for
18  my representation and so I trust -- passed it, you
19  know, right on to them.
20  Q         Okay.  And was there any other resources
21  that you provided to them financial or --
22  A         No.
23                   MR. MIHET:  Objection to form.
24  Q         Okay.  Do you recall the amount of any
25  check?
```

```
 1                      MR. MIHET:  Objection.  Asked and
 2             answered.
 3  A          There was a lot of $20 checks.  There was a
 4  lot of, you know, $10 checks.
 5  Q          Did you write a thank you note to these
 6  people?
 7  A          I issued thank yous, you know, when I
 8  went -- did interviews and stuff like that and thanked
 9  people in the book for their prayers and -- you know.
10  But as far as issuing thank you notes individually,
11  there's no way I could have done that, because there
12  were, like, thousands of letters and boxes and, you
13  know, just stuff coming in daily.
14  Q          So, just so I understand, there were
15  thousands of checks?
16  A          No.
17                      MR. MIHET:  Objection.  Misstates
18             the witness's testimony.
19                      MR. BUCKLES:  Well, I -- I'm
20             asking.  That's why.
21  A          Not thousands of checks.  Thousands of
22  letters and cards and stuff.  So there's no way that I
23  could have written each and every one to thank them
24  for a card of support or if one included a -- you
25  know, a $10 check or so that I could -- there was no
```

```
 1    way.

 2    Q         All right.

 3                   MR. BUCKLES:  I think I'll give up

 4              my seat.

 5                   MR. MIHET:  Okay.  I'm just going

 6              to -- I don't anticipate an issue, but

 7              I'm just going to put on the record

 8              what we discussed before, which is that

 9              our expectation is that the Yates and

10              Smith plaintiffs -- this is their one

11              and only chance to ask questions today

12              and there won't be any additional

13              questioning after we pass the torch.

14                   MS. HEINRICH:  I'm the Yates

15              plaintiff.

16                   MR. MIHET:  I'm sorry.  Ermold and

17              Smith.

18                   MS. HEINRICH:  I'm aware.

19                   MR. MIHET:  Sorry.

20                   MR. BUCKLES:  I agree to the

21              extent that Ermold and Moore wouldn't

22              ask any more questions.  However, the

23              record of both attorneys will be the

24              entire record of the Ermold and Moore

25              case.
```

```
 1                      MR. MIHET:  Yes.  The deposition --
 2                 the entirety of the deposition today
 3                 can be used in both cases.
 4                      MR. GARTLAND:  So are we going to
 5                 do a separate caption for this
 6                 transcript?
 7                      (Off-the-record discussion.)
 8            ------------------------
 9                      EXAMINATION
10  BY MS. HEINRICH:
11  Q         Hi, Ms. Davis.  My name's Rene Heinrich,
12  and I represent Will Smith and James Yates in that
13  portion of the case that we've been kind of talking
14  around today.
15            A few questions I am going to have are
16  going to be specific to them --
17  A         Okay.
18  Q         -- here at the beginning.  I know we've
19  been talking about Mr. Ermold and Moore, and so I want
20  you to kind of switch to Mr. Yates and Mr. Smith for a
21  minute.
22            So have you ever met Mr. Yates or Mr. Smith
23  to the best of your knowledge?
24  A         Not that I can recall.  I mean, I wouldn't
25  know them if they were in this room.
```

```
 1   Q          Okay.  So you remember specifically the --
 2   Mr. Ermold and Mr. Moore --
 3   A          I do.
 4   Q          -- from the interactions at your office?
 5   A          Yes.
 6   Q          But you don't really recall Mr. Smith and
 7   Mr. Yates --
 8   A          No --
 9   Q          -- correct?
10   A          -- I don't.
11   Q          So in our complaint, it lists that
12   Mr. Smith and Mr. Yates went to your office for the
13   first time on July 6, 2015.
14              Do you have any reason to believe that
15   that's incorrect?
16   A          If they said that's the date they came,
17   then I would assume --
18   Q          Sounds about right?
19   A          Yeah.
20   Q          Okay.  And do you have any firsthand
21   knowledge of that visit that they had that day?
22   A          I do not.
23   Q          Do you know if you were there at that time?
24   A          I probably was there, but, you know, I -- I
25   may have been in my office opening mail or doing
```

```
 1    reports, because that's about time that reports were
 2    due so --
 3    Q        Do you recall anybody from your office
 4    coming to you for any advice on what to do with
 5    Mr. Smith and Mr. Yates?
 6    A        No.
 7    Q        Do you recall anybody from your office
 8    coming to you for comments after they had left, that
 9    we just had a Mr. Smith and Mr. Yates or we had a gay
10    couple come and we turned them away?
11    A        No, I don't.
12    Q        Was your office in any way taking notes
13    or -- or keeping stats on the numbers of licenses that
14    you-all during that period of time were denying?
15    A        No.
16    Q        Okay.  So do you have any way of knowing
17    how many licenses, gay, straight, or otherwise that
18    you denied during the period of time that you had your
19    policy implemented to not hand out licenses?
20    A        I do not.
21    Q        Now that hindsight's kind of 20/20, you
22    know obviously that you denied Mr. Ermold and
23    Mr. Moore and Mr. Yates and Mr. Davis [sic].
24             Are there any other couples that you're
25    aware of that came in for a license that you denied?
```

1    A          Yes.  There was actually couples that came

2    in that I denied that didn't sue me.  There was a -- a

3    couple of ladies that I had played softball with back

4    in the day, and they came in and, you know, they were

5    upset and I apologized for their inconvenience and --

6    but -- you know, they lived in Fleming County

7    actually, and I told them -- I said, "Your clerk is

8    actually issuing the license if you want to go there."

9    Q          And you didn't find that referring them to

10   another county where you knew the offices were open

11   for business to be in violation of your closely held

12   religious beliefs?

13   A          If what they were trying to get was a

14   marriage license from someone that didn't have an

15   objection, no.

16   Q          So, in your mind, that wasn't, like, aiding

17   and abetting, for use of --

18   A          No.

19   Q          -- kind of a court term that --

20   A          No, because my name wouldn't have been on

21   that license.

22   Q          Okay.  So the injunction, I believe, that

23   Mr. -- or Judge Bunning entered was on August 12,

24   2015.  Does that sound about right?

25   A          Yes.

```
 1   Q          And James and Will, Mr. Smith and
 2   Mr. Yates, went on that same day.  Were you aware of
 3   that?
 4   A          If they say they were there, they were
 5   there, I'm sure.
 6   Q          And kind of same questions.  Did you have
 7   any staff members or anybody talk to you about their
 8   visit that day?
 9   A          No.
10   Q          And do you recall any firsthand memories of
11   what they might have done that day?
12   A          No.  Honestly, I don't.
13   Q          Okay.  The lawsuit that we filed was filed
14   on August 25th of 2015, and that was the same day that
15   the sixth circuit denied your request for stay.  Does
16   that sound familiar?
17   A          Yes.
18   Q          And then on August 27th James and Will
19   again went to the Rowan County Courthouse believing
20   because of that interaction things may have changed at
21   the clerk's office, and they were denied again.
22                     MR. MIHET:  I object to counsel
23              testifying.  Is there a question?
24                     MS. HEINRICH:  I was getting ready
25              to ask it, sir.
```

```
1                    MR. MIHET:   Okay.   I object to the
2              testimony that is offered to go into
3              the question.
4                    MS. HEINRICH:   Fine.
5    Q         Do you remember August 27th or have any
6    belief or have any reason to believe that they weren't
7    there on that day?
8    A         No.
9    Q         Okay.  And, again, did you see them on that
10   day?
11   A         No.
12   Q         Have any interactions?
13   A         I don't recall.
14   Q         Did you have any staff that you know of
15   that had any interactions with them on that day?
16   A         The only staff that would have had
17   interaction would have been the one that they went to
18   to try to get the marriage license, I'm sure.
19   Q         Okay.  But there was no discussion after
20   they left with you, with the staff --
21   A         No.
22   Q         -- that they were back?
23             Did you at that point have any knowledge
24   that the same couple had come in several different
25   times to try to get a marriage license?
```

```
 1   A        No.

 2   Q        Wasn't something that your staff would have

 3   mentioned to you?

 4   A        No.

 5   Q        Okay.  They tried again on August 21, 2015,

 6   which was after the Supreme Court of the United States

 7   denied the stay.

 8            Did you see them on that day?

 9   A        No.

10   Q        Do you have any reason to believe that that

11   wasn't something that they did on that day?

12   A        No.

13   Q        Okay.  And, again, any discussions with

14   staff members or anybody else about their visits?

15   A        No.

16   Q        So you have no personal knowledge --

17   A        No.

18   Q        -- or recollection about their visit?

19   A        No, I don't.

20   Q        Okay.  On September the 1st they also were

21   denied for the fifth time.  And same questions.  Did

22   you see them on that day?

23   A        No.

24   Q        Did you and your staff have any discussions

25   with --
```

```
 1    A          No.

 2    Q          -- anybody regarding that visit?

 3    A          No.

 4    Q          And were you aware at that time there had

 5    been five times that they had been denied the ability

 6    to --

 7    A          No.

 8    Q          -- get a marriage license?

 9    A          No.

10    Q          Okay.  They finally received their license

11    on an altered form on September 4, 2015.  Were you

12    aware of that?

13    A          I wasn't aware that they themselves

14    received it, but I do know that was the time that I

15    was incarcerated.

16    Q          Okay.  And was it your belief while you

17    were incarcerated that your employees were giving

18    marriage licenses at that time?

19                    MR. MIHET:  Object to form.

20    A          My son Nathan said that he had changed the

21    form to take my name off of it and that they were

22    issuing because they were under, I guess, an order

23    from the judge that if they didn't, they too could be

24    in jail.

25    Q          Okay.  And you were the only person in your
```

1    office that chose the route to not follow the court

2    orders and risk jail time, meaning the rest of your

3    staff was willing to cooperate and do what the judge

4    ordered and issue marriage licenses at that point;

5    correct?

6                    MR. MIHET:  Object to form.

7    A         After they altered the license, then they

8    were willing, because once my name came off of them --

9    that was the accommodations I had been asking for the

10   whole time, was to remove my name and my authority.

11   Q         Okay.  And how was that process -- and how

12   did that process happen?

13   A         I honestly cannot answer because I had no

14   part to that.  When I was incarcerated, my son and --

15   did all that and -- my son and my chief deputy were

16   there from what he told me.

17   Q         Why did that not happen sooner?

18   A         Simply because the Kentucky state statute

19   says that the form must be uniform, and the KDLA, who

20   makes those forms and issues them to every county

21   clerk, had not taken upon them to give me that

22   accommodations or give all the clerks who had, you

23   know, the same objection like I had, you know, that

24   accommodations to remove our name and authorization

25   from there.

1   Q       So is it your understanding that the forms

2   for the licenses that were issued during your

3   incarceration and after came from something your son

4   came up with or something the state came up with?

5   A       The altered form came from what my son did.

6   Q       And so I guess I'm trying to understand

7   what the difference would have been with the document

8   your son came up with after your incarceration versus

9   your son coming up with a similar document weeks

10  before any of that came to fruition.

11                  MR. MIHET:  Objection to form.

12                  Calls for legal conclusion.

13  A       Well, he simply gave me the accommodations

14  that I had been asking for from our legislators, our

15  governor.  He took it upon himself to -- to give me

16  that accommodations so that my name would not be on

17  those licenses that were issued while I was

18  incarcerated.  And that had not been done earlier

19  because I was still banking that the right people were

20  going to do the right thing and give me the

21  accommodations.

22  Q       So you needed your employee, who was your

23  son, to come to up with that form?

24                  MR. MIHET:  Objection to form.

25  A       He didn't come up with the form.  What he

1   did was he removed the county clerk's name off of it

2   where my name would be and put the county, Rowan

3   County, in there.  He did not change the actual form.

4   What he changed was what was printed on the form when

5   it was issued.

6   Q         And I'm really not trying to beat a dead

7   horse, but I don't understand why that couldn't have

8   been something that could have been done --

9                    MR. MIHET:  Objection.

10  Q         -- in the -- in the --

11                   MS. HEINRICH:  Let me finish my

12                   question, please.

13  Q         -- in the weeks following the Obergefell

14  decision when you were telling us that you were really

15  struggling with this.

16                   MR. MIHET:  Objection.  Asked and

17                   answered.  Form.  And calls for a legal

18                   conclusion.

19  A         Okay.  So, like I stated before, the

20  statute says that the form must be uniform.  It is a

21  form that is -- is made and issued and -- and designed

22  by the KDLA, which is the Kentucky Department of

23  Library and Archives.  They're responsible for the

24  actual marriage license application.  And on the

25  application -- the statute says that that

```
 1   application -- that form must be a uniform form
 2   statewide so that I'm not using one kind of form and
 3   the next county over is using another one and we've
 4   got several different kinds of forms that are being
 5   recorded and lodged as a permanent record in the
 6   Department of Library and Archives.  So with -- through
 7   vital statistics.
 8            And, you know, I was banking that -- hoping
 9   that the right people who had the authority to change
10   the form would do that and that I wouldn't -- you
11   know, I didn't want to alter the form.
12   Q        Were you worried that if you would have
13   altered the form that it would not have been a legal
14   form then?
15   A        Sure.
16   Q        Did you have the same concerns after your
17   son altered it after --
18   A        Yes.
19   Q        -- while you were jailed?
20   A        Yes.
21                 MR. MIHET:  Remember to let her
22              finish --
23              WITNESS:  Okay.
24              MR. MIHET:  -- her questions.
25              WITNESS:  I'm sorry.
```

```
 1   Q          And did you ever receive a response on that

 2   or an answer on that concern?

 3                    MR. MIHET:  Objection to form.

 4   A          I will say that I never received an actual

 5   answer, but our -- at time -- at that time the

 6   attorney general put out a statement and the governor

 7   concurred that they thought that the altered forms

 8   would be acceptable so --

 9   Q          Okay.  Your dates in office as the Rowan

10   County Clerk -- I think you said you started in

11   January 5th --

12   A          Uh-huh.

13   Q          -- of 2014?

14   A          2015.

15   Q          And when did you end your term?

16   A          I retired December 31st of 2018.

17   Q          Okay.  And what was your salary as the

18   clerk?

19   A          It started at about 78,000 on the first

20   year of your clerk and then you get a $3,600 expense

21   allowance that's paid out monthly also.  So it ended

22   up being a little over 80,000 the first year, 84 the

23   second, like 87 the third, and then 91 or 92 the

24   fourth year.

25   Q          Was there any reprimands that you gave to
```

1    any of your deputies for issuing licenses while you

2    were incarcerated?

3    A          No.

4    Q          Why not?

5    A          I love my deputies and it's like family

6    there.  You know how it is when you work with people.

7    And I just -- I wouldn't have done that.

8    Q          Okay.  Did you-all have any meetings

9    leading up -- following the Obergefell decision about

10   how you were going to handle same-sex marriage license

11   in the office?

12                     MR. MIHET:  Object to form.

13   A          Like I had said earlier, that day when we

14   closed, I -- I just walked up my line and I just told

15   everybody that as of right now we were not going to be

16   issuing any more licenses at all until we could

17   receive an accommodation.

18   Q          Was there any feedback that you got from

19   your clerks?

20   A          No.

21   Q          How many people, if you know, did you

22   recommend going to another county?

23   A          Every couple that came in that I spoke to

24   that I could not issue a license to, I recommended

25   that they go to a surrounding county.

1    Q          And I have a couple of questions about that

2    idea.  Did you know for a fact that those counties

3    were issuing?

4    A          Yes.

5    Q          How did you know that?

6    A          Because we have clerks meetings the third

7    Tuesday -- either the third Tuesday or the third

8    Wednesday of every month and, you know, you sit around

9    and you talk and, you know, there was just a -- a --

10   there was a lot of people that didn't agree with it,

11   but they were going to go ahead and issue the license

12   and -- and the only one -- the only surrounding county

13   that really travailed with it was Carter County, and

14   he -- he finally decided he was going to issue the

15   license.

16   Q          I'm sorry.  What do you mean "travailed

17   with it"?

18   A          He kind of suffered with the decision.  He

19   was a Christian man and, you know, weighing the pros

20   and cons, and really he -- he struggled inside

21   himself, you know, but he decided after all that he

22   was going to issue them.

23   Q          Okay.  I'm going to hand you --

24              MS. HEINRICH:  What number are we

25              on?

```
 1                      REPORTER:  27.

 2                      MR. BUCKLES:  27.

 3   Q         -- what I'm going to mark as 27.

 4                      (Said document is filed with this

 5                 transcript and marked Exhibit Number 27

 6                 for purposes of identification.)

 7                      MS. HEINRICH:  I don't have any

 8                 more than this copy.

 9   Q         Can you tell me whether or not you can tell

10   what it is I just handed you, Ms. Davis?

11   A         It is a marriage license application for

12   Mr. Yates and Mr. Smith.  Looks like it was issued on

13   September 4, 2015, by Brian, and then it was -- Larry

14   David Lewis performed the ceremony.  And then it was

15   returned to my office for recording on September 30th

16   of 2015.

17   Q         All right.  I see a seal with your name on

18   it at the bottom of that document.

19   A         There's not a seal there, but this is a

20   certified copy.  So when the -- the original one would

21   have a seal on it.

22   Q         Okay.  And so tell me what that

23   designation -- when you say that this is a certified

24   copy and that the original would have a seal on it,

25   tell me what that means.
```

```
1   A          The certified copy with a seal on is a
2   document that would present itself for legal issues as
3   good as in place of the original document.
4   Q          And is that something that's obtained at
5   your office?
6   A          It is.
7   Q          And your name is found on that seal;
8   correct?
9   A          On the certification.
10  Q          On the certification?
11  A          Uh-huh.
12  Q          Does that bother you --
13  A          No.
14  Q          -- that your name is there?
15  A          No.
16                  MR. MIHET:  Objection.
17  Q          Okay.  And why not?
18  A          Because I'm certifying a record of the
19  office.  It's not any kind of authorization.  It's not
20  any kind of thing other than just certifying that this
21  is a true copy of the original -- a certified copy of
22  the original.
23  Q          Okay.  Tell me a little bit about -- you
24  were talking with Mr. Buckles about the administrative
25  code and that there was a template, from my
```

```
 1  understanding --
 2  A          Uh-huh.
 3  Q          -- that then your office was allowed to
 4  tweak.
 5             Was that something, once you tweaked it,
 6  you have to get authorization from the state, then, to
 7  make sure it was in compliance with the state
 8  regulations, or was that something --
 9  A          No.
10  Q          -- you had autonomy over?
11  A          I -- once -- once -- it was a very generic
12  template.  And once it was -- when I say, "I tweaked
13  it," I put Rowan County Clerk's Office, you know, put
14  our name in there and how -- how many days of sick
15  leave people get, how many days of vacation people
16  get.  That's what I'm talking about when I say "I
17  tweaked it."  I just -- I made it ours by virtue of
18  putting our name in there and the office and stuff.  I
19  turned it in to the fiscal court.
20  Q          And then they would approve it --
21  A          Yes.
22  Q          -- I guess at a meeting?
23  A          Yes.
24  Q          Okay.  So there was some kind of oversight
25  over that set of administrative rules which would have
```

1  been your fiscal court in Rowan County?

2  A        I don't know if the court actually approved

3  it, but it had to be -- it just had to be on file with

4  them.

5  Q        Okay.  Do any of your employees -- at that

6  time, did any of your employees attend church at your

7  church?

8  A        At my church, no.

9  Q        Did you ever have any discussions with any

10  of your employees about the possibility of them going

11  to jail for following your decisions?

12  A        No.

13  Q        Did you ever think about that as a

14  consequence that could come from your decisions?

15  A        That they would go to jail?

16  Q        Uh-huh.

17  A        When we went to the -- the last hearing

18  before -- when I was remanded into -- to jail, Judge

19  Bunning had my -- my deputies come to court.  And I

20  remember telling them that -- that they had to follow

21  their own convictions and, you know, that they had to

22  do what they had to do.

23  Q        Okay.

24  A        Because I didn't want them being in jail.

25  Q        Do you think any of them -- do you know

1  whether or not any of them were worried about losing

2  their jobs if they would not do what you proposed or

3  not do what you had ordered them to do?

4  A         I told them up front that their jobs were

5  never in jeopardy.  I mean, that was never an issue.

6  Q         So if -- I think his name is Brian.  The

7  gentleman -- what was his last name?

8  A         Mason.

9  Q         Mason.  Thank you.  So if my clients

10 testify that Mr. Mason apologized to them for not

11 being able to because of your rule, is it your

12 testimony today that you would have been okay with him

13 issuing that license and he wouldn't have gotten into

14 trouble with you for doing that?

15                MR. MIHET:  Object to form.

16 A         I will tell you this:  If he had issued the

17 license with my authority on them, I'm not sure what I

18 would have done, just to be honest.

19 Q         What do you mean with your authority?

20 A         With my name --

21 Q         Okay.

22 A         -- on the license.

23 Q         Okay.

24 A         You know he apologized to them.  I've

25 apologized to many people for -- for not issuing the

1    license and, you know, tried to make ways that they

2    could get their license.  So that sounds like Brian.

3    Q        Okay.  Earlier and actually towards the

4    beginning of your testimony, Mr. Buckles was asking

5    you about the oath of office that you took.  And you

6    explained about how one of the most important parts of

7    that was the "so help me God" piece at the end of the

8    oath.

9             I want to know what -- why that's special

10   to you.  What does that mean to you when you say "so

11   help me God"?  Is that a promise to the Lord that

12   you're going to do the best job you can?  Is it a --

13   does it mean something else?  Can you explain that for

14   me a little bit?

15   A        Sure.  As a -- as a person who loves God

16   and lives for God to the best that I can each and

17   every day, everything I do I want to do for his glory,

18   and I wanted to do -- I wanted to bring glory to the

19   Lord in the job that I did.  It's important to me --

20   when I think of something, Ms. Rene, God is first on

21   my mind.  And to take the oath, he has to be there.

22   Q        So did you see it kind of as a promise to

23   God that you were going to uphold the constitution and

24   not duel, which is always my favorite part --

25   A        Right.

 1   Q          -- of the Kentucky oaths that we take?

 2   A          Yeah.

 3   Q          Floridians don't know about the duel part.

 4   A          Duel part.

 5   Q          It's always a good -- good part.

 6              Silliness aside, did you see it as kind of

 7   a promise to God that you were going to follow those

 8   things that you promised to do in that oath?

 9   A          Yes.

10   Q          And so how did you reconcile that oath that

11   you took with -- and the promise to follow the

12   constitution when the supreme court issued its

13   decision kind of setting out what the constitution

14   means?  Do you see where -- where I'm getting at?

15   There seems to be a disconnect there.

16                     MR. MIHET:  Objection to form.

17   A          Well, there seems to be a disconnect

18   because maybe, you know, you don't think like I do.  I

19   don't think like you do.  My connection is -- is God

20   first.  And so when I took the oath, I meant it with

21   every ounce and every fiber of my being.  It's not

22   something I took very lightly.

23              So for me there was not a disconnect

24   because, you know, a lot of the -- we have a lot of

25   rights that are given to us strictly through the Lord

1   himself.  And -- and I hold those dear.  I hold those

2   close.

3   Q        Okay.  When we look at the form itself, it

4   says kind of in the top "Marriage License."  Had it

5   said something different -- let's say contracted

6   agreement or some word other than marriage -- would

7   that have taken away some of the concern that you had

8   in regards to performing your duties?

9   A        Yes.

10  Q        Okay.  So marriage to you had more of a

11  religious meaning than a secular meaning --

12                   MR. MIHET:  Objection.

13  Q        -- is that correct?

14                   MR. MIHET:  Object to form.

15  A        Yes.

16  Q        And as a clerk who's worked probably with

17  hundreds, if not thousands, of legal documents, you

18  realize -- don't you? -- that we use kind of secular

19  words -- or religious words in a secular context all

20  the time in the law?

21  A        Yes.

22  Q        Prayer for relief, let's say.  And why was

23  it that you couldn't kind of use that same logic that

24  marriage in this context was sort of a contractual

25  thing after reading the Obergefell decision like you

1    have explained that you had done and not necessarily a

2    religious doctrine that you were signing off on?

3                        MR. MIHET:  Object to form.

4    A          Well, that's very easy for me to answer.

5    At the very top where it says "Marriage license valid

6    only in the Commonwealth of Kentucky," right

7    underneath there in the small print it says "To any

8    person or religious society qualified to perform

9    marriages per KRS 402.050."  That statute lists who is

10   eligible to marry people.

11              It says "You are hereby authorized to join

12   together in the state of matrimony according to the

13   laws of the Commonwealth of Kentucky."

14              That statement alone would negate all that.

15   Q          Okay.  But that statement doesn't say

16   "under the laws of God"; correct?

17   A          No, but I was also bound to uphold the

18   statutes of Kentucky --

19   Q          Okay.

20   A          -- under God.

21   Q          Okay.  You had talked a little bit about

22   how difficult this process has been for you and how

23   you had some hate mail and threats and some really

24   awful things that came your way as a result of the

25   position that you took.

```
1              You don't deny that our clients did as
2    well; correct?
3                    MR. MIHET:  Objection.  Calls for
4              speculation and lacks --
5    A       I --
6                    MR. MIHET:  -- lacks foundation.
7    A       Honestly, I don't know Mr. Yates or
8    Mr. Smith.  I've probably dealt with them some in my
9    personal life.  I don't know.  I don't know what they
10   went through.
11   Q       You would agree that being -- that them
12   being in the middle of this kind of national media
13   firestorm or this international media firestorm was
14   rough --
15   A       On myself, yes.
16   Q       -- correct?
17           And there were reporters at your house --
18   A       Yes.
19   Q       -- correct?
20           You had people saying nasty things to you,
21   getting nasty messages to you, whether via the mail or
22   email or whatever; correct?
23   A       Death threats to come to my home, burn us
24   out, beat my husband up and tie him up and rape me
25   while he watched and then they were going to kill him.
```

```
 1   Yes.  Yeah.
 2   Q        And if I were to tell you that Mr. Yates
 3   and Mr. Smith had similar experiences from the other
 4   side, you would have no reason to believe that those
 5   weren't true, would you?
 6                  MR. MIHET:  Objection.  I object
 7                  to counsel testifying.  Assumes facts
 8                  not in evidence.  Lacks foundation.
 9                  Calls for speculation.  And also the
10                  form of the question.
11                  Go ahead.
12   A        I will tell you this:  If it's any
13   consolation for both of your-all's clients, I have
14   prayed prayers of protection for your -- for your
15   clients and asked God to cover them to keep them safe
16   that they did not have to endure what I was enduring.
17   That is my heart.
18   Q        And I'm sure they appreciate that.  And
19   that tells me that you have some fears for them --
20                  MR. MIHET:  Objection.
21   Q        -- based on what you were going through; is
22   that correct?
23                  MR. MIHET:  Objection.  Misstates
24                  the witness's testimony.  Lacks
25                  foundation.  Calls for speculation.
```

1          And the form of the question.

2                You can answer.

3     A          I knew if I was going through what I was

4     going through -- if they were getting an nth of what I

5     was getting, I didn't want them to suffer with that.

6     I didn't want them to have the fear or anything like

7     that.

8     Q          You had said something interesting in

9     regards to Mr. Ermold, that he had mentioned to you

10    that he didn't want you to preach to him.

11               Did you-all have an office policy in

12    regards to proselytizing or preaching to public as

13    clerks?

14    A          No.

15    Q          Okay.  Had you ever had an issue where you

16    had to reprimand somebody for maybe crossing the line

17    as a clerk and discussing their religious beliefs or

18    any other beliefs with the public?

19    A          No.

20    Q          Did you ever ask anybody who -- or any of

21    your clerks were directed to ask anybody who were

22    referred to other counties whether or not they had

23    transportation or were able to get to other counties

24    to get their marriage license?

25    A          I don't recall.  I mean, I would have drove

1    them there if they had asked me.

2    Q        So tell me about that.  I mean, had -- had

3    Mr. Yates and Mr. Smith said, "Well, we can't get to

4    Flemingsburg or Fleming County," which I think you

5    said earlier was open for gays and lesbians, you would

6    have offered to drive them to Flemingsburg --

7    A        I would have seen --

8    Q        -- to help them get their license?

9    A        If they couldn't get there, I would have

10   seen them to have a way.

11   Q        And why would you feel that that is okay

12   and yet affixing your name to a license would not be?

13   A        Because I would not be the one authorizing

14   that license.

15   Q        Okay.  Is there any way that you can know

16   that you haven't authorized licenses to many couples

17   that had been in an adulterous relationships?

18   A        No.

19   Q        So there's really not a big difference, is

20   there, between you authorizing those licenses or

21   authorizing licenses for gay or lesbian couples?

22   A        I think there is.

23                    MR. MIHET:  Object to form.

24   Q        Can you explain to me what -- what you

25   believe?

```
 1    A          Well, I believe marriage is between one man

 2    and one woman.  Anything outside that realm is not a

 3    marriage as -- as, you know, naturally defined.

 4    Q          That's also interruption of scripture;

 5    right?

 6    A          That is the Word of --

 7    Q          Yeah.

 8    A          -- God.

 9    Q          Right.

10    A          It's pretty plain.

11    Q          Yeah.  I mean, it comes from scripture --

12    A          Uh-huh.

13    Q          -- I guess --

14    A          Yes.

15    Q          -- is what I meant.

16               But portions of the Bible that talk about

17    adultery and reasons for divorce and all are part of

18    the Bible too.

19    A          They are.  Uh-huh.

20    Q          And they're pretty clear as well; correct?

21    A          Yes.

22    Q          So, I guess, where on your moral compass

23    does that come from when you're licensing marriages

24    that may also be violating scripture?  How is that any

25    different than -- than a gay couple that comes in?
```

1    A          So a marriage between one man and one

2    woman, they're -- what they do -- their divorce is --

3    their adultery, their fornication, that is -- that is

4    between a man and woman.  That has to be theirs to

5    reconcile.  But to issue a license, you know, for a --

6    a same-sex couple is not even -- is not even in the

7    realm of marriage as -- as defined in the Bible.

8    Q          So are you then confirming adultery?

9    A          No, not at all.

10   Q          Okay.  Let's say that what appears to be a

11   man and a woman would have come in front of you and

12   then you would have found out that the person was

13   transsexual later on.

14   A          If a person appeared to be a man and woman,

15   they presented themselves as a man and a woman and a

16   license was issued, I don't know that it would be

17   legal -- that it would have been legal at the time.

18   Q          We talked a little bit about your book.

19   Did you enter into any contracts for publication or

20   any kind of legal contracts in regards to your book?

21   A          There was -- I think there was a contract

22   about, like, proceeds from it.

23   Q          Okay.  And did it also discuss kind of who

24   was going to publish it and where it was going to be

25   sold and those sorts of thing?

```
 1    A          It was published through Liberty Counsel
 2    Publishing.
 3    Q          Okay.
 4    A          I mean, I don't know the exact name of it.
 5    Q          Let's talk about Liberty Counsel for a few
 6    minutes.  How did you meet these gentlemen originally?
 7    A          I was contacted through -- there is a
 8    foundation -- a Kentucky -- I don't really remember
 9    the name of it.  But, anyway, they gave me a number,
10    and I called the phone number.  It was for Liberty
11    Counsel, one of their individuals, and we talked a
12    little bit.
13                         MR. MIHET:  Ms. Davis, I'm sorry
14                    to interrupt.  But, please, be very
15                    careful not to disclose anything that
16                    you said --
17                         WITNESS:  Right.
18                         MR. MIHET:  -- to anyone at
19                    Liberty Counsel or what anyone at
20                    Liberty Counsel said to you.  Okay?
21    A          But they -- they ultimately offered to --
22    to represent me pro bono.
23    Q          So let me break this down a little bit so I
24    understand it.  You said you were contacted through a
25    foundation.  Some kind of organization, I guess?
```

```
 1   A          Yeah.  It was --

 2   Q          Was it a Kentucky-based --

 3   A          Uh-huh.

 4   Q          -- organization?

 5   A          Yes.

 6   Q          Okay.  And out of the blue, or had you

 7   been --

 8   A          No.  I --

 9   Q          -- posting things on social media that you

10   were looking for somebody or --

11   A          I don't do social media.

12   Q          Okay.

13   A          So I guess just maybe through watching the

14   news and hearing what was going on, they contacted me.

15   Q          Okay.  And my understanding of your

16   testimony -- correct me if I'm wrong -- is that they

17   said, "Hey, we've got some people that might be able

18   to help you.  Here's a phone number.  Give them a

19   call"?

20   A          Yes.

21   Q          Okay.  And do you have -- and, again,

22   without telling me anything that you've discussed with

23   your counsel other than the stuff that is maybe in

24   your book, do you have any contracts with your counsel

25   for how they're getting paid or how they're being
```

```
 1   compensated?

 2   A          No.

 3   Q          You've never signed a document with them to

 4   discuss kind of what they're representing you on?  I

 5   mean, if you wanted to adopt a kid next week, would

 6   Liberty Counsel be your counsel to do that?  And, if

 7   not, how would you know that?

 8   A          I'm sure there was some kind of form I

 9   signed when -- when they accepted to represent me, but

10   it didn't mention money or -- or anything like that.

11   Q          Okay.  Did you ever ask them whether they

12   are licensed in Kentucky?

13   A          No.  They have a representative that is

14   licensed in Kentucky that helps them.

15   Q          Okay.  Who's that?

16   A          That would be A.C. Donahue.

17   Q          Okay.

18   A          A.C. Donahue.

19   Q          Where's he located out of?

20   A          I'm not really sure.

21   Q          Okay.  You had mentioned that there were

22   checks that would come in and that you would turn that

23   over to your counsel.

24              Did you ever make copies of those checks --

25   A          No.
```

```
 1   Q          -- in case they got lost in the mail or --
 2   A          No.
 3   Q          Okay.  Was there ever a ledger of what you
 4   were sending --
 5   A          No.
 6   Q          -- to your counsel in regards to that?
 7                    MR. STILZ:  Can we take a break?
 8                    MS. HEINRICH:  Yeah.  Yeah, I
 9               think now would be probably a good time
10               to take a break.  Okay.
11                    (A break was taken.)
12   Q          All right.  Thank you for your patience on
13   that little break that we had.  I just have a couple
14   more questions for you, Ms. Davis.
15               Were you in the building when the
16   protesters were there at times in 2015 when all of
17   this kind of blew up?
18   A          Yes.
19   Q          And what was your understanding of who was
20   protesting and who were there?
21   A          There were several groups that were
22   protesting.  One group was against me and one group
23   was in support of me.
24   Q          Okay.  Did you ever have worries for your
25   safety?
```

```
 1   A          Oh, yes.

 2   Q          What, if anything, did you do to change

 3   your entry and exit from the building or anything else

 4   in regards to safety as a result of the protesters?

 5   A          I came to work at different times.  I

 6   parked in different locations.  My husband would drop

 7   me off.  I had to put -- in the inside of my office, I

 8   had four big windows.  I had to put some blinds in

 9   there so that people wouldn't be trying to snap

10   pictures, you know, just so I would have some privacy

11   to work.

12   Q          Uh-huh.  Did you have to go through the

13   throng of protesters to get into your office in the

14   morning or when you left in the afternoon?

15   A          I was usually there before they got there

16   and I usually left after they left.

17   Q          Okay.  Were you aware that the protestors

18   were also there when groups of people were denied

19   marriage licenses as they were exiting the building?

20   A          Oh, yes.

21   Q          And did you have an opportunity to ever

22   hear what they were yelling?

23   A          No.

24   Q          Either the people for you or against you?

25   A          No.
```

1    Q         Did you ever contact any of the

2    organizations that were kind of for you and have any

3    discussions about their activities at the protests or

4    try to get them to tamper down --

5    A         No.

6                   MR. MIHET:  Object.

7    Q         -- the vitriol?

8                   MR. MIHET:  Objection to form.

9                   Lacks foundation.  Assumes facts not in

10                  evidence.

11   A         No.  I didn't have --

12                  MR. MIHET:  Go ahead.

13   A         I didn't have anything to do with them.  I

14   was just there doing my job.

15   Q         Okay.  Did any of your employees or anybody

16   else that you worked with ever talk to you about some

17   things they overheard that was being screamed out and

18   said by the protesters?

19   A         If they did, I can't recall, you know, what

20   they said.

21   Q         Did you have any safety concerns for the

22   gay couples that were turned away in the same way that

23   you had safety concerns for yourself --

24   A         Yeah.

25   Q         -- as they were going in and out of those

1    throngs of people?

2    A        Yes.

3    Q        Okay.  Did you ever discuss with the

4    sheriff's office or with anybody else other safety

5    measures that might be able to be put in place to try

6    to help those people?

7    A        The sheriff's office sent a couple of

8    deputies down to my office to offer security for us.

9    They placed a -- an occupancy-like poster on there of

10   how many people were allowed.  And, you know, I'm sure

11   they had people out -- they had deputies out front,

12   but I don't -- I don't know what they did actually as

13   far as safety is concerned so --

14   Q        You would agree that the concern for safety

15   was real at that point?

16                    MR. MIHET:  Objection to form.

17                    Lacks foundation.  Calls for

18                    speculation.

19   A        I know it was in my regard because we got

20   threats that they were going to -- people were going

21   to come in with an AK47 and mow us down and -- I mean,

22   I got litter bombs and everything in the mail so --

23   Q        Did you ever disclose on your taxes any of

24   the money that came in that you ended up sending to

25   your lawyers?

```
1    A          No, because I just passed it through.

2    Q          Have your lawyers ever told you how much

3    money was collected and turned in to them?

4    A          No.

5               MR. MIHET:  Objection.

6    A          No.  I have no idea.

7               MS. HEINRICH:  I don't think I

8               have any further questions.  I pass the

9               witness.

10               WITNESS:  Thank you.

11               MS. HEINRICH:  Thank you for your

12               time.

13               WITNESS:  Thank you.  Appreciate

14               it.

15               MR. MIHET:  We'll read and sign.

16          -------------------------

17            (DEPOSITION CONCLUDED)

18          _____

19

20

21

22

23

24

25
```

1  STATE OF KENTUCKY    )
                        )   SS.
2  COUNTY OF FAYETTE    )

3          I, TAMELA T. LEWIS, Certified Court Reporter and

4  Notary Public, State of Kentucky at Large, whose

5  commission as such will expire March 19, 2023,

6  do hereby certify that the foregoing deposition was

7  taken by me at the time, place, for the purpose and

8  with the appearances set forth herein; that the same

9  was taken down by me in stenotype in the presence of

10  the witness and thereafter correctly transcribed by me

11  upon computer; that the witness was duly placed under

12  oath by me prior to giving testimony; and that the

13  deposition was submitted to the witness for reading

14  and signing.

15          I further certify that I am not related to nor

16  employed by any of the parties to this action or their

17  respective counsel and have no interest in this

18  litigation.

19          Given under my hand this 21st day of February,

20  2021.

21

22

                    *Tamela T. Lewis*
23                  TAMELA T. LEWIS
                    Certified Court Reporter
24                  Kentucky Certification 20042065
                    Notary Public, State-at-Large
25                  Notary ID 619310

```
1                        SIGNATURE PAGE

2

3              I, KIMBERLY JEAN DAVIS, do hereby state

4    that I have read the foregoing deposition given by me

5    on January 21, 2021, and declare under penalty of

6    perjury under the laws of the United States of

7    America that, together with corrections, if any, as

8    noted on the attached errata sheet, the deposition is

9    true and correct.

10                   Executed on April 1          , 2021.

11

12

13

14   KIMBERLY JEAN DAVIS

15

16

17

18

19

20

21

22

23

24

25
```

ERRATA SHEET

| Page | Line | Correction |
|---|---|---|
| 23 | 14, 17 | "Christy" should be "Kristie" |
| 25 | 1 | "light" should be "line" |
| 45 | 13 | "Wall" should be "Waugh" |
| 127 | 22 | "litter" should be "glitter" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |