# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### ASHLAND DIVISION

| | | |
|---|---|---|
| **DAVID ERMOLD, et al.,** | **:** | **CIVIL ACTION** |
| | **:** | |
| **Plaintiffs,** | **:** | **0:15-CV-00046-DLB-EBA** |
| | **:** | |
| **v.** | **:** | **DISTRICT JUDGE** |
| | **:** | **DAVID L. BUNNING** |
| **KIM DAVIS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Kim Davis, pursuant to Rule 56, Fed. R. Civ. P., and LR 7.1, moves the Court for entry of summary judgment for Davis and against Plaintiffs on all of Plaintiffs' claims because, as shown below, there is no genuine dispute as to any material fact and Davis is entitled to judgment as a matter of law.

Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
(407) 875-1776
hmihet@LC.org
rgannam@LC.org
court@LC.org

A.C. Donahue
Donahue Law Group, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
Tel: (606) 677-2741
Fax: (606) 678-2977
ACDonahue@DonahueLawGroup.com

*Attorneys for Defendant, Kim Davis*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ...................................................................................................... 1

BACKGROUND AND MATERIAL FACTS NOT IN DISPUTE ................................ 2

      A.    Kentucky Marriage Law Prior to *Obergefell* ............................................ 2

           1.    Marriage licensing ........................................................................ 2

           2.    Kentucky Religious Freedom Restoration Act (KRFRA) .......................... 3

      B.    Kentucky Marriage Litigation Prior to *Obergefell* ................................ 4

      C.    *Obergefell* and Governor Beshear's Marriage License Mandate ........................... 5

      D.    Governor Beshear's Denial of Accommodation for Davis's and Other Clerks' Sincerely Held Religious Beliefs about Marriage ................................... 7

      E.    The *Miller v. Davis* Litigation ............................................................. 12

      F.    Plaintiffs' Lawsuit and Quest for Publicity .......................................... 14

      G.    Plaintiffs' Marriage License and Governor Beshear's Belated Accommodations ................................................................................... 20

      H.    Governor Matt Bevin's Executive Order Accommodation for All Clerks Who Object to Endorsing Same-Sex Marriage ........................................... 20

      I.    The General Assembly's Legislative Accommodation for All Clerks Who Object to Endorsing Same-Sex Marriage ........................................... 21

      J.    Plaintiffs' Damages Claims ................................................................. 22

      K.    Procedural Posture .............................................................................. 25

SUMMARY JUDGMENT STANDARD .................................................................... 26

ARGUMENT ............................................................................................................ 27

I.    IMPOSING § 1983 LIABILITY ON DAVIS WOULD VIOLATE DAVIS'S FREE EXERCISE RIGHTS UNDER THE FIRST AMENDMENT BECAUSE GOVERNOR BESHEAR'S MARRIAGE LICENSE MANDATE CANNOT SURVIVE ANY LEVEL OF CONSTITUTIONAL SCRUTINY. ................................... 27

A.  Plaintiffs' Claims Against Davis Individually Depend on the Constitutionality of Governor Beshear's Marriage License Mandate. ..............................................27

B.  Governor Beshear's Marriage License Mandate Is Subject to Strict Scrutiny Because It Burdened Davis's Religious Exercise and Was neither Neutral Towards Religion nor Generally Applicable. ........................................................29

    1.  Governor Beshear's marriage license mandate burdened Davis's religious exercise. ....................................................................................29

    2.  Governor Beshear's marriage license mandate was not neutral towards religion. ....................................................................................32

    3.  Governor Beshear's marriage license mandate was not generally applicable. ....................................................................................34

C.  Governor Beshear's Marriage License Mandate Cannot Survive Strict Scrutiny Because It Was Not the Least Restrictive Means of Advancing a Compelling Government Interest....................................................................................37

D.  Governor Beshear's License Mandate Cannot Even Satisfy Rational Basis Scrutiny. ....................................................................................40

II.  PLAINTIFFS FAIL TO STATE A CLAIM BECAUSE THERE WAS NO VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHT TO MARRY. ...............41

A.  *Obergefell* did not elevate a right to same-sex marriage above the existing right to marry....................................................................................41

B.  The relevant inquiry is whether Kentucky violated Plaintiffs' right to marry.......42

C.  Kentucky's non-discriminatory and temporary suspension of marriage licenses in one county to accommodate Davis's religious beliefs until the marriage license form was revised did not violate Plaintiffs' constitutional right to marry. ....................................................................................43

    1.  Rational basis scrutiny applies....................................................................................43

    2.  Kentucky's accommodation of Davis's religious beliefs satisfies rational basis scrutiny as a reasonable means of advancing a legitimate government interest....................................................................................47

    3.  Kentucky's accommodation of Davis's religious beliefs also satisfies strict scrutiny because Davis's free exercise rights are entitled to the highest constitutional protection. ..............................................................48

III.   DAVIS IS ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFFS'
CLAIMS BECAUSE SHE DID NOT VIOLATE ANY CLEARLY ESTABLISHED
RIGHTS. ...................................................................................................................49

A.   It is Still Plaintiffs' Burden to Overcome Davis's Qualified Immunity Defense
on the Merits. ..............................................................................................49

B.   Qualified Immunity is Granted Broadly to Public Officials Who Do Not
Violate Clearly Established Constitutional Rights. ...............................................50

C.   There Was No Violation of Any Clearly Established Right of Plaintiffs.............51

1.   *Obergefell* did not clearly establish a constitutional right to demand a
state-issued marriage license from a particular state official.....................51

2.   Davis's conduct was objectively reasonable...............................................56

a.   Qualified immunity allows for mistaken judgments and
balancing reasonable uncertainties. ................................................56

b.   It was reasonable for Davis to balance her rights of conscience
with the right to marry. ................................................................57

c.   Kentucky's highest officials agreed that Davis's judgment was
reasonable under the circumstances.............................................61

IV.   PLAINTIFFS' PRAYER FOR DAMAGES IS BARRED BECAUSE THEY
CANNOT QUANTIFY ANY RECOVERABLE DAMAGES.......................................62

A.   Plaintiffs Cannot Quantify Any Recoverable Compensatory Damages. ..............62

B.   Plaintiffs Failed to Mitigate Their Claimed Damages by Intentionally and
Continually Manufacturing Confrontations and Publicizing Them.....................65

C.   Plaintiffs Cannot Justify or Even Identify Any Claim for Punitive Damages.......66

CONCLUSION.....................................................................................................67

CERTIFICATE OF SERVICE ...................................................................................68

## <u>TABLE OF AUTHORITIES</u>

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)......................................................37

*Agudath Israel of Am. v. Cuomo*, 141 S. Ct. 889 (2020) ...........................................................35

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..................................................................51,52,56

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................................................27

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) ..................................................................................56

*Betts v. Costco Wholesale Corp.*, 558 F.3d 461 (6th Cir. 2009)..................................................63

*Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky. 2014) ...........................................................4

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ...................................................................................52

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ............................................................37

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...............................................37,38,39

*Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) ........................................................38

*Caldwell v. Woodford Cnty. Chief Jailor*, 968 F.2d 595 (6th Cir. 1992) ................................56,57

*Campbell v. City of Springboro*, 700 F.3d 779 (6th Cir. 2012) ....................................................50

*Carey v. Piphus*, 435 U.S. 247 (1978) .........................................................................................63

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................26,27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)...................32,34

*City of Boerne v. Flores*, 521 US. 507 (1997) ..............................................................................37

*Claybrooks v. Am. Broad. Companies, Inc.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012) ..........28,40

*Cope v. Heltsley*, 128 F.3d 452 (6th Cir. 1997) ............................................................................52

*Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016).................................................49

*Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015), *cert. granted sub nom.*,
    *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 137 S. Ct. 2290 (2017), *rev'd*,
    138 S. Ct. 1719 (2018)...............................................................................................................53

*Crocket v. Cumberland Coll.*, 316 F.3d 571 (6th Cir. 2003) .........................................................50

*Daugherty v. Campbell*, 935 F.2d 780 (6th Cir. 1991) ................................................................52

*Davis v. Ermold*, 141 S. Ct. 3 (2020)..............................................................................26,66,67

*DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014) .........................................................................5

*Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ....................32

*Ermold v. Davis*, No. 15-46-DLB-EBA, 2017 WL 4108921 (E.D. Ky. Sept. 15, 2017) .........49,50

*Ermold v. Davis*, 936 F.3d 429 (6th Cir. 2019) ...............................................................26,28,49

*Estate of Carter v. Detroit*, 408 F.3d 305 (6th Cir. 2005) ...........................................................50

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ...............................................................65

*Flora v. Cnty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015) .............................................................52

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)........................................30,31,32,34,35,66

*Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021)..........................................................35

*Gibbs v. Lomas*, 755 F.3d 529 (7th Cir. 2014) .....................................................................51,52

*Gish v. Newsom*, 141 S. Ct. 1290 (2021) .................................................................................35

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ..................38

*Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684 (6th Cir. 2002) .......................................59

*Grossman v. Allen*, 950 F.2d 338 (6th Cir. 1991) ......................................................................57

*Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990).......................................................................57

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..........................................................................50,52

*Harvest Rock Church, Inc. v. Newsom,* 141 S. Ct. 889 (2020)....................................................35

*Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 1289 (2021)...................................................35

*High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (2020).......................................................35

*Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010).......................................................56

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................52

*Johnson v. Moseley*, 790 F.3d 649 (6th Cir. 2015) ....................................49

*Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011) ......................51

*Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146 (11th Cir. 1994).........................51

*Long v. Norris*, 929 F.2d 1111 (6th Cir. 1991) ..........................................51

*Love v. Beshear*, 989 F. Supp. 2d 536 (W.D. Ky. 2014) ..............................5

*Loving v. Virginia*, 388 U.S. 1 (1968).................................................45,46

*Malley v. Briggs*, 475 U.S. 335 (1986) ....................................................50

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020)....................35

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................37

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299 (1986).........................62,63,65,66

*Miller v. Davis*, 123 F. Supp. 3d 924 (E.D. Ky. 2015) ........................... *passim*

*Miller v. Davis*, 667 F. App'x 537 (6th Cir. 2016) ..................................14,21

*Miller v. Davis*, No. 15-44-DLB, 2017 WL 3122657 (E.D. Ky. July 21, 2017) ..........................43

*Montgomery v. Carr*, 101 F.3d 1117 (6th Cir. 1996) ...............................44,45,46,47,49

*Meyers v. City of Cincinnati*, 14 F.3d 1115 (6th Cir. 1994) .........................65

*NAACP v. Claiborne Hardware Co.,* 458 U.S. 886 (1982)..........................28

*New York Times Co. v. Sullivan,* 376 U.S. 254 (1964)................................28

*O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011)................................52

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)................................... *passim*

*Occupy Nashville v. Haslam*, 769 F.3d 434 (6th Cir. 2014)........................55,56

*Pavan v. Smith*, 137 S. Ct. 2075 (2017)...............................................41,53

*Pearson v. Callahan*, 555 U.S. 223 (2009).........................................50,51,58,59,62

*Pidgeon v. Turner*, No. 15-0688, 2017 WL 2829350 (Tex. June 30, 2017)................................53

*Pinkhasov v. Petocz*, 331 S.W.3d 285 (Ky. App. 2011) ...............................................42

*Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014)......................................................55,56,61

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) ........................................................35

*Robinson v. Murphy*, 141 S. Ct. 972 (2020) ...............................................................35

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)..............................35

*Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507 (6th Cir. 1997) ...........................51

*South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021).............................35,36

*Stanton v. Sims*, 134 S. Ct. 3 (2013) ....................................................................56,61

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) .............................................................35,37

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000)..............................37

*Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703 (6th Cir. 2001) ..................................44,46,47

*Walton v. City of Southfield*, 995 F.2d 1331 (6th Cir. 1993) ...................................51,52

*Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130 (6th Cir. 1995) .................................44

*Zablocki v. Redhail*, 434 U.S. 374 (1978)...............................................................44,45,46

## **Statutes**

42 U.S.C. § 1983..................................................................................................1,62,63,65

42 U.S.C. § 2000bb-1 ..........................................................................................38

2013 Ky. Acts ch. 111, § 1 (HB 279) .....................................................................3

2016 Kentucky Acts ch. 132 (SB 216) .......................................................... 14,21,39

Kentucky Religious Freedom Restoration Act,
    KRS 446.350 (KRFRA)................................................................................ *passim*

KRS 64.5275.......................................................................................................43

KRS 150.195.......................................................................................................36

KRS 402.080.................................................................................................3,42,43,54

KRS 402.100...........................................................................................2,21,29,43,54

KRS 402.110...................................................................................................2,21,29

KRS 402.240......................................................................................................3,36,39

KRS 402.990..............................................................................................................2

KRS 446.010............................................................................................................60

KRS 446.030............................................................................................................60

KRS 446.090............................................................................................................60

KRS 446.140............................................................................................................60

KRS Ch. 402............................................................................................................14

KRS Ch. 446..............................................................................................................3

Md. Code Ann., Fam. Law § 2-401........................................................................54

Mich. Comp. Laws § 551.101.................................................................................54

Mich. Comp. Laws § 551.103a..............................................................................54

Minn. Stat. § 517.07................................................................................................54

Minn. Stat. § 517.08................................................................................................54

N.C. GEN. STAT. § 51-5.5......................................................................................40

Ohio Rev. Code Ann. § 3101.05.............................................................................54

Tenn. Code Ann. § 36-3-103...................................................................................54

**<u>Rules</u>**

Fed. R. Civ. P. 56....................................................................................................26

**<u>Other Authorities</u>**

Executive Order 2015-048 Relating to the Commonwealth's
    Marriage License Form...............................................................13,20,21,39,61

**<u>Constitutional Provisions</u>**

Ky. Const. Preamble ...................................................................................48

Ky. Const. § 5 ............................................................................................48

Ky. Const. § 233A .......................................................................................2

Ky. Const. § 246 ........................................................................................43

U.S. Const. amend. I .............................................................................. *passim*

U.S. Const. amend. XI ...............................................................................25

U.S. Const. amend. XIV .....................................................................41,56,59

## <u>INTRODUCTION</u>

### "I would love to see her hang"

### "SLOWLY"[1]

This case is now only about retribution. Plaintiffs sued Davis under 42 U.S.C. § 1983 and *Obergefell v. Hodges*, 576 U.S. 644 (2015), for allegedly violating their constitutional right to marry. But Plaintiffs no longer want a marriage license—they got it years ago. Other parties who sued Kentucky and Kim Davis to obtain marriage licenses resolved their lawsuit when those licenses were issued.[2] These Plaintiffs, however, want to punish Kim Davis financially, and worse—they want "to see her hang. . . . SLOWLY."[3]

Davis is entitled to summary judgment against Plaintiffs because, on the undisputed record now before the Court (*see infra* Background and Material Facts Not in Dispute ("Facts")), and as argued below (*see infra* Argument), Plaintiffs fail to state a claim because the Free Exercise Clause of the First Amendment protects Davis from Plaintiffs' § 1983 claim (Arg. I), there was no violation of Plaintiffs' constitutional right to marry (Arg. II), Davis is entitled to qualified immunity from Plaintiffs' claims because she did not violate any clearly established right (Arg. III), and Plaintiffs' cannot quantify any recoverable damages (Arg. IV).

---

[1]     Comment and reply to Plaintiff David Ermold's Facebook post about Kim Davis, which Ermold "liked." (Doc. 90-1 at 157:11–161:12, Exs. 20, 21.)

[2]     *Miller v. Davis*, No. 0:15-CV-00044-DLB. (*See infra* Facts Pt. E.)

[3]     *Supra* note 1.

## BACKGROUND AND MATERIAL FACTS NOT IN DISPUTE

**A.    Kentucky Marriage Law Prior to *Obergefell***

    **1.    Marriage licensing**

Prior to *Obergefell*, Kentucky constitutionally and statutorily defined marriage as the union between one man and one woman. KY. CONST. § 233A (2004) ("Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky."); KRS 402.005 (1998) ("'marriage' refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life"). The pre-*Obergefell* marriage licensing statutes dictated that "[e]ach county clerk shall use the form prescribed by the Department for Libraries and Archives [KDLA] when issuing a marriage license" which "shall be uniform throughout this state, and every license blank shall contain the identical words and figures provided in the form." KRS 402.100 (2006), 402.110 (1984). The licensing statutes did not authorize county clerks to alter the composition or requirements of the KDLA-prescribed form. Moreover, the licensing statutes impose criminal penalties on any county clerks "who knowingly issues a marriage license to any persons prohibited by this chapter from marrying." KRS 402.990(6) (1996). (*See* Doc. 89-15, *Amicus Curiae* Br. Ky. Sen. Pres. Hon. R. Stivers, at 2, 4.)

By statute, the pre-*Obergefell* marriage license form had to include both a "marriage license" and a "marriage certificate." KRS 402.100 (2006). The license section had to include an "authorization statement of the county clerk issuing the license" and "the signature of the county clerk or deputy clerk issuing the license." KRS 402.100(1) (2006). The certificate section had to include "the name of the county clerk under whose authority the license was issued, and the county in which the license was issued," and "[a] signed statement by the county clerk or a deputy county clerk of the county in which the marriage license was issued that the marriage license was recorded." KRS 402.100(2), (3) (2006). The pre-*Obergefell*, KDLA-prescribed form included the

sections and language required by statute, specifically referencing "marriage" in six different places, and "join[ing] together in the state of matrimony" once. (Doc. 89-10 at 5, n.1; Doc. 89-11 at 2; Doc. 89-1 at 36:14–39:17.)

The Kentucky marriage licensing statutes permit the issuance of a Kentucky marriage license to any qualified couple **in any of the Commonwealth's 120 counties**. KRS 402.080. Some county clerks have multiple branch offices in the same county, providing approximately **137 marriage licensing locations** in Kentucky. (Doc. 89-10 at 4 ¶ 9.) Kentucky statutes also permit the issuance of a marriage license by a county judge/executive, the highest elected officer in a county, upon the absence of the county clerk or vacancy in the clerk's office. KRS 402.240. This alternative procedure does not require the use of the KDLA marriage license form; rather, it authorizes the county judge/executive to issue a marriage license by "a memorandum thereof," which is recorded by the clerk in the same manner as a KDLA form. *See id.*

### 2.    Kentucky Religious Freedom Restoration Act (KRFRA)

Introduced in the 2013 Regular Session of the Kentucky General Assembly as House Bill No. 279, "AN ACT relating to the construction of the law," 2013 Ky. Acts ch. 111, § 1 (HB279), the Kentucky Religious Freedom Restoration Act (KRFRA), KRS 446.350, was passed by overwhelming majorities in both the Kentucky House and Senate. (Ky. Bill Tracking, Ky. House Bill 279 (2013 Reg. Sess.), Doc. 92-7 (82-7 in House, 29-6 in Senate).) Governor Beshear vetoed the legislation on March 22, 2013. (Doc. 92-7.) The General Assembly overrode the veto, however, again with overwhelming majorities. (Doc. 92-7 (79-15 in House, 32-6 in Senate).)

KRFRA is housed in KRS ch. 446, titled "Construction of Statutes," in a section titled "Rules of Codification," and provides:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened

> unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

KRS 446.350.

**B.    Kentucky Marriage Litigation Prior to *Obergefell***

In February 2014, the Western District of Kentucky issued a decision holding Kentucky's enduring definition of marriage unconstitutional. *Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky. 2014) (decided February 12, 2014). In March 2014, Kentucky's then-Attorney General Jack Conway, whose office had represented Kentucky in the case, tearfully proclaimed that after prayer and consultation with his wife he could not continue defending Kentucky's marriage laws as an "inescapable" matter of conscience. (Doc. 89-9.) Conway said,

> There are those who believe it's my mandatory duty, regardless of my personal opinion, to continue to defend this case through the appellate process, and I have heard from many of them. However, I came to the inescapable conclusion that, if I did so, I would be defending discrimination. . . .
>
> That I will not do. . . .
>
> . . . .
>
> . . . . **I can only say that I am doing what I think is right. In the final analysis, I had to make a decision that I could be proud of**—for me now, and my daughters' judgment in the future.

(Doc. 89-6 (emphasis added)).

Within minutes of Conway's announcement, Governor Beshear announced the Commonwealth would hire private attorneys to pursue the appeal of the Western District's ruling,

and to represent Kentucky in a companion Western District case.[4] (Doc. 89-9.) Governor Beshear indicated **no chastisement or adverse actions towards Conway** as a result of Conway's refusal to perform official duties due to his conscience, though Conway's refusal caused the Commonwealth to incur additional costs for outside counsel upwards of $200,000.00. (Doc. 89-7, Doc. 89-8.)

C.     *Obergefell* **and Governor Beshear's Marriage License Mandate**

On June 26, 2015, a five-to-four majority of the United States Supreme Court held that the laws of Kentucky and three other states, defining marriage as the union of one man and one woman, were "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Obergefell v. Hodges*, 576 U.S. 644, 675–76 (2015). According to the majority, the United States Constitution "does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex." *Id.* at 680. The majority also recognized, however, "The First Amendment ensures that religious . . . persons are given proper protection . . . ." *Id.* at 679; *see also id.* at 711 (Roberts, C.J., dissenting) ("Many good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion is . . . spelled out in the Constitution."). (*See also infra* Pt. III.C.2.b.)

On June 26, 2015, moments after the Supreme Court announced its decision in *Obergefell*, Governor Beshear announced by letter to all Kentucky county clerks a new marriage license policy:

> Kentucky . . . must license and recognize the marriages of same-sex couples. . . .

---

[4]      The Western District ruled against Kentucky in the companion case, *Love v. Beshear*, 989 F. Supp. 2d 536 (W.D. Ky. 2014). The Sixth Circuit reversed both Western District decisions in *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), which was ultimately reversed by the Supreme Court in *Obergefell*.

> Effective today, Kentucky will recognize as valid all same sex marriages performed in other states and in Kentucky. In accordance with my instruction, all executive branch agencies are already working to make any operational changes that will be necessary to implement the Supreme Court decision. Now that same-sex couples are entitled to the issuance of a marriage license, the Department of Libraries and Archives [KDLA] will be sending a gender-neutral form to you today, along with instructions for its use.
>
> You should consult with your county attorney on any particular aspects related to the implementation of the Supreme Court's decision.

(Doc. 92-1 (*see also Miller v. Davis*, 123 F. Supp. 3d 924, 932 (E.D. Ky. 2015), *vacated*, 2016 WL 11695944 (E.D. Ky. Aug. 18, 2016).)

The same day, in accordance with Governor Beshear's directive, the KDLA provided county clerks with a new marriage license form, substituting references to "first party" and "second party" for "bride" and "groom." (Doc. 92-3.) The new form retained all references to "marriage," and all requirements for the name, signature, and authorization of the county clerk for issuance. (Doc. 92-3; *see Miller*, 123 F. Supp. 3d at 931–32, 931 n.3.) The KDLA communication accompanying the new license form reiterated county clerks' statutory obligation to use the KDLA-prescribed form. (Doc. 92-3 (admonishing "each county clerk shall use the form prescribed" and "the revised Marriage License form **shall** replace the current form" (cleaned up)).)

In addition to marriage license policy directives to the KDLA and county clerks, Governor Beshear's marriage license mandate included express "instruction [to] all executive branch agencies . . . to make any operational changes that will be necessary to implement the Supreme Court decision" (Doc. 92-1), and an express directive to "[a]ll Cabinets of the executive branch . . . to immediately alter any policies necessary to implement the decision from the Supreme Court." (Doc. 89-2.) Governor Beshear further declared that "[t]his Administration continues to identify

statutes which must now be interpreted in a different way and is making the appropriate changes."
(Doc. 89-4.)

**D.    Governor Beshear's Denial of Accommodation for Davis's and Other Clerks' Sincerely Held Religious Beliefs about Marriage**

Davis is a professing Christian who is heavily involved in her local church, attending weekly Bible study and worship services there, and who leads a weekly Bible study for women at a local jail. (Doc. 89-10 ¶ 16.) As a Christian, Davis possesses a sincerely held religious belief and conviction, based upon the Bible which she believes to be the Word of God, that "marriage" is exclusively a union between one man and one woman. (Doc. 89-10 ¶ 17; Am. Compl., Doc. 27, at 3, ¶¶ 21, 23 (*see also Miller*, 123 F. Supp. 3d at 932).) According to her beliefs, there is no arrangement of people other than one man and one woman that is, or can be called, "marriage." (Doc. 89-10 ¶ 17.)

As county clerk, as a matter of Kentucky law, Davis authorized, and signified her authorization and approval by affixing her name to, each and every marriage license issued from her office. (Doc. 89-10 ¶ 18.) But Davis could neither authorize nor approve the "marriage" of a same-sex couple according to her conscience, because even calling the relationship of a same-sex couple "marriage" would violate her deeply and sincerely held religious beliefs. (Doc. 89-10 ¶ 18.) Nor could Davis allow her name to appear as the source of authority and approval for any marriage license issued to a same-sex couple because providing such endorsement would violate her sincere religious beliefs and convictions. (Doc. 89-10 ¶ 18; Doc. 89-1 at 42:19-20 ("Because if I say that I authorize that, I'm saying I agree with it, and I can't.").) During Davis's entire tenure in the Rowan County Clerk's Office, spanning nearly thirty years, neither Davis, any deputy clerk, nor Davis's predecessor in office ever asserted a religious objection to performing any other function of the clerk's office. (Doc. 89-10 ¶ 31.)

Before taking office as County Clerk in January 2015, Davis swore an oath to support the Constitutions and laws of the United States and the Commonwealth of Kentucky "so help me God." (Doc. 89-10 ¶ 19.) Davis understood (and understands) this oath to mean that, in upholding the federal and state constitutions and laws, she would not act in contradiction to the moral law of God, natural law, or her sincerely held religious beliefs and convictions. (Doc. 89-10 ¶ 19.) Davis also understood (and understands) the Constitution and laws she swore to uphold to incorporate the constitutional and other legal protections of all individuals' rights to live and work according to their consciences, as informed by their sincerely held religious beliefs and convictions, including without limitation such rights she holds in her own individual capacity.[5] (Doc. 89-10 ¶ 19.)

Davis's sincerely held religious belief regarding the definition of "marriage" was perfectly aligned with the prevailing marriage policy in Kentucky at the time she took office, as provided in the Kentucky Constitution, Kentucky statutes, and controlling court decisions, and as effected by the Commonwealth through Governor Beshear and the State Librarian. (Doc. 89-10 ¶ 20.)

On January 16, 2015, just two weeks after Davis took office, the United States Supreme Court announced it would review the then-controlling Sixth Circuit decision upholding Kentucky's natural definition of marriage. (Doc. 89-10 ¶ 21.) Davis immediately began a long quest of seeking reasonable, neutral and non-discriminatory accommodations for herself and other county clerks with sincere religious beliefs about marriage. On January 23, Davis wrote Kentucky legislators exhorting them to "get a bill on the floor to help protect clerks" who had a religious objection to issuing marriage licenses to same-sex couples:

> I am contacting you in hope of support of possible legislation that
> would give county clerks the option to exempt themselves from

---

[5]    In 2018, Plaintiff Ermold told an Associated Press reporter that "Kim Davis has the integrity to stand up for what she believes in." (Doc. 90-1 at 142:14–23, 146:6–11; 91-18.)

issuing marriage license, **not only to same sex couples but to all parties, as to not discriminate anyone**. The LRC has determined in "the duties of the County Clerk", the Clerk may be exempted from selling other licenses, i.e .... fishing and hunting license by applying with written notice to that department. I wanted to have the option, as a person who has deep moral conviction, **to choose not to discriminate any party**, by allowing a Clerk to apply for an exemption for the issuance of marriage licenses.

(Doc. 89-12 (emphasis added); Doc. 89-10 ¶ 22; Doc. 89-1 33:13–36:12.)

On June 26, after receiving the new marriage license form, Davis submitted an inquiry to Kentucky County Clerk's Association (KCCA) official Bill May: "What about the Clerk's who have strong objections/moral convictions to this situation about issuing same sex marriage license? Can there be an 'opt out' for marriage licenses like there are for hunting & fishing license?" (Doc. 92-2.)

Davis's religious beliefs compel her to stop any marriage license applicant from obtaining a marriage license from any other county clerk or other official. (Doc. 89-16 at 53:6–53:23.) Nor does Davis have a religious objection to issuing, signing, or otherwise approving a marriage license for any man and woman who otherwise satisfy all of the legal requirements for marriage under Kentucky law, regardless of the identities, orientations, or practices of the applicants, including sexual identities, orientations, and practices. (Doc. 89-10 ¶ 23.) Furthermore, Davis's religious beliefs do not compel her to inquire of such applicants as to any aspects of their identities, orientations, or practices beyond the information required to complete the prescribed marriage license form. (Doc. 89-10 ¶ 23.)

Without any accommodation from Beshear or the legislature, on June 27, 2015, Davis discontinued issuing marriage licenses in Rowan County because of her sincere religious beliefs. (Doc. 89-10 ¶ 29; Doc. 27 at 3 ¶¶ 21, 23; Doc. 90-1 at 140:20–142:13; Doc. 90-3 at 35:23–38:17, 44:6–17, 104:8–17; Doc. 91-17 at 1; *see also Miller*, 123 F. Supp. 3d at 929–930.) This was not a

"spur-of-the-moment decision" reached by Davis. (Doc. 89-10 ¶ 29.) Rather, after exhorting legislators to provide conscience protection for county clerks upon taking office, Davis prayed and fasted during the months leading up to *Obergefell* over how she would respond to such a Supreme Court decision. (Doc. 89-10 ¶ 29.) Though Davis's religious objection is limited to issuing licenses to same-sex couples, **she suspended the issuance of all licenses to ensure that all individuals and couples in Rowan County were treated the same**, and only until she could receive an accommodation of her religious beliefs.[6] (Doc. 90-3 at 44:6–17, 46:2–8, 104:8–17; Doc. 89-10 ¶ 29; *see Miller*, 123 F. Supp. 3d at 929–930.) Davis and her deputy clerks advised those seeking marriage licenses that licenses were available from clerks in surrounding counties. (Doc. 90-3 at 49:4–50:12, 104:21–25.)

On July 2, 2015, the President of KCCA, Chris Jobe, wrote to all Kentucky county clerks to acknowledge the religious objections of many county clerks to Governor Beshear's *Obergefell* mandate, and to solicit participation in an urgent letter to the Governor requesting protection of clerks' constitutional rights:

> Last Friday's ruling on KY's same sex marriage ban has put many County Clerks' moral and religious beliefs at odds with a part of our current duties as Clerks. I have spoken with many Clerks that firmly believe that forcing Co Clerks to issue same-sex marriage license when it is against their deeply held beliefs is a direct violation of the U.S. Constitution's First Amendment. The First Amendment prohibits the making of any law respecting an establishment of religion, impeding the free exercise of religion.
>
> For the aforementioned reason I am asking each County Clerk if they are willing to sign a letter to the Governor urgently requesting the Governor to call a special session to address this violation of rights. Please respond immediately if you are willing send a letter.

---

[6]    In their Amended Complaint, Plaintiffs mischaracterized Davis's decision as "a policy to deny same-sex marriage licenses." (Doc. 27 at 3 ¶ 17.) They corrected themselves, however, in their opposition to Davis's motion to dismiss their amended complaint, acknowledging that Davis' decision applied to "any and all couples." (Doc. 31 at 2 (citing *Miller*, 123 F. Supp. 3d at 929).)

> Once we have compiled a list of those who are willing we will send a form letter for you to put on your letterhead, to sign and send to the Governor. . . .
>
> FYI- we are currently working on proposed bill that would end the State sanctioning of the new definition of marriage and remove it as duty of the County Clerk except for the recording.

(Doc. 92-4.) Davis responded the same day, requesting to join in the letter. (Doc. 92-5.)

Also on July 2, still less than one week after Gov. Beshear issued his mandate, the plaintiffs in *Miller v. Davis* (two same-sex and two different-sex couples) filed the first lawsuit against Davis in this Court, alleging federal constitutional claims and seeking a preliminary injunction, demanding immediate issuance of marriage licenses to them in Rowan County, under Davis's name and authority. (*Miller v. Davis,* No. 0:15-cv-44-DLB, Compl., Doc. 1, at 1–15.[7]) The *Miller* plaintiffs filed their case as a putative class action, on behalf of themselves and "individuals who are qualified to marry and who intend to seek a marriage license from the Rowan County Clerk." (*Id.*) The Court scheduled a hearing on the preliminary injunction motion for July 13. (*Miller* Doc. 5.)

On July 8, KCCA President Jobe distributed to all Kentucky county clerks a draft letter to Governor Beshear. (Doc. 92-6.) The same day, Davis adopted and sent the letter, appealing to

---

[7]    Although this Court did not formally consolidate *Miller* with this case, the Court treated the cases, along with a third case, *Yates v. Davis,* as consolidated for some purposes, including dismissal. (*See* Order, Doc. 19 (dismissing together *Miller, Yates,* and the instant case under the caption *In re: Ashland Civil Actions,* referring to *Miller* as "the lead case"); *see also* Order, Doc. 13 (staying briefing in instant case pending outcome of appeal in "related case" *Miller*)). Furthermore, this Court expressly contemplated Plaintiffs' claims herein when it expanded the *Miller* preliminary injunction to benefit not only the *Miller* Plaintiffs, but all persons who may seek a marriage license in Rowan County. (Doc. 89-16 at 9:4-19:17 ("There are a couple of companion cases, [*Ermold*, 15-]46 and [*Yates*, 15-]49? 51? I can't remember the numbers, but there are three cases now pending with various plaintiffs.") ("[I]n granting that relief that's requested at Docket 68, the Court finds that given the fact that it does have two companion cases that involve, in essence, the very same allegations with the same lawyers, it just makes judicial sense to have the Circuit review the decision for all three of them."))

Governor Beshear to uphold her religious conscience rights, and to call a special session of the General Assembly to address the conflict between her religious beliefs and the new Kentucky marriage policy effected by Governor Beshear. (Doc. 89-10 ¶ 30; Doc. 89-13; Doc. 89-1 45:14–47:4.)

Governor Beshear rejected the pleas of Davis and county clerks for a special session or other accommodation of their sincere religious objections to issuing marriage licenses to same-sex couples and publicly rebuked them, chiding that "[r]egardless of whatever their personal feelings might be, the overwhelming majority of county clerks are . . . iss[uing] marriage licenses . . . and the courts will deal appropriately with the two or three clerks [out of 120] who are acting otherwise" (Doc. 89-4); that "[i]t's time for everyone to take a deep breath" as "I will not be calling a special session on this topic" (Doc. 89-4); and that county clerks who oppose issuing marriage licenses to same-sex couples due to "personal beliefs" or "personal convictions" should either issue the licenses in violation of conscience or "resign and let someone else step in" (Doc. 89-5).

### E.    The *Miller v. Davis* Litigation

The Court conducted hearings on the *Miller* plaintiffs' preliminary injunction motion on July 13 and July 20 (*Miller* Docs. 21, 26), and briefing on the motion was completed on August 6 (*Miller* Doc. 36). In the meantime, on August 4, Davis filed a third-party complaint against Gov. Beshear and the commissioner of the KDLA (Doc. 89-10) asserting, *inter alia*, her right to religious accommodation from Governor Beshear's mandate as violating Davis's religious liberty and conscience rights under the Free Exercise Clause of the First Amendment and KRFRA. On August 7, Davis filed a motion for preliminary injunction against Governor Beshear and the KDLA commissioner (*Miller* Doc. 39) seeking immediate relief from Governor Beshear's mandate to violate her conscience or resign.

On August 12, prior to any hearing on Davis's preliminary injunction motion against Governor Beshear, the Court granted the *Miller* plaintiffs' preliminary injunction motion, enjoining Davis, in her official capacity, "from applying her 'no marriage licenses' policy to future marriage license requests submitted by Plaintiffs." (*Miller*, 123 F. Supp. 3d at 930, 944.) Davis immediately appealed the preliminary injunction order. (*Miller* Doc. 44.) On August 25, the Court *sua sponte* stayed all proceedings on Davis's preliminary injunction motion against Governor Beshear pending the outcome of Davis's appeal from the *Miller* plaintiffs' preliminary injunction against Davis. (*Miller* Doc. 58.) On September 3, 2015, the Court expanded the preliminary injunction to apply to "other individuals who are legally eligible to marry in Kentucky," including Plaintiffs here. (*Miller* Doc. 74; *supra* note 7.) On the same day, the district court held Davis in contempt of the preliminary injunction, and remanded Davis to the custody of the United States Marshal pending compliance. (*Miller* Doc. 49.) Davis appealed the September 3 preliminary injunction expansion order and contempt order. (*Miller* Docs. 82, 83.)

At the September 3 hearing where the Court expanded the *Miller* preliminary injunction to apply to Plaintiffs here, the Court expressed hope for a legislative or executive accommodation of the kind ultimately granted by Gov. Bevin in his Executive Order 2015-048 (*see infra* Facts Pt. H), and made permanent by the enactment of Kentucky Senate Bill 216 (*see infra* Facts Pt. I): "I recognize, and I mentioned this when we first came out earlier this morning, that the legislative and executive branches do have the ability to make changes. And those changes may be beneficial to everyone. Hopefully, changes are made." (Doc. 89-16 at 96:5–9.) "If legislative or executive remedies . . . come to fruition, as I stated, better for everyone." (*Id.* at 97:3–5.)

At the same hearing, the Court granted the motion of Kentucky Senate President Robert Stivers for leave to file an amicus brief in support of Davis (Doc. 89-16 at 19:20–20:23), in which

Senator Stivers advised the Court that "the concept of marriage as between a man and a woman is so interwoven into KRS Chapter 402 that the defendant County Clerk cannot reasonably determine her duties until such time as the General Assembly has clarified the impact of *Obergefell* by revising KRS Chapter 402 through legislation," or "[a]lternatively the clerk's duties could be clarified by Executive Order of the Governor . . . ." (Doc. 89-14 at 1–2.) Senator Stivers's accepted brief also advised the Court that the protections of KRFRA are a "mandate upon the Commonwealth" such that any revision of Kentucky's marriage licensing policies to accord with *Obergefell*, whether by the General Assembly or the Governor, must accommodate the religious conscience rights of Davis in "the least restrictive manner possible." (Doc. 89-15 at 2.)

The passage of Kentucky Senate Bill 216 (SB 216) permanently removing county clerks' name and authorization from Kentucky marriage licenses (*see infra* Facts Pt. I) rendered moot Davis' appeals from this Court's preliminary injunction orders in *Miller*. Accordingly, the Sixth Circuit dismissed the *Miller* appeals and remanded the case to this Court, instructing it to vacate the August 12 and September 3, 2015, preliminary injunction orders. *Miller v. Davis,* 667 F. App'x 537 (6th Cir. 2016). The Court duly vacated the orders (*Miller* Doc. 181) and dismissed *Miller* (Doc.19; *see supra* note 7; *infra* Facts Pt. K), including the *Miller* plaintiffs' remaining damages claims against Davis. (*Miller* Doc. 1.) The *Miller* plaintiffs did not seek to reinstate their damages claims.

### F.    Plaintiffs' Lawsuit and Quest for Publicity

Plaintiffs filed the second lawsuit against Davis in this Court, on July 10, 2015. (Compl., Doc. 1.) Plaintiffs sued Davis for allegedly violating their constitutional right to marry. (Am. Compl., Doc. 27, at 4-7.) According to the Amended Complaint, Plaintiffs are two males residing in Rowan County, Kentucky, who desired but were denied a Kentucky marriage license. (Doc. 27 at 1–3, 5, ¶¶ 3, 4, 7, 19, 22, 24, 25.) Based on *Obergefell* and Governor Beshear's mandate,

14

Plaintiffs claim their constitutional right to marry includes the right to be issued a marriage license by Davis herself, in Rowan County, without any accommodation for Davis' sincerely held religious beliefs. (*Id.* at 1–3, 6, ¶¶ 3–4, 7–8, 15, 17, 19, 22, 24, 25, 43.) Davis' observance of her "deeply held Christian beliefs" about marriage, Plaintiffs claim, violated their constitutional right to marry. (*Id.* at 3, 6, ¶¶ 21, 43.) Plaintiffs seek actual and punitive damages, pre- and post-judgment interest, and attorneys' fees and costs against Davis. (*Id.* at 7.)

Plaintiffs' residence in Morehead is located approximately 9 miles (11 minutes) from the Rowan County Clerk's office. (Doc. 92-9.) By comparison, the county clerks' offices in the seven counties surrounding Rowan County are located at the following approximate distances (and times) from Plaintiffs' residence (shortest to longest):

| | |
|---|---|
| Bath County (Owingsville) | 15 miles (16 minutes) |
| Menifee County (Frenchburg) | 20 miles (27 minutes) |
| Fleming County (Flemingsburg) | 24 miles (31 minutes) |
| Morgan County (West Liberty) | 30 miles (34 minutes) |
| Elliott County (Sandy Hook) | 33 miles (37 minutes) |
| Carter County (Grayson) | 41 miles (38 minutes) |
| Lewis County (Vanceburg) | 42 miles (54 minutes) |

(Docs. 92-10 to 92-16.)

Plaintiff Ermold worked at the University of Pikeville (UPIKE) in Pikeville, Kentucky, from 2014 to 2018, which included all of 2015. (Doc. 90-1 at 14:18–15:4, 33:3–7.) The UPIKE campus is located approximately 97 miles (2 hours) from Plaintiffs' home in Morehead, Kentucky, and Doc. 90-1 at made the drive to and from UPIKE each week during the fall and spring semesters. (Doc. 90-1 at 33:14–23, 91-7 at 2; Doc. 92-17.) For the five years prior, from 2009 to

2014, Ermold worked at Southern West Virginia Community and Technical College in Williamson, West Virginia, located approximately 131 miles (2 hours 15 minutes) from Plaintiffs' home in Morehead, and from 2010 to 2014 made the drive to and from weekly. (Doc. 90-1 at 15:8–16:2, 34:16–36:8, 91-7 at 2; Doc. 92-18.) From 2007 to the present Ermold also worked part time at several campuses of Maysville Community and Technical College, including at its Eastern Kentucky Correctional Complex (EKCC) campus in West Liberty, Kentucky, located approximately 31 miles (37 minutes) from Plaintiffs' home. (Doc. 90-1 at 13:16–14:17, 31:9–33:2; Doc. 92-19.) In 2015, while working full time at UPIKE, Ermold also worked at the Maysville EKCC campus, stopping weekly in West Liberty to teach on the return trip from UPIKE. (33:24–34:10.) Ermold's 2015 weekly driving for work took him to or through the county seats of Morgan (West Liberty), Magoffin (Salyersville), Floyd (Prestonsburg), and Pike (Pikeville) Counties. (Google Maps.) Plaintiff Moore occasionally accompanied Ermold on his weekly work trips. (Doc. 90-1 at 34:11–13, 38:11–13; Doc. 92-20.)

Plaintiffs identified no financial, physical, or legal obstacles to their seeking and obtaining a marriage license from any of the clerks' offices surrounding Rowan County, some of which they were near on a daily or weekly basis.

Plaintiffs first went to the Rowan County Clerk's office to seek a marriage license on July 6, 2015. (Doc. 90-1 at 64:11–23; Doc. 27 ¶ 19.) At the time, Plaintiffs knew Davis was not issuing licenses. (Doc. 90-1 at 58:17–22, 60:16–61:16, 62:11–18, 63:9–23, 64:24–67:11; Doc. 90-2 at 24:9–25:7; 91-10 (Ermold letter to Davis prior to July 6 visit chastising her for not issuing licenses); 91-11 at 178 ("I read online that Davis was denying the licenses.") ("We kept hearing that people were getting denied."); Ex. 12 at 00:19–00:25.) Plaintiffs went to the Clerk's Office anyway, with the intention of video recording a confrontation with Davis, having asked a friend to

film their endeavor. (Doc. 90-1 at 67:17–68:19; 91-11 at 178 ("We decided we were going to go in and document it.").)

Plaintiffs recorded an introduction to their video outside the Rowan County Clerk's Office, during which Ermold confirmed his understanding that no license would be issued. (Ex. 12 at 00:00–00:26.) Plaintiffs entered the office with their videographer and were advised by a deputy clerk that the office was not issuing marriage licenses, but that marriage licenses were available from the clerks of the surrounding counties. (Ex. 12 at 00:27–06:13.) Plaintiffs pressed the deputy clerk to explain why no licenses were being issued and requested to continue discussing the matter with the deputy clerk, and continued waiting in the office after being advised again that no licenses would be issued. (Ex. 12 at 06:02–09:33.) Plaintiffs approached a different deputy clerk when she became free and argued for a marriage license, while the deputy clerk advised that Kim Davis would be available to speak with them shortly and explained again that marriage licenses were not available at the office but were available in any other county clerk's office. (Ex. 12 at 09:33–11:06.) When Kim Davis became available to speak to Plaintiffs, she requested to speak to them off camera. (Ex. 12 at 11:08–11:38.) Plaintiffs did not receive a marriage license or a different answer from Davis. (Doc. 90-1 at 74:17–25.) **Plaintiffs intentionally, willingly, and publicly posted their video on YouTube and shared it on Facebook, and it generated 200,000 hits overnight, resulting in numerous media inquiries to Plaintiffs**. (Doc. 90-1 at 138:2–140:12; Doc. 90-2 at 26:1–15; 91-11 at 180.)

With knowledge of the already-filed *Miller* lawsuit, Plaintiffs decided to sue Davis instead of seeking a marriage license in another county. (Doc. 90-1 at 76:21–25, 78:2–19.)

After this Court entered the *Miller* preliminary injunction on August 12 (applying only to the *Miller* plaintiffs), Plaintiffs Ermold and Moore—at their lawyers' prompting—returned to the

17

Clerk's Office on August 13 to video record their demand for a marriage license. (Doc. 90-1 at 79:5–83:24, 85:11–20; Ex. 13 00:00–01:33.) Within 10 seconds of their videographer's starting the recording, still in the foyer of the Clerk's Office building, deputy clerks advised Plaintiffs and several media members present that the Office was not issuing licenses. (Ex. 13 00:00–00:10.) Plaintiffs argued that the *Miller* preliminary injunction entitled them to a marriage license, and demanded to enter the Clerk's Office to film their "applying" for a marriage license despite having been advised that no marriage licenses were being issued and that the Office's deputy clerks requested not to be filmed. (Ex. 13 at 01:34–01:45.) Plaintiffs lead their videographer and media members into the Clerk's Office and confronted the deputy clerks again, and were told again that no marriage licenses were being issued. (Ex. 13 at 01:45–2:30.)

Plaintiffs then lead their videographer and the press entourage to the office of Rowan County Judge/Executive Walter Blevins, in the same building, to seek a marriage license, but Judge Blevins was not in, and Plaintiffs did not obtain a marriage license from his office. (Doc. 90-1 at 85:24–86:5; Ex. 13 at 02:30–11:50.) Plaintiff Ermold addressed the gathered media before leaving Judge Blevins' office. (Ex. 13 at 11:50–12:54.) With full knowledge of the publicity and exposure resulting from their July 6 video recording, **Plaintiffs publicly posted their August 13 recording online and shared it on social media.** (Doc. 90-1 at 138:2–140:19.)

Plaintiffs do not recall whether they called the Clerk's Office on August 13 to inquire whether licenses were being issued, but would have gone even if the answer was no. (Doc. 90-1 at 80:13–19.) After not receiving a marriage license on August 13, Plaintiffs decided again not to seek a marriage license in another county, for the sole reason that Plaintiffs reside in Rowan County. (Doc. 90-1 at 86:13–87:17.)

Plaintiffs returned to the Clerk's Office on September 1 to video record their demand for a marriage license. (Doc. 90-1 at 87:18–89:16; Ex. 14.) In addition to the recording made by their videographer, Plaintiff Moore wore a collar microphone attached to a recording device to capture separate, clear audio of their encounters. (Doc. 90-1 at 90:14–93:18; Doc. 90-2 at 28:6–29:2; Ex. 14 at 00:03–01:10.) When Plaintiffs entered the Clerk's Office a crowd of media surrounded *Miller* plaintiffs April Miller and Karen Roberts attempting to obtain a marriage license from a deputy clerk, and then Plaintiffs and the assembled crowd were told the *Miller* plaintiffs did not receive a license and that no licenses would be issued that day. (Ex. 14 at 00:19–01:04.) An off-camera voice asked Plaintiffs whether they were going to ask for a marriage license anyway, to which Moore responded, "yes," and Ermold responded, "absolutely, absolutely." (Ex. 14 at 01:05–01:10.) Plaintiffs pushed through the throng of media to approach a deputy clerk, who advised them that the Office was not issuing marriage licenses. (Ex. 14 at 01:11–01:35.) Plaintiffs protested to the deputy clerk on video, raising their voices, and demanding to confront Kim Davis until the deputy called for Davis to speak to Plaintiffs. (Ex. 14 at 01:35–04:04.) While waiting for Davis, Plaintiffs continued to protest to the deputy clerk on video. (Ex. 14 at 04:05–06:25.)

When Davis came out of her office to speak with Plaintiffs, they redirected their protests to her, and she advised them again that her office was not issuing marriage licenses. (Ex. 14 at 06:25–07:06.) Plaintiffs continued protesting to Davis, pressing her to explain why she was not issuing marriage licenses, mocking her personally, and raising their voices to the point of shouting; and continued recording, protesting, and addressing the media inside the public area of the Clerk's Office after Davis returned to her office. (Ex. 14 at 07:06–21:58.[8]) **Plaintiffs publicly posted their**

---

[8]    At timestamp 11:14 of the Exhibit 14 recording an electronic tone is audible, after which the audio track is slightly out of synchronization with the video.

**September 1 recording online and shared it on social media to generate publicity**. (Doc. 90-1 at 138:2–140:19.)

Ermold was assigned to teach at UPIKE on September 1, but canceled his classes for the day and drove 2 hours to Morehead to demand a marriage license. (Ex. 14 at 05:2305:40.) Prior to traveling to the Clerk's Office, Plaintiffs did not call to inquire whether licenses were being issued. (Doc. 90-1 at 88:15–18.)

### G.    Plaintiffs' Marriage License and Governor Beshear's Belated Accommodations

On September 4, 2015, the day after Davis was jailed for contempt of the *Miller* injunction, Plaintiffs received a Kentucky marriage license from a Rowan County deputy clerk, on a license form altered to remove Davis's name, and without Davis's authorization. (Doc. 90-1 at 100:18–101:10; Doc. 27 ¶¶ 26, 27, 30; Doc. 27-2, Page ID # 130; Doc. 27-4 Page ID ## 134-135; Doc. 49 at 3–4; Doc. 90-3 at 98:10–103:8.) Governor Beshear, however, who first authorized and directed the alteration of Kentucky marriage license forms in response to *Obergefell*, authorized the altered form from the deputy clerk after-the-fact. (Doc. 27-4 Page ID # 134 ("'I'm . . . confident and satisfied that the licenses that were issued last week (and) this morning substantially comply with the law in Kentucky' . . . . 'And they're going to be recognized as valid in the Commonwealth." (first modification in original)); Doc. 90-3 at 101:19–103:8.) Governor Beshear's authorization also extended to marriage license forms which were further altered by Davis, to clarify the removal of her name and authorization, upon her return to work after her imprisonment. (*Id.*, Page ID ##134–35.)

### H.    Governor Matt Bevin's Executive Order Accommodation for All Clerks Who Object to Endorsing Same-Sex Marriage

On December 22, 2015, newly elected Kentucky Governor Matt Bevin issued Executive Order 2015-048 Relating to the Commonwealth's Marriage License Form (the "Executive Order,"

Doc. 29-1 at pages 34–37 of 37), which explicitly acknowledged the protections afforded county clerks under KRFRA. Specifically, the Executive Order established that (1) Governor Beshear's mandate placed a substantial burden on the free exercise of religion by some county clerks and their employees, (2) KRFRA requires that the Commonwealth use the least restrictive means available to carry out Kentucky marriage license policy in light of that substantial burden, (3) there is no compelling governmental interest to justify requiring the name and authority of county clerks on marriage licenses, (4) a reasonable accommodation for county clerks could easily and must be made, and (5) the Commonwealth is legally obligated to comply with KRFRA through the creation and provision of a revised marriage license form removing the requirement of a county clerk's name and authority. (*Id.*)

I.    **The General Assembly's Legislative Accommodation for All Clerks Who Object to Endorsing Same-Sex Marriage**

On July 14, 2016, Kentucky Senate Bill 216 ("SB 216") took effect, permanently modifying Kentucky law regarding the issuance and authorization of marriage licenses beyond the Executive Order. Specifically, SB 216 expressly modified the Kentucky marriage licensing scheme to remove entirely a county clerk's name, personal identifiers, and authorization from any license, thereby providing through a permanent change in the law the very religious accommodation Davis sought from the beginning of this litigation. The Kentucky General Assembly unanimously passed SB 216, and Governor Bevin signed it into law on April 13, 2016, thereby amending KRS 402.100 and 402.110. *See* 2016 Kentucky Acts ch. 132 (SB 216).

SB 216 rendered moot Davis' appeals from this Court's preliminary injunction orders in *Miller*. Accordingly, the Sixth Circuit dismissed the *Miller* appeals and remanded the case to this Court, instructing it to vacate the August 12 and September 3, 2015, preliminary injunction orders. *Miller,* 667 F. App'x at 537. The Court duly vacated the orders. (*Miller* Doc. 181.)

### J.    Plaintiffs' Damages Claims

Plaintiffs each claim "damages for mental anguish, emotional distress, humiliation, and reputational damages in an amount not to exceed $50,000.00," and no other damages. (Doc. 90-1 at 105:5–10, 108:2–13; Doc. 90-2 at 30:3–17; 91-7 at 2; 91-22 at 2.) Neither Plaintiff identified any punitive damages claimed in his answers to interrogatories (91-7 at 2; 91-22 at 2), and at deposition neither Plaintiff knew of any punitive damages claim. (Doc. 90-1 at 108:14–16; Doc. 90-2 at 31:16–32:23.)

Although Ermold did not quantify each item of damages he claims in his interrogatory answers (91-7 at 2), Ermold testified at deposition that he bases his $50,000 claim on two components: the nonrenewal of his UPIKE teaching contract in 2018, which paid $47,000 per year,

> and—and—and whatever humiliation and—and I don't know how you calculate this. I don't know how you calculate this. So that's my answer and that's the only answer you're going to get. . . .

(Doc. 90-1 at 104:25–107:8, 111:20–24.)

Ermold blames Davis for the nonrenewal of his UPIKE contract:

> Q   And you blame Kim Davis directly for the nonrenewal of your contract at Pikeville?
>
> A   I think it's related, yes. I do.

(Doc. 90-1 at 135:10–136:14.) Ermold, however, did not adduce any evidence that Kim Davis's actions in 2015 caused the nonrenewal of his UPIKE contract in 2018. (Doc. 90-1 at 105:11–106:18 ("Maybe it's related, maybe it's not."), 108:17–110:3, 110:21–111:24, 114:7–116:14, 120:13–18, 126:11–18.) The testimony of UPIKE representative Michael Pacheco, therefore, that the 2018 nonrenewal of Ermold's teaching contract was due solely to discontinuation of the program in which Ermold taught, and had nothing at all to do with Kim Davis, is unrebutted. (Doc. 90-5 at 9:9–18, 10:15–11:25, 12:2–12, 19:11–29:9; Exs. 31, 34.)

Ermold identified his visits to the Clerk's Office seeking a marriage license and a temporary message on a church sign near his home, in 2015, as the principal sources of the "humiliation" for which he claims damages. (Doc. 90-1 at 105:11–107:8, 128:13–129:21, 130:5–131:6; 91-8 at 1; 91-16.)

The church sign belongs to a church on the same street as Plaintiffs' residence, and the temporary message on the sign read: "MAN MAKING SIN LEGAL DOESN'T MAKE IT RIGHT." (Doc. 90-1 at 128:13–129:21, 130:2–12, 91-16.) Ermold blames Davis for the sign, and blames the sign for his "humiliation":

> Q  And just so I'm clear, the $50,000 that you are seeking in damages includes—[takes] into account this sign, for example?
>
> A  Yeah. That's humiliation.
>
> . . . .
>
> Q  . . . . [H]ow much of that is attributable to the sign?
>
> A  This sign wouldn't exist if Kim Davis hadn't done what she did, that sign would not be there. Okay. That's how I know it's related to Kim Davis. So I want to be clear about that. It's not an assumption, that sign would not exist if what we went through did not occur. . . . As far as me ever getting over this in my entire life, no, I will never get over it. Just looking at this has put me at a heightened sense of complete and total anxiety, and anger, and frustration right now, just looking at it. This is my life from now on because of your client.
>
> Q  And you blame Kim Davis directly for this sign?
>
> A  Absolutely. This would not exist if she didn't do what she did.
>
> . . . .
>
> Q  So as you sit here today, you cannot assign a dollar value to what you've experienced as a result of this sign, specifically?
>
> A  Of this sign? That sign is disgusting. That sign is a direct attack on me. I honestly don't know that there's a dollar amount high enough to make me be okay with this and to move it into the past. I

don't know that there's enough money that someone could give me to undermine my integrity, undermine my—my sense of dignity as being a human being.

Q   It's your belief that this sign was directed at you based solely on the fact that you live on the same street as the church?

A   This sign was directed at me because of what had occurred by Kim Davis and because we live in the vicinity of that church, yes.

(Doc. 90-1 at 135:10–137:13.)

The wife of the church's pastor, Jerrel Dean McClurg, who was responsible for placing the rotating messages on the sign, however, gave unrebutted testimony that the message was a general message to the public, close in time but not necessarily in response to the *Obergefell* decision, and was not directed at Plaintiffs because **she did not know Plaintiffs lived there when she put the message up**. (Doc. 90-4 at 15:1–22:12.) She found out Plaintiffs lived there when a friend informed her that Ermold complained on social media that the church sign offended him. (Doc. 90-4 at 21:3–21.) After learning this, she noticed Ermold outside one day when she was driving by with her husband and stopped to let Ermold know the sign was not directed at him. (Doc. 90-4 at 21:3–25:16.) Ermold corroborated McClurg's testimony, though he claims her stopping by to tell him the sign was not directed at him was "harassing." (Doc. 90-1 at 131:7–132:6.) Ermold also admitted, however, when asked whether he had any knowledge as to whether Davis had any direct involvement with the sign, "I have no idea about that. I—I have no clue." (Doc. 90-1 at 133:10–14.) Plaintiff Moore believes the sign "may have" gone up "irrespective of whether [Plaintiffs] were involved in a dispute with Kim Davis," but that "[t]here's no way for me to know." (Doc. 90-2 at 8:21–10:25.)

Ermold also attributes his "humiliation" damages to Plaintiffs' experiences in the Clerk's Office when they video recorded their demands for a marriage license. (Doc. 90-1 at 105:11–

107:8, 128:13–24.) Plaintiffs, however, publicly posted their video recordings online and shared them on social media to generate publicity. (Doc. 90-1 at 138:2–140:19; 91-11 at 180.)

Although Moore did not quantify each item of damages he claims in his interrogatory answers (91-22 at 2), Moore testified at deposition that he attributes his $50,000 damages claim solely to **Ermold's** (not his) prior annual salary at UPIKE. (Doc. 90-2 at 30:18–32:6.)

### K.    Procedural Posture

Following the vacatur of the *Miller* preliminary injunction orders, the Court consolidated the instant case with *Miller* and *Yates*, under the caption *In re: Ashland Civil Actions*, for the purpose of dismissing all three actions as moot. (Doc. 19; *see supra* note 7.) Plaintiffs appealed the dismissal of their case. (Doc. 20.) The Sixth Circuit reversed the dismissal order and remanded the case for reinstatement of Plaintiffs' claims. (Docs. 21–23.) This Court granted Plaintiffs leave to amend their complaint (Doc. 26 at 1), and Plaintiffs filed their First Amended Complaint on June 8, 2017 (Doc. 27).

Davis filed a motion to dismiss Plaintiffs' Amended Complaint on the grounds that Davis is immune from Plaintiffs' damages claims—by Eleventh Amendment sovereign immunity in her official capacity as a state official, and by qualified immunity in her individual capacity; and on the jurisdictional grounds that Plaintiffs' claims present no cognizable federal constitutional question. (Doc. 29 at 1; Doc. 29-1 at 1–37.) The Court entered an order granting, in part, and denying, in part, Davis' motion. (Doc. 49 at 1, 21.)

The Court held that Davis, in her official capacity, acted as a state official for purposes of marriage licensing, and therefore dismissed Plaintiffs' official capacity claims on sovereign immunity grounds. (*Id.* at 1, 5–7, 21.) The Court also held, however, that Plaintiffs alleged sufficient facts to plausibly make out a claim that Davis violated Plaintiffs' clearly established constitutional right to marry, and therefore denied Davis' qualified immunity defense to Plaintiffs'

individual capacity claims against her. (*Id.* at 1, 7–21.) Davis appealed that portion of the Court's order denying, in part, her motion to dismiss the Amended Complaint on qualified immunity grounds.

The Sixth Circuit affirmed this Court's denial of qualified immunity. *See Ermold v. Davis*, 936 F.3d 429, 432 (6th Cir. 2019). But **the court's determination was specific to the pleadings stage**. *See id.* ("That means we don't look at evidence; we look at allegations. So we ask not whether Davis definitively violated plaintiffs' rights but whether they adequately **allege** that she did."); *id.* at 437 ("In short, plaintiffs **pleaded** a violation of their right to marry . . . ." (emphasis added)).

Davis petitioned the Supreme Court for review in January 2020. (Doc. 71.) In October 2020 the Supreme Court denied review of the Sixth Circuit's pleadings-stage decision, prompting a statement by Justice Thomas, joined by Justice Alito, that "[t]his petition implicates important questions about the scope of our decision in *Obergefell*, but it does not cleanly present them." *Davis v. Ermold*, 141 S. Ct. 3, 4 (2020) (statement of Thomas, J., respecting the denial of certiorari).

Following the Supreme Court's decision, this Court reset pretrial deadlines (Docs. 80, 82, 87), and the parties completed discovery, including depositions (Doc. 84.) Davis now moves for summary judgment on all of Plaintiffs' claims.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a party has properly supported her motion for summary judgment by demonstrating "an absence of evidence to support the non-moving party's case," *Celotex*, 477 U.S. at 325, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). To avoid summary judgment, the nonmoving party must establish a factual issue that is both material ("might affect the outcome of the suit under the governing law") and genuine ("such that a reasonable jury could return a verdict for the nonmoving party"). *Id.* at 248.

## ARGUMENT

**I.    IMPOSING § 1983 LIABILITY ON DAVIS WOULD VIOLATE DAVIS'S FREE EXERCISE RIGHTS UNDER THE FIRST AMENDMENT BECAUSE GOVERNOR BESHEAR'S MARRIAGE LICENSE MANDATE CANNOT SURVIVE ANY LEVEL OF CONSTITUTIONAL SCRUTINY.**

### A.    Plaintiffs' Claims Against Davis Individually Depend on the Constitutionality of Governor Beshear's Marriage License Mandate.

Plaintiffs claim Davis violated their constitutional right to marry based on *Obergefell* and Davis's alleged violation of Governor Beshear's marriage mandate. (Doc. 27 at 2 ¶ 15.) Indeed, Plaintiffs' claims depend entirely on the constitutionality of imposing Governor Beshear's mandate on Davis because, but for Governor Beshear's unilateral directive to KDLA to issue new uniform marriage license forms to county clerks, and to county clerks to use them without any accommodation for their sincerely held religious beliefs, neither Davis nor any other county clerk could have issued a marriage license to a same-sex couple. Conversely, had Governor Beshear's mandate initially and timely provided the reasonable accommodation that Davis sought (or any other reasonable accommodation), which was subsequently (but belatedly) provided by him, his

successor, and the legislature, Plaintiffs would have received their marriage license without incident or fanfare, and Plaintiffs would not have any claim against Davis.

To be sure, Davis's Kentucky law obligations are necessarily at issue where violation of the constitutional right to marry is claimed because "Kentucky controls every aspect of how county clerks issue marriage licenses." *Ermold v. Davis*, 936 F.3d 429, 434 (6th Cir. 2019). As the Sixth Circuit recognized:

> Kentucky has absolute jurisdiction over the regulation of the institution of marriage. Indeed, Kentucky law governs everything about marriage. It defines marriage and sets eligibility requirements. It vests courts with the authority to declare certain marriages void. It describes who may solemnize a marriage and requires a couple to obtain a marriage license prior to marrying. It sets out the process for licensing and recording a marriage. And specific to Davis, Kentucky law vests county clerks with the duty of issuing marriage licenses, recording marriage certificates, and reporting marriages.

*Id.* (cleaned up).

Moreover, the imposition of § 1983 liability on Davis for violating Governor Beshear's mandate is subject to Davis's First Amendment (and statutory) defenses to the mandate. *See Claybrooks v. Am. Broad. Companies, Inc.*, 898 F. Supp. 2d 986, 992–93 (M.D. Tenn. 2012) ("The First Amendment shields protected speech and expression from private litigation, as well as from statutory restrictions and criminal penalties." (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 277–78 (1964); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 916 n. 51 (1982)). Thus, Plaintiffs' claims against Davis depend on the constitutionality of Governor Beshear's marriage mandate under the Free Exercise Clause of the First Amendment.

**B.    Governor Beshear's Marriage License Mandate Is Subject to Strict Scrutiny Because It Burdened Davis's Religious Exercise and Was neither Neutral Towards Religion nor Generally Applicable.**

**1.    Governor Beshear's marriage license mandate burdened Davis's religious exercise.**

Governor Beshear's mandate forcing Davis to authorize marriage licenses for same-sex couples substantially burdened her religious exercise as protected by the Free Exercise Clause of the First Amendment. As shown above, Kentucky marriage law predating *Obergefell* required that "each county clerk" use the same prescribed form to issue a marriage license. KRS 402.100, 402.110. As county clerk, Davis was provided the form by the KDLA, and she had no local discretion in the composition and requirements of that prescribed form. (*See supra* Facts Pt. A.1.) By legislative enactment predating *Obergefell*, this form included: (1) an "authorization statement of the county clerk issuing the license"; (2) "the signature of the county clerk or deputy clerk issuing the license"; (3) "[a] signed statement by the county clerk or a deputy county clerk of the county in which the marriage license was issued"; and (4) the "the name of the county clerk under whose authority the license was issued." KRS 402.100(1)–(3). Thus, before *Obergefell*, as county clerk, Davis had to include her name, signature, and approval four times on marriage licenses she signed. (*See supra* Facts Pt. A.1; Doc. 89-10 ¶ 11; Doc. 89-11.) Even on licenses that she did not sign, the KDLA-approved form required Davis to put her imprimatur on each and every marriage license issued in her county. (*Id.*)

Governor Beshear unilaterally directed the KDLA to prepare a revised mandatory form in response to *Obergefell*, which the KDLA distributed to county clerks for immediate, mandatory use, without exception. (Doc. 89-10 ¶¶ 25–26; Doc. 92-1.) The new form provided no opportunity for county clerks (or their deputy clerks) with religious objections to opt out of participating in endorsement and approval of same-sex marriage. On this new form, as conceived by Governor

29

Beshear and KDLA, the "authorization" or permission to marry (even on licenses she did not personally sign) still unmistakably came from Davis herself. (Doc. 89-10 ¶ 12; Doc. 92-1; Doc. 89-1 at 37:10–16, 38:9–17, 40:11–14, 41:4–7, 41:16-23, 50:20–21, 77:9–12, 77:21–78:3. As with the old forms, the new KDLA-approved form required Davis to put her imprimatur on each and every marriage license issued in her county. (Doc. 89-10 ¶¶ 11, 26; Doc. 92-1.)

But, as shown above, Davis cannot sanction, endorse, and approve a union of two persons which, according to her sincerely held religious beliefs, is not marriage. (*See supra* Facts Pt. D.) Coercing Davis to choose between endorsing relationships inconsistent with her beliefs or resigning from her office, as Governor Beshear's mandate did, burdened Davis's religious exercise **as a matter of law**. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

The plaintiff in *Fulton*, Catholic Social Services (CSS), is a foster care agency that the City of Philadelphia excluded from its foster care referral system "upon discovering that the agency would not certify same-sex couples to be foster parents due to its religious beliefs about marriage." 141 S. Ct. at 1874. CSS challenged the exclusion under the Free Exercise Clause of the First Amendment. *Id.* at 1876. The Supreme Court concluded at the outset that Philadelphia's requirement for CSS to certify same-sex couples to be foster parents burdened CSS's religious exercise under the Free Exercise Clause:

> As an initial matter, it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs. The City disagrees. In its view, certification reflects only that foster parents satisfy the statutory criteria, not that the agency endorses their relationships. **But CSS believes that certification is tantamount to endorsement. And religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection**. Our task is to decide whether the burden the City has placed on the religious exercise of CSS is constitutionally permissible.

141 S. Ct. at 1876 (cleaned up) (emphasis added).

Here, as in *Fulton*, "the religious views of [Davis] inform" her life and work. *Id*. at 1875. Davis, like CSS, deeply believes that "marriage is a sacred bond between a man and a woman," and "understands [her authorization] of prospective [married couples] to be an endorsement of their [marriage]." *Id*. Thus, even if Plaintiffs or the Court would view Governor Beshear's mandate as simply requiring Davis "to signify that couples meet the legal requirements to marry" and "not asking her to condone same-sex unions on moral or religious grounds," *see Miller*, 123 F. Supp. 3d at 944, Davis's sincere belief that her issuance of a marriage license bearing her authorization and signature "is tantamount to endorsement" compels the conclusion that the mandate burdens her religious exercise under the Free Exercise Clause. *See Fulton*, 141 S. Ct. at 1877.

In other words, the Supreme Court's decision in *Fulton* makes it absolutely clear that it is Davis's subjective belief about the meaning of her name, signature, and authorization on marriage licenses that controls the inquiry of whether or not her religious exercise is burdened. *Fulton*, 141 S. Ct. at 1876 ("But CSS believes that certification is tantamount to endorsement.") Neither Plaintiffs nor this Court can cast Davis's belief aside as not "logical" or not "comprehensible" to conclude that her religious exercise was not burdened. (*Id*.) There is no evidence or basis upon which to dispute the sincerity of Davis's religious belief that her name, signature, and authorization on marriage licenses would constitute an endorsement of same-sex relationships, which would violate her faith and conscience. As such, Governor Beshear's mandate indisputably burdened Davis's religious exercise as a matter of settled law.[9]

---

[9]    Kentucky, acting through Governor Beshear's successor, Governor Bevin, confirmed that Governor Beshear's mandate substantially burdened the religious exercise of Davis and other county clerks. (*See supra* Facts Pt. H.)

### 2.    Governor Beshear's marriage license mandate was not neutral towards religion.

Laws that burden religious exercise which are not neutral and generally applicable violate the Free Exercise Clause unless they satisfy strict scrutiny. *See Fulton*, 141 S. Ct. at 1876–77 (citing *Employment Div., Dept. of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877–78 (1990)).[10] "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) [hereinafter *Lukumi*].

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. Courts first look to the text, but "facial neutrality is not determinative. The Free Exercise Clause . . . extends beyond facial discrimination [and] forbids subtle departures from neutrality." *Lukumi*, 508 U.S. at 533–34 (cleaned up). The First Amendment prohibits hostility that is "masked, as well as overt." *Id.* Governor Beshear's marriage license mandate was not neutral as demonstrated by the mandate's overt hostility towards particular religious beliefs and the intentional denial of KRFRA rights implicit in the mandate.

As shown above, Governor Beshear's marriage license mandate comprised several official and unilateral pronouncements of Kentucky marriage policy by the Governor, beginning with the Governor's public assent to Attorney General Conway's refusal to defend Kentucky's laws defining marriage on appeal based on Conway's "pray[ing] over this decision" and "doing what I think is right" and "mak[ing] a decision that I could be proud of." (*See supra* Facts Pt. D.) Unlike his mandate pronouncements to county clerks such as (and specifically) Kim Davis, Governor

---

[10]    Though Davis cannot request it of this Court, if the *Smith* standard bars the vindication of Davis's Free Exercise rights then *Smith* should be overruled.

Beshear did not lecture Conway that "Neither your oath nor the Supreme Court dictates what you must believe. But as elected officials, they do prescribe how we must act," or that "when you accepted this job and took that oath, it puts you on a different level," or "[y]ou have official duties now that the state law puts on you." (*See supra* Facts Pt. D.) Nor did Governor Beshear publicly chastise Conway for "refusing to perform [his] duties" and failing to "follow[] the law and carry[] out [his] duty," or admonish Conway to "comply with the law regardless of [his] personal beliefs." (*See supra* Facts Pt. D.) Nor did Governor Beshear give Conway the ultimatum that "if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that you were elected to do, then obviously the honorable course to take is to resign and let someone else step-in who feels that they can fulfill these duties," or ominously declare that "[t]he courts and voters will deal appropriately with" Conway. (*See supra* Facts Pt. D.) But Governor Beshear publicly directed all of these criticisms to the "two or three" county clerks who were not issuing marriage licenses due to sincerely held religious beliefs. (*See supra* Facts Pt. D.) Thus, although Governor Beshear gave Conway a pass for his conscience about marriage without any threats of repercussion, clerks like Davis were repeatedly told by Governor Beshear to abandon their religiously informed beliefs or resign.

Moreover, Governor Beshear flatly denied any accommodation to clerks seeking a way to avoid having to issue the KDLA-prescribed marriage licenses under their name and authority based on their religious objections to same-sex marriage, but subsequently and gratuitously granted that very accommodation to same-sex couples who received altered marriage licenses while Davis was in jail. (*See supra* Facts Pt. G.) Refusing an accommodation on religious grounds and then granting it on nonreligious grounds is the opposite of religious neutrality.

Furthermore, Governor Beshear's marriage license mandate also implicitly denied county clerks statutory KRFRA protections pursuant to a bald claim of executive power to "alter policies" and interpret statutes "in a different way" to comply with *Obergefell*. (*See supra* Facts Pt. D.) Having vetoed KRFRA, only to see his veto overridden by an overwhelming majority of the General Assembly, Governor Beshear was well aware of KRFRA's protections for "a person's . . . right to act or refuse to act in a manner motivated by a sincerely held religious belief." KRS 446.350. But Governor Beshear's unequivocal "issue licenses or resign" pronouncement, by necessary implication, denied KRFRA's protections to the few county clerks who had sincere religious objections to issuing marriage licenses to same-sex couples. In his marriage license mandate, Governor Beshear effectively vetoed KRFRA all over again. This intentional and unnecessary denial of a preeminent religious right of the Commonwealth negates any claim to religious neutrality for Governor Beshear's mandate.

> **3.    Governor Beshear's marriage license mandate was not generally applicable.**

Governor Beshear's marriage license mandate not only fails neutrality, it also fails general applicability. "[N]eutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). A law can also fail general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*

In *Fulton*, the city policy that disqualified CSS from receiving foster care referrals from the city reserved to a single city official the sole discretion to grant exceptions to the policy. 141

S. Ct. at 1878. The Supreme Court held that this "system of individualized exemptions" rendered the policy not generally applicable, such that the city "may not refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* (cleaned up); *see also Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) ("The real question goes to exceptions."); *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) ("Faith-based discrimination can come in many forms.").[11]

Here, Governor Beshear's authorizing alterations to the KDLA-prescribed marriage license form, twice—once for same-sex couples who received licenses while Kim Davis was in jail, and again when Davis returned to work—proves that Governor Beshear reserved to himself the discretion to grant individualized exceptions to his marriage license mandate. Under *Fulton*, this "system of individualized exemptions" negates general applicability, prohibiting Beshear from "refus[ing] to extend the exemption system to cases of religious hardship without compelling reason." *Fulton*, 141 S. Ct. at 1878 (cleaned up); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."); *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Gorsuch, J., statement) ("When a State so obviously targets

---

[11]    Prior to *Fulton*, in a series of decisions related to state-imposed COVID-19 restrictions on assembling for religious worship, the Supreme Court has clarified how systems of exceptions negate the general applicability of such restrictions. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020); *Agudath Israel of Am. v. Cuomo*, 141 S. Ct. 889 (2020); *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021); *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 1289 (2021); *Harvest Rock Church, Inc. v. Newsom,* 141 S. Ct. 889 (2020); *Gish v. Newsom*, 141 S. Ct. 1290 (2021); *High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (2020); *Robinson v. Murphy*, 141 S. Ct. 972 (2020).

religion for differential treatment, [the Court's] job becomes that much clearer."). Thus, Governor Beshear's refusal to grant the same exception to Davis, who sought the accommodation on religious grounds, is an unconstitutional burden on Davis's religious exercise unless the refusal satisfies strict scrutiny, which it cannot.

Governor Beshear's marriage license mandate also fails general applicability because of the individualized exemption Governor Beshear extended to Attorney General Conway to accommodate Conway's conscientious objection to defending Kentucky's traditional definition of marriage on appeal, while denying a similar exemption to Davis who sought accommodation, on religious grounds, to uphold the traditional definition of marriage as a matter of conscience. (*See supra* Facts Pt. B.) Another exception that negates the general applicability of Governor Beshear's marriage license mandate is the statutory exception that allows a county judge/executive to license a marriage by "a memorandum thereof" as an alternative to the KDLA-prescribed form. *See* KRS 402.240.[12] Still another exception that negates general applicability is the statutory exception to county clerk licensing duties for hunting and fishing licenses, which any county clerk may claim simply by submitting a written memorandum. *See* KRS 150.195(2).

Thus, Governor Beshear's marriage license mandate not only fails neutrality, but it also fails general applicability at numerous levels. Thus, the Governor's refusal to grant a religious accommodation to Davis is unconstitutional unless it satisfies strict scrutiny, which it cannot.

---

[12]    The County Judge/Executive of Rowan County, Walter Blevins ("Judge Blevins"), would have raised no religious objection to issuing marriage licenses to same-sex couples under the authority of KRS 402.240. (Doc. 89-10 ¶ 32.) However, Judge Blevins refused to issue a marriage license to any of the plaintiffs who sued Kim Davis based on his belief that Davis's discontinuation of the issuance of marriage licenses does not count as the "absence" of Davis for purposes of the issuance of marriage licenses under KRS 402.240. (Doc. 89-10 ¶ 32.)

**C.    Governor Beshear's Marriage License Mandate Cannot Survive Strict Scrutiny Because It Was Not the Least Restrictive Means of Advancing a Compelling Government Interest.**

As a result of the above, Plaintiffs must demonstrate by clear and convincing evidence that Governor Beshear had (1) a compelling governmental interest in infringing Davis's religious conscience through the marriage license mandate, and (2) the Governor used the least restrictive means to accomplish that interest. Under this strict scrutiny analysis, to be a compelling governmental interest, the mandate had to have furthered an interest "of the highest order," *Lukumi*, 508 U.S. at 546, and, "[i]f a less restrictive alternative would [have served] the Government's purpose," then the government was required to use that alternative. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 US. 507, 534 (1997). Indeed, as the Supreme Court recently cautioned, "**That standard is not watered down; it really means what it says**." *Tandon*, 141 S. Ct. at 1298 (cleaned up) (emphasis added).

To meet this burden, the government would have to show it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (emphasis added). And the government would have to "show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interests, not simply that the chosen route was easier.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (quoting *McCullen*, 573 U.S. at 495).

There is no compelling governmental interest in forcing Davis to violate her religious freedom. In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Supreme Court

emphasized that the similar Federal RFRA "contemplates a 'more focused' inquiry" in considering government's purported interests. 573 U.S. at 726. This inquiry "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religions is being substantially burdened," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)), and further requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing" the marriage license mandate in this case. *See Hobby Lobby*, 134 S.Ct. at 2779 (emphasis added) (quoting *O Centro*, 546 U.S. at 431); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) (explaining that compelling interest determination "is not to be made in the abstract" but instead "in the circumstances of this case" and how the asserted interest is "addressed by the law at issue").

No governmental interest can justify forcing Davis to violate her religious freedom when marriage licenses were readily available in nearby and surrounding county clerks' offices. Moreover, forcing Davis to sign, issue, and approve marriage licenses over and against her sincere religious objections is also not the least restrictive means of distributing Kentucky marriage licenses. "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. Plaintiffs have adduced no evidence that Kentucky "lack[ed] other means" of issuing marriage licenses "without imposing a substantial burden" on Davis' "exercise of religion." *See*

*id.* Not only that, but the least restrictive means test may "require the Government to expend additional funds to accommodate citizens' religious beliefs."[13] *Id.* at 730.

In this case, several less restrictive means were available to accomplish the goal of providing Plaintiffs with Kentucky marriage licenses without substantially burdening Davis's religious freedom and conscience. This is demonstrated beyond doubt by the fact that these less restrictive means were ultimately enacted. First, Governor Beshear could have modified the KDLA-prescribed form to remove the personal authorization and approval of county clerks. Indeed, Governor Beshear effected precisely such an accommodation by approving marriage license forms issued without the name and authorization of Kim Davis while she was in jail, and again upon her return to work. Moreover, Governor Bevin effected the same accommodation on a statewide basis through his Executive Order 2015-048, as did the General Assembly on a permanent basis by enacting SB 216. (*see supra* Facts Pts. H, I.) There is no reason at all—none whatsoever—why these less restrictive means could not have been implemented by Governor Beshear *ab initio*, instead of his broad and unforgiving mandate.

Second, Kentucky could have designated other persons who are able to issue marriage licenses in a particular county in the event the county clerk has a religious objection to issuing such licenses, structured similarly to the statute that already allows a county judge/executive to issue a marriage license in the absence of the county clerk. *See* KRS 402.240.

---

[13]    This principal is embodied in the fiscal impact reports provided by the Kentucky Legislative Research Commission ("KYLRC") to Kentucky legislators prior to enacting KRFRA. In those reports, the KYLRC noted that the least restrictive alternative required "may be minimal . . . or significant, for example, if it requires hiring additional staff or paying overtime for other staff to do a job that an employee declines to do because of religious beliefs." (*See* Kentucky LRC, Local Mandate Fiscal Impact Estimate, Ky. House Bill 279 (2013 Reg. Sess.), Doc. 92-8.)

Third, Kentucky could have provided an opt-out or exemption to county clerks who have a religious objection to issuing marriage licenses to same-sex couples bearing the clerks' names and authorizations. Other states, such as North Carolina, have provided precisely this type of remedy to conscientious objectors to participating in same-sex marriage. *See, e.g.*, N.C. GEN. STAT. § 51-5.5.

Fourth, Kentucky could have effected the issuance of marriage licenses at the state-level through an online or other state-wide licensing scheme that removes county clerks as state agents for authorizing and approving licenses.

All of these options, and certainly others as well, were available to avoid substantially burdening Davis' religious freedom. Indeed, the State of Kentucky, through its subsequent Governor Bevin, agreed and acknowledged that less restrictive alternatives to Beshear's mandate were available and could easily have been implemented. (*See supra* Facts Pt. H.) By refusing to adopt any of these less-restrictive alternatives, Governor Beshear's mandate violated Davis's First Free Exercise rights. Plaintiffs cannot now use this Court to punish Davis for her conscientious objection to an unconstitutional mandate. *See Claybrooks*, 898 F. Supp. 2d at 992–93.

### D.    Governor Beshear's License Mandate Cannot Even Satisfy Rational Basis Scrutiny.

Even if strict scrutiny does not apply, Governor Beshear's mandate cannot survive rational basis scrutiny. Whatever interest Kentucky had in a marriage license policy that treated same-sex couples the same as different-sex couples in accordance with *Obergefell*, Kentucky had no legitimate interest in adopting a marriage license policy that denied the religious liberty protections of KRFRA as Governor Beshear's mandate necessarily did, while reserving to Governor Beshear the discretion to grant individualized, non-religious exceptions as he saw fit. Put differently, the Governor's mandate was not reasonably related to the equal treatment goal dictated by *Obergefell*

because there were so many alternatives to the restrictive mandate Governor Beshear imposed that would have ensured equal treatment for all couples seeking marriage licenses while not coercing any county clerk to violate his or her conscience. (*See supra* Argument Pt. I.C.) Indeed, the fact that Kentucky ultimately employed these alternatives, successfully and without any issue or adverse effect to the ability of couples to marry, conclusively establishes that no rational basis existed for denying such accommodation to Kim Davis in the first place.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM BECAUSE THERE WAS NO VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHT TO MARRY.

### A.   *Obergefell* did not elevate a right to same-sex marriage above the existing right to marry.

This case is neither the same as *Obergefell* nor controlled by it. The *Obergefell* opinion did not address the details or realities of state marriage licensing schemes, like Kentucky's, that are geographically permissive and must be applied in light of pre-existing, state law religious freedom protections, such as KRFRA. At bottom, the majority in *Obergefell* reached two conclusions about the right to marry under the Fourteenth Amendment: (1) states may not absolutely bar an individual from marrying a person of the same-sex, and (2) states that recognize marriage, or provide benefits related to marriage, must do so on the same terms and conditions for same-sex couples as different-sex couples. *Obergefell*, 576 U.S. at 675–76; *see also Pavan v. Smith*, 137 S. Ct. 2075, 2076 (2017) ("As this Court explained in *Obergefell v. Hodges*, the Constitution entitles same-sex couples to civil marriage "on the same terms and conditions as opposite-sex couples."). Neither of these conclusions is directly implicated in the case at bar. Thus, although this case would not exist but for *Obergefell*, that opinion does not bind this Court to a foregone conclusion in this case.

On the first point, before *Obergefell*, Plaintiffs were "absolutely prevented" from obtaining a Kentucky marriage license if they wanted to marry a person of the same sex. No same-sex couple was able to obtain a Kentucky marriage license in any one of Kentucky's 120 counties. And no

same-sex marriage obtained in another state would have been recognized in Kentucky. After *Obergefell*, even with the "no marriage licenses" policy in place in Rowan County, same-sex couples desiring marriage licenses could obtain them because Kentucky was issuing marriage licenses statewide, in nearly 137 locations. Thus, unlike in the cases consolidated in *Obergefell*, there was no absolute (or near absolute) statewide ban at issue or being challenged here.

The second point of *Obergefell* is also not at issue here because same-sex couples and different-sex couples are (and were) indisputably being treated the same in Kentucky, and in Rowan County, obviating any equal protection issue. The undisputed record shows that Davis discontinued the issuance of all marriage licenses, regardless of whether the applicant couple was different-sex or same-sex. Nevertheless, Plaintiffs claim a violation of their right to marry because they were unable to obtain a marriage license in a particular location (Rowan County) approved by a particular individual (Davis). But this is not a federal constitutional right created by *Obergefell*, or mandated by any other Supreme Court right to marry case.

**B.    The relevant inquiry is whether Kentucky violated Plaintiffs' right to marry.**

Plaintiffs cannot establish a violation of their "constitutional right to marry" based solely on the unavailability of marriage licenses in one county. Although Plaintiffs reside in Rowan County, they could have obtained a marriage license from "any county clerk." KRS 402.080. Kentucky law neither required that they obtain a marriage license in Rowan county, nor tied any legal benefit to a license issued there. To be sure, marriage licensing is an exclusively state-level function; the Commonwealth has "absolute jurisdiction over the regulation of the institution of marriage." *Pinkhasov v. Petocz*, 331 S.W.3d 285, 291 (Ky. App. 2011). All matters relating to marriage in Kentucky, including its definition and the procedures for licensing, solemnizing, and dissolving marriages are governed by Chapter 402 of the Kentucky Revised Statutes. In particular,

42

the duty of county clerks to issue marriage licenses is governed by section 402.080, and the license form that county clerks must use for marriage licenses by section 420.100. County clerks, such as Davis, are statutorily conferred duties and jurisdiction "coextensive with that of the Commonwealth." *See* KRS 64.5275(1); *see also* Ky. Const. § 246. In light of this absolute state control over marriage in Kentucky, both this Court and the Sixth Circuit concluded that Davis is a state official for purposes of marriage licensing, and was acting as the state when she did not issue marriage licenses to Plaintiffs. *Ermold v. Davis*, 936 F.3d 429, 434 (6th Cir. 209). (Doc. 49 at 6 (citing *Miller v. Davis*, No. 15-44-DLB, 2017 WL 3122657 (E.D. Ky. July 21, 2017)).)

Given the state's complete control over marriage licensing, and Davis' status as but one state official in the state's marriage licensing scheme, the relevant inquiry for purposes of Plaintiffs' constitutional right to marry is whether Kentucky violated Plaintiffs' right. Critically, Plaintiffs do not allege that Kentucky prevented Plaintiffs from marrying whom they wanted to marry or barred them from obtaining a marriage license. To the contrary, marriage licenses, including for same-sex couples, were readily available throughout the state, including in the surrounding counties and every county on Plaintiff Ermold's commute. (Doc. 27 at 2 ¶ 15; *supra* Facts Pt. F.) Plaintiffs have proved **no obstacle** to their traveling to any of these clerks' offices, the closest of which was just 15 miles (16 minutes) from their residence—1 hour and 44 minutes closer than UPIKE where Plaintiff Ermold worked. (*See supra* Facts Pt. F.)

C.    **Kentucky's non-discriminatory and temporary suspension of marriage licenses in one county to accommodate Davis's religious beliefs until the marriage license form was revised did not violate Plaintiffs' constitutional right to marry.**

1.    **Rational basis scrutiny applies.**

As shown above, Plaintiffs' have not proved that Kentucky prevented them from marrying. Rather, they allege only that Kentucky, acting through its licensing official, prevented them from

obtaining a marriage license in a particular county, to accommodate the official's sincerely held religious beliefs.

To determine whether Kentucky violated Plaintiffs' constitutional right to marry by making all marriage licenses temporarily unavailable in one county, as a means of accommodating the protected religious conscience rights of a state official, the Court must first determine whether rational basis scrutiny or strict scrutiny applies to Kentucky's action.[14] *See Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996). Importantly, "not every state action 'which relates in any way to the incidents of or the prerequisites for marriage must be subjected to rigorous scrutiny.'" *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1134 (6th Cir. 1995) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978)). Heightened scrutiny only applies to restrictions on the right to marry that are "direct and substantial." *Montgomery*, 101 F.3d at 1124. "[M]erely placing a non-oppressive burden on the decision to marry . . . is not sufficient to trigger heightened constitutional scrutiny." *Id.* at 1125. Instead, a "direct and substantial" burden requires an "absolute barrier" in which individuals are "absolutely or largely prevented from marrying" whom they want to marry or "absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001).

Consideration of Sixth Circuit precedent and the minimal burden placed on Plaintiffs compels the conclusion that rational basis scrutiny applies to Kentucky's action in this case. The Sixth Circuit's decision in *Montgomery* is instructive.

---

[14]    "The right to marry is both a fundamental substantive due process and associational right." *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996). "Supreme Court precedent, however, specifically establishes that the same level of scrutiny applies in both the First Amendment and substantive due process contexts." *Id.*

In *Montgomery*, the court affirmed summary judgment for a group of governmental defendants after applying rational basis scrutiny to the defendants' anti-nepotism policy. 101 F.3d at 1118. The *Montgomery* plaintiffs were a couple who were employed at the same campus of defendants' school system, which was a large secondary school system serving thirty-five affiliated school districts in Ohio. *Id.* Defendants' anti-nepotism policy prohibited married couples from working at the same campus. *Id.* Pursuant to defendants' policy, upon the plaintiff couple's marriage, the wife's employment was transferred to another campus in the system. *Id.* at 1119. Thus, the policy caused the couple "to drive collectively about 65 miles per day more," and for the wife added "an extra hour per day in commuting time." *Id.* at 1120.

Having considered plaintiffs' increased daily commute, and resulting psychological ailments for the wife, the *Montgomery* court concluded that defendants' anti-nepotism policy did not impose a "direct and substantial" burden on the plaintiffs' right to marry. *Id.* at 1124-26. Thus, the Court concluded, rational basis scrutiny applied to the Court's review of the policy. *Id.* at 1124-29.

In reaching its conclusion, the *Montgomery* court distinguished the case before it from two Supreme Court cases involving "direct and substantial" burdens:

> Two examples of "direct and substantial" burdens on the right of marriage derive from the facts of *Loving* and *Zablocki*. In *Loving*, the anti-miscegenation statute at issue was a "direct and substantial" burden on the right of marriage because it absolutely prohibited individuals of different races from marrying. In *Zablocki*, the burden on marriage was "direct and substantial" because the Wisconsin statute in that case required non-custodial parents, who were obliged to support their minor children, to obtain court permission if they wanted to marry:
>
> > Some of those in the affected class . . . will never be able to obtain the necessary court order, because they either lack the financial means to meet their support obligations or [will not be able to] prove that their children will not become public charges. These persons are absolutely prevented from

45

> getting married. Many others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry.

*Id.* at 1124–25 (quoting *Zablocki*, 434 U.S. at 387). Compared to the "direct and substantial" burdens imposed by the *Loving* and *Zablocki* policies, which "absolutely prevented [some] from getting married" or "coerced [some] into foregoing their right to marry," the *Montgomery* court concluded that the anti-nepotism policy involved "a non-oppressive burden on the decision to marry." *Id.* at 1125.

In *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703 (6th Cir. 2001), a case similar to *Montgomery*, the Sixth Circuit held that a governmental anti-nepotism policy requiring the termination of one spouse when two employees married "must be considered a non-oppressive burden on the right to marry, and so subject only to rational basis review by this court." 269 F.3d at 712. Building on *Montgomery*, the court explained:

> Our analysis of the case law in *Montgomery* indicated that we would find direct and substantial burdens only where a large portion of those affected by the rule are **absolutely or largely prevented from marrying**, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses.

*Id.* at 710 (emphasis added). The policy in *Vaughn* did not meet the "direct and substantial" test, the court reasoned, because "the policy did not bar [the plaintiff couple] from getting married, nor did it prevent them from marrying a large portion of population even in [their home] County." *Id.*

In light of *Montgomery* and *Vaughn*, it is clear that the temporary suspension of marriage licenses in Rowan County placed no direct and substantial burden on Plaintiffs' right to marry. Plaintiffs have not proved any obstacle, economic or otherwise, to their traveling to a clerk's office in one of the seven counties surrounding Rowan County, or any of the over 130 other Kentucky marriage license outlets, to obtain a Kentucky marriage license. Nor have Plaintiffs proved that

such travel, one time, would absolutely or largely prevent a large number of people from marrying, or absolutely or largely prevent anyone from marrying a large portion of the otherwise eligible population of spouses. The lack of a marriage license "from the Rowan County Clerk" (Am. Compl., Doc. 27, at 3, at ¶ 19) "does not change the essential fact" that Plaintiffs were never barred "from getting married, nor did it prevent them from marrying a large portion of population even in [Rowan] County." *Vaughn*, 269 F.3d at 712.

Plaintiffs have not alleged that marriage licenses were unavailable to them in any of Kentucky's other counties. Kentucky does not violate any couple's constitutional right to marry by offering marriage licenses in 119 of 120 counties, or in 7 of 7 surrounding counties. [15]

### 2. Kentucky's accommodation of Davis's religious beliefs satisfies rational basis scrutiny as a reasonable means of advancing a legitimate government interest.

Applying rational basis review shows that Plaintiffs' right to marry was not violated because Kentucky's temporary suspension of marriage licenses in one office to accommodate the protected conscience rights of its official until the marriage license could be revised was a reasonable means of advancing a legitimate governmental interest. *See Vaughn*, 269 F.3d at 712; *Montgomery*, 101 F.3d at 1129-1130. By temporarily stopping the issuance of marriage licenses to all couples in one county until appropriate (and very simple) accommodations could be accomplished, Kentucky ensured that individuals' fundamental rights to religious accommodation secured by the First Amendment and KRFRA (including Davis') were protected, while leaving ample outlets for marriage licenses open. The stoppage was reasonable under all the circumstances

---

[15]    This case does not present, and the Court need not answer, the constitutional question arising from a state that restricts marriage licensing to the county of residence or marriage solemnization, and stops issuing licenses in a particular county as a religious liberty accommodation to an official in that county. Kentucky's geographically permissive marriage licensing scheme obviates the need to answer such a question.

because Davis, as the state official responsible for the stoppage, did not possess any obvious authority when *Obergefell* was decided to unilaterally alter the Kentucky marriage license form to achieve the accommodation she ultimately received from Governor Bevin's Executive Order, and then the General Assembly.[16] Issuing no licenses at all was a reasonable policy because it was the only policy Davis could effect at the time that could (i) treat all couples the same, and (ii) rightfully accommodate religious conscience under KRFRA and the United States and Kentucky Constitutions, while (iii) leaving marriage licenses readily available to every couple throughout every region of the state and not preventing Plaintiffs from marrying whom they want to marry. The resulting burden on the Plaintiffs was minimal, and non-oppressive as a matter of constitutional law.

### 3. Kentucky's accommodation of Davis's religious beliefs also satisfies strict scrutiny because Davis's free exercise rights are entitled to the highest constitutional protection.

Indeed, protecting natural and inalienable religious liberties is not merely a legitimate government interest, it is a compelling interest of the highest degree and foundational to the very establishment of the Commonwealth of Kentucky. *See*, *e.g.*, Ky. Const., Preamble (referring to Kentuckians' "religious liberties"); Ky. Const. § 5 ("No human authority shall, in any case whatever, control or interfere with the rights of conscience."); KRFRA ("Government shall not substantially burden a person's freedom of religion.") And given that Davis' policy was not only reasonable, but also the only policy she could enact to respect all rights involved, the policy was

---

[16]    Davis ultimately altered the Kentucky marriage license forms being issued by her office only after she had returned to work following her incarceration, and after her deputy clerk had issued altered license forms while she was in jail. Governor Beshear approved the altered license forms after-the-fact, which was a change from his marriage license mandate first announced to Davis and other Kentucky clerks. (*Supra* Facts Pt. G; Doc. 27 at 3–4 ¶¶ 26–31, 31 n.2; Doc. 27-4.)

closely tailored to effectuate Kentucky's compelling religious liberty interests. Thus, the policy satisfies strict scrutiny as well, and Plaintiffs' right to marry was not violated. *See Montgomery*, 101 F.3d at 1124.

## III. DAVIS IS ENTITLED TO QUALIFIED IMMUNITY FROM PLAINTIFFS' CLAIMS BECAUSE SHE DID NOT VIOLATE ANY CLEARLY ESTABLISHED RIGHTS.

### A. It is Still Plaintiffs' Burden to Overcome Davis's Qualified Immunity Defense on the Merits.

Having been raised by Davis, it is Plaintiffs' burden to overcome her qualified immunity defense. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). "At the pleading stage, this burden is carried by alleging facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time . . . ." In reviewing this Court's prior determination that Plaintiffs had met the pleading standard, the Sixth Circuit was required to "construe the complaint in the light most favorable to the plaintiff[s], accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff[s]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016); *see also Ermold v. Davis*, 936 F.3d 429, 432 (6th Cir. 2019) ("That means we don't look at evidence; we look at allegations. **So we ask not whether Davis definitively violated plaintiffs' rights but whether they adequately allege that she did**." (emphasis added)). Applying this lenient standard, the Sixth Circuit concluded **only** that Plaintiffs had pleaded enough. *Ermold*, 936 F.3d at 437 ("In short, plaintiffs pleaded a violation of their right to marry . . . ."). "Although an [official's] entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point," however, "that point is usually summary judgment and not dismissal under Rule 12." *Courtright*, 839 F.3d at 518 (cleaned up); *see also Ermold v. Davis*, No. 15-46-DLB-EBA, 2017 WL 4108921 (E.D.

49

Ky. Sept. 15, 2017) (same). Thus, it remains Plaintiffs' burden to overcome Davis's qualified immunity defense on the merits, and on a full record. Plaintiffs cannot now overcome their burden.

**B.** **Qualified Immunity is Granted Broadly to Public Officials Who Do Not Violate Clearly Established Constitutional Rights.**

Qualified immunity generally "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Carter v. Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity is granted broadly and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is also intended to serve the public interest "by permitting officials to take action with independence and without fear of consequences." *Crocket v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003) (internal quotations omitted).

In reviewing qualified immunity at this stage, the Court must determine whether an official is entitled to qualified immunity under a two-step inquiry: (1) whether a constitutional right has been violated, and (2) if so, whether the right was clearly established and one that a reasonable official should have known. *See Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Though traditionally answered in that order, the Supreme Court recognized in *Pearson v. Callahan*, 555 U.S. 223 (2009), that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." 555 U.S. at 237. Thus, the Court held, the sequence of the qualified immunity inquiry is not mandatory: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular

case at hand." *Id.* at 236. As a result, "[i]f *either* inquiry is answered in the negative, the defendant official is entitled to [prevail]." *See Gibbs v. Lomas,* 755 F.3d 529, 537 (7th Cir. 2014). Plaintiffs have not established the violation of a constitutional right in the first instance (*see supra* Argument Pt. II), and certainly not the violation of a clearly established right.

**C.    There Was No Violation of Any Clearly Established Right of Plaintiffs.**

**1.    *Obergefell* did not clearly establish a constitutional right to demand a state-issued marriage license from a particular state official.**

Even if Plaintiffs had sufficiently alleged the violation of a federal constitutional right, they have not demonstrated any violation of a "clearly established" constitutional right. Such a "right 'must have been clearly established in a . . . particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotations omitted). "For a constitutional right to be clearly established, as this Court has repeatedly noted, '**the law must be clear in regard to the official's particular actions in the particular situation**.'" *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997) (emphasis added) (quoting *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991)). Indeed,

> [f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*.

*Id.* (quoting *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).

In deciding whether a constitutional right is clearly established, the Sixth Circuit "'look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our

circuit, and finally to decisions of other circuits.'" *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)); *see also O'Malley v. City of Flint*, 652 F.3d 662, 667-68 (6th Cir. 2011). "This standard requires the courts to examine the asserted right **at a relatively high level of specificity**," and "on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997) (emphasis added) (internal quotation marks and citations omitted). Where a case arises in an area "in which the result depends very much on the facts of each case," and no case "squarely governs the case here," no clearly established right is demonstrated. *See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004).

To the extent Plaintiffs attempt to point to any "pre-existing law" that was clearly established, *see Anderson*, 483 U.S. at 640, to overcome Davis' qualified immunity, they will be limited exclusively to the sudden redefinition of marriage on June 26, 2015 in the *Obergefell* decision. But such recent changes or modifications rarely constitute clearly established law because "the contours of the right must be sufficiently clear." *Anderson*, 483 U.S. at 639. Indeed, "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818; *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("'[I]n the light of pre-existing law the unlawfulness must be apparent.'"). Thus, subsequent developments in the law or recently enacted changes are not reliable bases for clearly establishing unlawful conduct. *See Gibbs* 755 F.3d at 539-40 (holding recently enacted or modified laws not clearly established and cannot support discarding qualified immunity); *see also Flora v. Cnty. of Luzerne*, 776 F.3d 169, 179 n.11 (3d Cir. 2015) (considering recent changes to law relevant to qualified immunity defense).

*Obergefell* did not answer clearly, if at all, every question concerning the States' regulation of same-sex marriage in relation to religious liberty and the historical view of marriage as between one man and one woman. *See Pidgeon v. Turner*, No. 15-0688, 2017 WL 2829350, *12 n.21 (Tex. June 30, 2017) ("The [Supreme] Court's decision to hear and consider *Masterpiece Cakeshop* illustrates that neither *Obergefell* nor *Pavan* provides the final word on the tangential questions *Obergefell*'s holdings raise but *Obergefell* itself did not address." (citing *Pavan v. Smith*, 137 S. Ct. 2075 (2017), *and Craig v. Masterpiece Cakeshop, Inc.*, 370 P.3d 272 (Colo. App. 2015), *cert. granted sub nom.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 137 S. Ct. 2290 (2017), *rev'd*, 138 S. Ct. 1719 (2018)). Rather, as shown above, *Obergefell* states an answer to a narrow constitutional question: "The Constitution ... does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex." *Obergefell*,135 S. Ct. at 2607.

Kentucky immediately changed the Kentucky marriage license form to comply, treating all couples the same. (*Supra*, Facts Pt. C, D.) Six months later, Kentucky changed the marriage license form again, to comply with KRFRA, still treating all couples the same. (*Supra*, Facts Pt. E.) In between, Davis treated all couples the same while she sought the accommodation that Kentucky would soon agree she was entitled to. *Supra*, Facts Pt. D, E.) It is clear that Kentucky, through Governor Beshear, could have both complied with both *Obergefell* and upheld free exercise rights under the First Amendment and KRFRA at the same time, and thereby avoided altogether the conflict between Plaintiffs and Davis. It was not clearly established, however, in the mere days following *Obergefell*, that Davis was required to abandon any claim to the accommodation **she would soon thereafter actually receive**.

Furthermore, state marriage laws differ across the country, and Kentucky marriage law is far less restrictive than other states, even if Kentucky exempted Davis from administering it on the basis of her sincerely held religious beliefs. For instance, some states require prospective couples to obtain a license in the county where the ceremony will occur, *see*, *e.g.*, Md. Code Ann., Fam. Law § 2-401(a), whereas others, like Kentucky, permit residents to obtain their license in one county and hold their ceremony in another county, *see*, *e.g.*, KRS 402.080, 402.100; Minn. Stat. § 517.07. Some states require a prospective couple to obtain their license in their home county, *see*, *e.g.*, Mich. Comp. Laws § 551.101; Ohio Rev. Code Ann. § 3101.05(a), whereas others, like Kentucky, allow residents to obtain a license in any county, *see* KRS 402.080; Tenn. Code Ann. § 36-3-103. Some states require a prospective couple to wait to receive their license upon application, *see*, *e.g.*, Mich. Comp. Laws § 551.103a (3 days); Minn. Stat. § 517.08(a) (5 days), whereas others, like Kentucky, Ohio, and Tennessee, have no waiting period. These various state regulations on the process and personnel for issuing marriage licenses differ widely in location and timing of access to licenses, and *Obergefell* has nothing to say about the disparity from state to state, provided the regulations treat same-sex couples and different-sex couples on the same terms. To be sure, there is no plausible argument that *Obergefell* requires every state to issue licenses in the home county of every applicant, regardless of the availability of licenses elsewhere.

*Obergefell* did not clearly establish Plaintiffs' right to receive a marriage license from Davis, without any accommodation for her sincere religious beliefs, when marriage licenses were readily available elsewhere. Plaintiffs' implicit claim—that individuals have an "on demand" right to a marriage license in a particular county and authorized by a particular person, is not supported by *Obergefell* at all, let alone clearly established. For example, under their faulty logic, Maryland, Michigan, and Ohio marriage laws are unconstitutional, because, as discussed above, they restrict

54

marriage applicants from obtaining marriage licenses in the county of their own choosing, requiring instead that licenses be obtained only in counties specified by the state (*e.g.*, county of residence or county of solemnification). Such cannot be the case, and such cannot be the law, even after *Obergefell*.

As the Sixth Circuit has noted, "[t]he level of generality at which the constitutional right in question is defined is of great importance." *Occupy Nashville v. Haslam*, 769 F.3d 434, 443 (6th Cir. 2014); *id.* at 444 ("There must be specificity in the definition of the right at stake."). "In some circumstances, as when an earlier case leaves open whether a general rule applies to the particular type of conduct at issue, **a very high degree a prior factual particularity may be necessary**." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (emphasis added). Indeed, "[t]he Supreme Court has 'repeatedly told courts ... not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably **in the particular circumstances that he or she faced**.'" *Occupy Nashville*, 769 F.3d at 443 (second alteration in original) (emphasis added) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

In *Occupy Nashville*, plaintiffs alleged that their right was the "clearly established First Amendment right to be present on the plaza to air their grievances against the government." *Id.* The officials, however, claimed that the right needed to be more particularized than the general First Amendment right to air grievances, and argued that it must be described with particularity as to the particular situation and circumstances under which the plaintiffs wanted to exercise that right. *Id.* The officials claimed that the right must be described as the right to a "24-hour occupation" of the plaza to engage in their First Amendment rights. This Sixth Circuit agreed with the officials, noting that a general assertion of right under a specific amendment is too broad. *Id.*

Here, Plaintiffs allege that the clearly established right is simply the "right to marry" under the Fourteenth Amendment. (Doc. 27 at 3, 6, ¶¶ 21, 43.) While no doubt clearly established in a general sense, it is still no more defined than the clearly established, general right of due process, which the Supreme Court said lacked the requisite specificity to overcome qualified immunity. *See Anderson*, 483 U.S. at 639. It is also no more specific than the alleged First Amendment right to air grievances found insufficient in *Occupy Nashville*. *See* 769 F.3d at 443. Here, the alleged clearly defined right must be framed with particularity: Whether Plaintiffs have a clearly established right to obtain a marriage license from a particular government official, in a particular place. As in *Occupy Nashville*, this is "[t]he more specific and accurate framing of the issue," and must be used to determine whether Davis is entitled to qualified immunity. *Id.* As shown herein, no such right has been clearly established, or violated.

### 2. Davis's conduct was objectively reasonable.

#### a. Qualified immunity allows for mistaken judgments and balancing reasonable uncertainties.

This Court must consider whether the official's alleged conduct was objectively unreasonable in light of a clearly established constitutional right. *See, e.g.*, *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2010); *see also Anderson*, 483 U.S. at 640. But, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). "In other words, 'existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.'" *Plumhoff*, 134 S. Ct. at 2023 (emphasis added). Thus, "[t]he official will be immune 'if officers of reasonable competence could disagree on whether the conduct violated the plaintiffs' rights." *Caldwell v. Woodford Cnty. Chief Jailor*, 968 F.2d 595, 599 (6th

Cir. 1992) (quoting *Grossman v. Allen*, 950 F.2d 338, 342 (6th Cir. 1991)); *see also Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990) (same).

Given this broad standard, this Court has permitted government officials to make reasonable determinations concerning competing rights and still be cloaked in the protection of qualified immunity. *See, e.g.*, *Guercio*, 911 F.2d at 1198 (holding government official entitled to qualified immunity when reasonable official could have reached conclusion after balancing plaintiffs' alleged rights and defendant's action); *Grossman*, 950 F.2d at 343 n.3 (noting balancing of the competing rights at issue can be relevant to the determination of qualified immunity).

### b.    It was reasonable for Davis to balance her rights of conscience with the right to marry.

In this case, Davis was faced with the assertion of a new right not previously known to the law of Kentucky, and her competing right, well-grounded in federal and state law, to receive reasonable accommodation of her religious beliefs. Given that Davis unquestionably has protection under the First Amendment and KRFRA, a reasonable official could conclude that the competing rights balanced in favor of her actions (or, at minimum, that the issue was not **beyond debate**) such that she is entitled to qualified immunity.

In *Obergefell*, the Court unanimously agreed that First Amendment protections remain despite same-sex marriage. Specifically, dissenting justices in *Obergefell* recognized that "[m]any good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion" is specifically "spelled out" in the First Amendment of the Constitution. *Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting). Continuing, these Justices noted that "[r]espect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to include accommodations for religious practice." *Id.*; *see also id.* at 733 (explaining the historical significance of "religious liberty") (Thomas, J., dissenting). Even the

majority opinion recognized that religious freedoms continue unabated even as they redefined marriage:

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and **persons** are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Obergefell*, 576 U.S. at 679–680 (Kennedy, J., majority) (emphasis added).

Not only that, but the nature of the religious objection in the context of marriage is even more firmly established in history because the "meaning of marriage" as a union between one man and one woman "has persisted in every culture," "has formed the basis of human society for millennia," and has singularly "prevailed in the United States throughout our history." *Obergefell*, 576 U.S. at 690 (Roberts, C.J., dissenting); *see also id.* at 738 ("For millennia, marriage was inextricably linked to the one thing that only an opposite-sex couple can do: procreate.") (Alito, J., dissenting). In fact, the majority in *Obergefell* conceded that the institution of marriage as exclusively a union between a man and a woman "has existed for millennia and across civilizations" and this view "long has been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world." *Obergefell*, 576 U.S. at 657 (Kennedy, J., majority). Thus, although the traditional view of marriage was discarded in *Obergefell*, that long-held view of marriage provides the historical underpinnings for a religious exemption and accommodation from the redefinition of marriage.

Thus, the *Obergefell* court specifically recognized the tensions that would occur for religious believers and in the law regarding religious accommodations. In *Pearson v. Callahan,* the Supreme Court also specifically contemplated how to analyze claims of qualified immunity in

the face of such tensions when it receded from its holding in *Saucier*: "A constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance." 555 U.S. at 238. Plaintiffs' alleged constitutional violation from a newly minted right to marry for same-sex couples (which is more accurately stated as the right to have a license issued by a particular county clerk, in a particular county) is in direct competition with Davis' constitutional and statutory rights, specifically including the right to a reasonable accommodation of her religious beliefs under KRFRA. When Plaintiffs filed their Complaint just two weeks after the *Obergefell* decision, the Kentucky courts had not determined whether KRFRA would afford a county clerk, who is an elected official, a reasonable accommodation of her religious beliefs. The right to same-sex marriage was literally brand new.

To be sure, this Court, in its preliminary injunction order in the *Miller* case, immediately recognized the tension presented by the newfound right to same-sex marriage in *Obergefell*:

> At its core, this civil action presents a conflict between two individual liberties held sacrosanct in American jurisprudence. One is the fundamental right to marry implicitly recognized in the Due Process Clause of the Fourteenth Amendment. The other is the right to free exercise of religion explicitly guaranteed by the First Amendment. Each party seeks to exercise one of these rights, but in doing so, they threaten to infringe upon the opposing party's rights.

*Miller*, 123 F. Supp. 3d at 930.

Davis' marriage licensing duties and obligations "clearly flow from the state." *See Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 693 (6th Cir. 2002). And Davis' decision *not* to issue marriage licenses to anyone was no less the act of a state official because that decision was likewise sanctioned by Kentucky state law. As ultimately acknowledged by Governor Bevin's Executive Order, Davis' right to relief from carrying out Governor Beshear's marriage license mandate against her conscience is protected by and entrenched in KRFRA which provides, in pertinent part:

> Government shall not substantially burden a person's[17] freedom of religion. The right to act **or refuse to act** in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest.

KRS 446.350 (emphasis added).

KRFRA, in turn, applies to all Kentucky statutes. KRFRA is housed under Chapter 446, which is entitled "Construction of Statutes," and includes such other generally applicable provisions as "Definitions for Statutes Generally," "Computation of Time," "Severability," and "Titles, Headings, and Notes." KRS 446.010, 446.030, 446.090, 446.140. Even more specifically, KRFRA is included under a section of Chapter 446 reserved for "Rules of Codification." As such, Kentucky's marriage statutes—much like any other body of Kentucky law—cannot be interpreted without also considering and applying KRFRA.

Thus, the right to **refuse to act** against religious conscience is expressly conferred by KRFRA, which applies to Kentucky marriage licensing statutes. Moreover, the specific application of this right to county clerks in the issuance of marriage licenses was expressly established by the Executive Order. Put differently, Kentucky (*i.e.*, Davis in her official capacity) has a duty under KRFRA not to substantially burden "the right of any person" (*i.e.*, Davis in her individual capacity) "to act **or refuse to act** in a manner motivated by a sincerely held religious belief ...." KRS 446.350

---

[17]    While "person" is not defined in KRFRA, it is defined in Kentucky's general definitions statute to include "bodies-politic and corporate, societies, communities, the public generally, **individuals**, partnerships, joint stock companies, and limited liability companies." *See* KRS 446.010(33) (emphasis added). There is no exception from the definition for individuals who are publicly elected officials.

(emphasis added). Accordingly, both in issuing marriage licenses, and in not issuing licenses pursuant to KRFRA, Davis was complying with state law, and acting reasonably.

Notably, in their attempts to dismiss the uncertainty KRFRA creates with respect to Plaintiffs' alleged right to receive a marriage license from a particular person in a particular place, Plaintiffs concede that Davis was entitled to at least some accommodation. (Doc. 31 at 26 (arguing Davis availed herself of an accommodation).) What Plaintiffs ignore is that their entire discussion of KRFRA proves the point that **the question of the extent of accommodation available to Davis was uncertain**. Plaintiffs claim Davis was not entitled to the accommodation of not providing marriage licenses. (*Id.*) In the same breath, however, Plaintiffs claim there were other accommodations which would have been "less burdensome" on the Plaintiffs. (*Id.*) Plaintiffs' entire argument demonstrates that there is legitimate debate concerning the extent of the accommodation to which Davis was entitled under KRFRA. Plaintiffs believe the accommodation was less than Davis wanted, and Davis argues she was entitled to a broader exemption under KRFRA (which she ultimately received). The discussion proves Davis' uncertainty was reasonable, and the issue is not "beyond debate." *Plumhoff*, 134 S. Ct. at 2023. Indeed, even if Davis was mistaken in her understanding of the extent of accommodation to which she was entitled, "[q]ualified immunity gives government officials breathing room to make **reasonable but mistaken judgments**." *Stanton*, 134 S. Ct. at 5 (emphasis added). As would be shown by Governor Bevin's subsequent Executive Order, however, Davis was not mistaken.

### c. Kentucky's highest officials agreed that Davis's judgment was reasonable under the circumstances.

After both the *Obergefell* Court and this Court acknowledged the tension between old and new rights, Kentucky's highest officials took action to resolve it. Kentucky Senate President Robert Stivers showed the Court that *Obergefell* made the law unclear, requiring action by the

Kentucky Governor or General Assembly to clarify the respective rights of county clerks and marriage licensees. (Doc. 89-14 at 1–2.) Governor Bevin answered the tension with his Executive Order, which explicitly recognized the substantial burden placed upon county clerks' religious beliefs, explicitly declared that there was no compelling governmental interest to justify requiring the name and authority of county clerks on marriage licenses, and explicitly declared that a reasonable accommodation could easily and must be made. (*Supra* Facts Pt. H.) The Kentucky General Assembly further answered the tension by unanimously passing SB 216. (*Supra* Facts Pt. I.) Given that Kentucky's highest executive and legislative branch officials took official action to not only identify the uncertainty and tension in Kentucky marriage law following *Obergefell*, but also to explicitly vindicate Davis' position (which official action this Court invited as "better for everyone" (*supra* Facts Pt. E), it cannot be reasonably argued that Davis' conduct was unreasonable, nor can it be reasonably argued that the supposed right asserted by Plaintiffs was clearly established (or established at all). As the Supreme Court noted in *Pearson v. Callahan*, "where there is a divergence of views on [the constitutional question], it is improper to subject [the public officials] to money damages for their conduct." 555 U.S. at 245.

In light of the foregoing, Plaintiffs cannot meet their burden of proving that Davis' actions were objectively unreasonable to survive summary judgment against their claims on qualified immunity grounds.

## IV.  PLAINTIFFS' PRAYER FOR DAMAGES IS BARRED BECAUSE THEY CANNOT QUANTIFY ANY RECOVERABLE DAMAGES.

### A.  Plaintiffs Cannot Quantify Any Recoverable Compensatory Damages.

"The basic purpose of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). "The abstract value of a constitutional right may not form the basis

for § 1983 damages." *Id.* at 308. Rather, damages must be based on evidence of an actual injury suffered by a plaintiff. *Carey v. Piphus*, 435 U.S. 247, 264 (1978). Plaintiffs' damages claims are barred because they cannot adduce competent evidence of compensatory damages that satisfy these basic principles.

Both Plaintiffs limit their damages claims by category and amount to "mental anguish, emotional distress, humiliation, and reputational damages in an amount not to exceed $50,000.00." (*Supra* Facts Pt. J.) "Damages for mental and emotional distress will not be presumed, and must be proven by competent evidence." *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 472 (6th Cir. 2009) (cleaned up). But when asked to identify the damages they claim for each category, Plaintiffs identify damages outside the categories they are claiming, or damages that could not have been caused by the constitutional deprivation they claim. Thus, Plaintiffs have failed to adduce competent evidence of any recoverable compensatory damages under § 1983, and their compensatory damages claim must fail.

Plaintiff Ermold's claimed damages comprise the nonrenewal of his $47,000 annual teaching contract at UPIKE **in 2018**, more than three years after the events at issue here, and "humiliation" from not receiving a marriage license on his recorded trips to the Rowan County Clerk's Office, and from a religious message on a church sign near his home that he found offensive. (*Supra* Facts Pt. J.) Plaintiff Moore attributes all of *his* claimed damages to the nonrenewal of *Ermold's* contract. (*Id.*) Plaintiffs, however, failed to adduce any evidence that the nonrenewal of Ermold's UPIKE contract in 2018 was in any way attributable to Davis's not issuing Plaintiffs a marriage license in 2015, leaving unrebutted the UPIKE testimony that the nonrenewal was due solely to discontinuation of the program in which Ermold taught, and had nothing at all to do with Kim Davis. (*Id.*) Moreover, Plaintiffs disclaim any economic damages, thereby

excluding even a colorable claim for recovery of the value of the nonrenewed UPIKE contract (which nonrenewal was not caused by Davis in any event).

Plaintiffs also failed to adduce any evidence that the religious message on the church sign near Plaintiffs' home was directed to Plaintiffs or caused by Davis's not issuing licenses, leaving unrebutted the testimony of the author of the message that it was intended for the general public and did not involve Davis, and that the author did not even know Plaintiffs lived near the sign. (*Id.*) Nor did Plaintiffs adduce any evidence that could remove the sign message from the clear and strong protection of the First Amendment even if it was "caused" by Davis, which it was not.

As for Ermold's claimed damages from his experiences in the Clerk's Office, Plaintiffs adduced no evidence apportioning or separating any such damages from the nonrecoverable economic (contract nonrenewal) and "humiliation" (church sign) damages that could not have been caused by Davis. Moreover, Plaintiffs failed to adduce any evidence differentiating Ermold's claimed "humiliation" allegedly caused by Davis from Plaintiffs' own intentionally manufactured, prolonged, and self-publicized confrontations with Davis and her deputy clerks in the Clerk's Office. (*Supra* Facts Pts. F, J; *see also infra* Argument Pt. IV.B.) The first time Plaintiffs went to the Clerk's Office for a marriage license they knew that marriage licenses were not being issued. (*Supra* Facts Pt. J.) On their second and third visits, if they did not know that no licenses were being issued before going to the Office, they easily could have known by making a telephone call, and in any event knew within a minute that no licenses were being issued. (*Id.*) On each of the three visits, however, Plaintiffs intentionally filmed the visit, intentionally provoked, escalated, and prolonged confrontations after being advised no marriage licenses would be issued, and intentionally posted the filmed confrontations online and shared them on social media. (*Id.*)

Plaintiffs have adduced no evidence that could differentiate the attention Plaintiffs intentionally sought and obtained, from the public "humiliation" Ermold claims to have suffered, and therefore have adduced no competent evidence of any "humiliation" damages caused by Davis.

**B.    Plaintiffs Failed to Mitigate Their Claimed Damages by Intentionally and Continually Manufacturing Confrontations and Publicizing Them.**

"[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura*, 477 U.S. at 306. "[A]n . . . obvious policy imported from the general theory of damages [is] that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute." *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998). Thus, "[i]n a § 1983 case the plaintiff has a duty to mitigate damages." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994).

As shown above, Plaintiffs intentionally manufactured, prolonged, and publicized utterly unnecessary confrontations with Davis and her deputy clerks. Even if Plaintiffs were determined to sue Kim Davis for her temporary discontinuation of all marriage licenses, Plaintiffs could have easily obtained the denial of their license application to give them standing for legal action either by phone or by quiet visit to the clerk's office, without the media attention and fanfare that Plaintiffs themselves invited and encouraged.

Plaintiffs adduced no competent evidence on which the publicity and attention they intentionally sought can be differentiated from attention they did not want (if any). (*Supra* Facts Pts. F, J; Argument Pt. IV.B.) What is clear, however, is that Plaintiffs utterly failed to mitigate their claimed damages and cannot differentiate the claimed damages they failed to mitigate from any other claimed damages, which bars any compensatory recovery.

**C.    Plaintiffs Cannot Justify or Even Identify Any Claim for Punitive Damages.**

Although Plaintiffs' Amended Complaint includes perfunctory allegations of malice and bad faith in support of alleged punitive damages (Doc. 27 at 6, ¶¶ 44–48), neither Plaintiff identified any punitive damages claimed in his answers to interrogatories (Doc. 91-7 at 2; Doc. 91-22 at 2), and at deposition neither Plaintiff knew of any punitive damages claim. (Doc. 90-1 at 108:14–16; Doc. 90-2 at 31:16–32:23.) Thus, Plaintiffs have adduced no evidence to support a claim for punitive damages.

To the extent Plaintiffs continue to press punitive damages, however, such damages are available in a § 1983 action "only on a showing of the requisite intent," *i.e.*, "acts 'maliciously, or wantonly, or oppressively done.'" *Stachura*, 477 U.S. at 307 n.9. Plaintiffs have failed to adduce any evidence of such acts by Davis. To be sure, the Amended Complaint explicitly alleges that Davis' acts were done according to her "deeply held Christian beliefs." (Doc. 27 at 3, ¶ 21.) Moreover, Ermold told an Associated Press reporter in 2018 that "Kim Davis has the integrity to stand up for what she believes in." (Doc. 90-1 at 142:14–23, 146:6–11; 91-18.) Allowing a punitive damage award premised on equating sincere religious conviction against same-sex marriage with animus would violate the Establishment Clause:

> Lumping those who hold traditional beliefs about marriage together with racial bigots is insulting to those who retain such beliefs. In *Obergefell v. Hodges* the majority made a commitment. It refused to equate traditional beliefs about marriage, which it termed "decent and honorable," with racism, which is neither. And it promised that "religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." An open society can keep that promise while still respecting the dignity, worth, and fundamental equality of all members of the community.

*Fulton*, 141 S. Ct. at 1925 (Alito, J., concurring in the judgment) (cleaned up); *cf. Davis v. Ermold*, 141 S. Ct. 3, 4 (2020) (Statement of Thomas, J., respecting the denial of certiorari.)

("Since *Obergefell*, parties have continually attempted to label people of good will as bigots merely for refusing to alter their religious beliefs in the wake of prevailing orthodoxy.") Thus, Plaintiffs cannot recover punitive damages on the bare allegation that Davis's sincerely held religious convictions are malicious.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should decline the opportunity to become the mechanism by which Plaintiffs seek retribution from Kim Davis so that they can "see her hang. . . . SLOWLY," and instead enter summary judgment for Davis and against Plaintiffs on all of Plaintiffs' claims.

Respectfully submitted,

A.C. Donahue
Donahue Law Group, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
Tel: (606) 677-2741
Fax: (606) 678-2977
ACDonahue@DonahueLawGroup.com

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
(407) 875-1776
hmihet@LC.org
rgannam@LC.org
court@LC.org

*Attorneys for Defendant, Kim Davis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed via the Court's ECF filing system and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record:

Michael J. Gartland
DelCotto Law Group PLLC
200 North Upper Street
Lexington, KY 40507
mgartland@dlgfirm.com

Joseph D. Buckles
149 North Limestone
Lexington, KY 40507
joe@joebuckles.com

DATED this July 30, 2021.          /s/ Roger K. Gannam
                                    Roger K. Gannam
                                    *Attorney for Defendant, Kim Davis*