UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND
- - -

| | |
|---|---|
| DAVID ERMOLD,<br>DAVID MOORE,<br>Plaintiffs,<br><br>versus<br><br>KIM DAVIS, Individually,<br>Defendant. | **Docket No. 15-cv-46**<br><br>Ashland, Kentucky<br>Wednesday, September 13, 2023<br>8:15 a.m. |
| JAMES YATES,<br>WILLIAM SMITH,<br>Plaintiffs,<br><br>versus<br><br>KIM DAVIS, Individually,<br>Defendant. | **Docket No. 15-cv-62**<br><br>**Jury Trial Day 3 of 3** |

- - -

TRANSCRIPT OF JURY TRIAL
BEFORE DAVID L. BUNNING
UNITED STATES DISTRICT COURT JUDGE
- - -

APPEARANCES:

**Case No. 15-cv-46**
**For the Plaintiffs:**

JOSEPH DANIEL BUCKLES, ESQ.
Buckles Law Office PLLC
149 N. Limestone
Lexington, KY 40507

MICHAEL JOSEPH GARTLAND, ESQ.
DelCotto Law Group PLLC
200 N. Upper Street
Lexington, KY 40507

Appearances continued on the following page

APPEARANCES: (Continued)

**Case No. 15-cv-62**
**For the Plaintiffs:**

RENE B. HEINRICH, ESQ.
The Heinrich Firm, PLLC
526 York Street
Newport, KY 40171

WILLIAM KASH STILZ, JR., ESQ.
Roush & Stilz, PSC
19 W. Eleventh Street
Covington, KY 41011

**For the Defendant:**

HORATIO G. MIHET, ESQ.
DANIEL JOSEPH SCHMID, ESQ.
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854

ANTHONY CHARLES DONAHUE, ESQ.
Donahue Law Group, PSC
410 S. Main Street
P.O. Box 659
Somerset, KY 42502-0659

Court Reporter:

LISA REED WIESMAN, RDR-CRR
Official Court Reporter
35 W. Fifth Street
Covington, KY 41011
(859) 291-4410

Proceedings recorded by mechanical stenography, transcript produced by computer.

(Proceedings commenced at 8:15 a.m.)

THE COURT: I understand we still have a few jurors missing, but it's not quite 8:30.

I did want to give you my decision on the motion for directed verdicts that was raised at the close of the plaintiffs' case at the end of yesterday.

During the overnight recess, the Court was able to read the cases cited by the attorneys during the motion. Upon reviewing those cases and considering the evidence presented by the plaintiffs at trial, and reviewing my notes of the testimony -- of course, I didn't have the transcript, but I have my notes, and I'm up to 25 pages of notes now -- the Court will deny the defendant's motions with regard to all four plaintiffs' damages under 1983.

Of course, it's well settled in the *Carey* case that Section 1983 entitles plaintiffs to seek compensation for injuries caused by the deprivation of such constitutional rights. We've already made that determination previously. That was upheld by the Court of Appeals, and that's the *Carey versus Piphus* case, 435 U.S. 246 at page 254, a 1978 case.

In fact, one of the cases cited by defense counsel, *Pembaur* -- and I recalled yesterday the *Pembaur* case being a Supreme Court case, but the case cited by the defense counsel was the Sixth Circuit case, *Pembaur versus City of Cincinnati*,

882 F.2d 1101 at page 1104, a 1989 decision. The Court held that such compensatory damages are to compensate the aggrieved party for injuries sustained, and then they cite the *Memphis Community School District versus Stachura* case, 477 U.S. 299 at page 307. That's a 1986 decision.

*Pembaur* went on to state, however, that compensatory damages may only be awarded when proof of actual injuries has been established. That, frankly, is where the parties here diverge substantially. The defendant says that the evidence that was presented is insufficient to establish actual injuries and that the testimony of the plaintiffs is also insufficient to do so.

The Court disagrees after reviewing the cited case law and after reviewing other Sixth Circuit authority. In the *Stachura* case, the Supreme Court held that in the context of 1983 cases, such compensatory damages may include injuries, such as impairment of reputation, humiliation, mental anguish, and suffering.

In fact, the Sixth Circuit has also recognized those types of injuries in the *Chatman v. Slagle* case, a case cited by the defendant yesterday. That's 107 F.3d 380 at page 384 through 385, 1997 Sixth Circuit.

The Court of Appeals identified several cases that have found emotional distress to be a compensable injury under Section 1983, including intimidation, marital problems, weight

loss, loss of sleep, shock, and humiliation. Now, we don't have all of those things. There was some testimony regarding some of those things here.

Even the *Pembaur* case recognized that injuries need not be physical ones. Damages for pain and suffering, anguish, et cetera, are available to the extent that an actual injury has been proven. The Court finds that reviewing the evidence in the light most favorable to the nonmoving party, which, of course, is the standard here, the Court finds that each plaintiff has established actual injuries as explained during their testimonies yesterday.

The defendant, of course, downplays the alleged injuries by arguing they could have mitigated the injuries by perhaps calling ahead before going to the clerk's office to attempt to get the licenses.

Unfortunately for the defendant, once the Supreme Court issued its *Obergefell* decision, they weren't required to wait or avoid going to the Rowan County Clerk's Office because Ms. Davis wasn't issuing the licenses. They were entitled to get married as same-sex couples, and the defendant's refusal to issue the licenses caused the injuries as they described.

The issue for the Court at this juncture isn't whether the jury will find those injuries sufficient to award compensatory damages. They very well may decide that the numbers that are being thrown out or blackboarded by

plaintiffs' counsel are not grounded in sufficient evidence and may award zero or something very small, but that isn't the standard here.

In denying the defendant's motions, the Court is also persuaded by plaintiffs' reliance on *the Turic v. Holland Hospitality* case, 85 F.3d 1211 at page 1215, a 1996 Sixth Circuit case. As in *Turic*, the plaintiffs here have suffered -- have offered sufficient evidence to establish the *Carey* standard.

The plaintiffs and Plaintiff Yates' sister all testified that the plaintiffs suffered some level of humiliation. To the extent with Mr. Ermold and Mr. Smith, some level of anxiety and PTSD, perhaps. Actions caused -- the actions by the defendant in refusing the licenses caused an emotional strain on the relationship, and this is with respect to Mr. Ermold and Mr. Moore perhaps more specifically than the other two plaintiffs.

Both were under constant stress due to the refusal to issue licenses. Both testified about the humiliation they suffered as well, in addition to the stress and anxiety, and I think at least one of the plaintiffs mentioned that they felt like second class citizens.

Ermold said the mere mention of the defendant in situations from the sequence of events were triggers for his PTSD.

Now, of course, anything that predated Ms. Davis's actions, she's not responsible for that. That's not what I'm looking at here for purposes of the motion.

As for the defendant's arguments that they made the situation worse by granting interviews and putting themselves out there, to some extent, that goes perhaps to the level of damages, not the actual proof of the damages themselves.

As for Plaintiffs Smith and Yates, their testimonies, along with Yates' sister, established that defendant's actions in refusing the licenses were humiliating also to both of them and that Smith tried multiple times after being turned away by Brian Mason, who was carrying out the defendant's orders not to issue the licenses.

Smith identified panic attacks, and Yates' sister actually assisted him on two occasions during this time period to help him with those attacks. According to both of them, both of the plaintiffs as well as Mr. Yates's sister, Mr. Smith's depression seemed to get worse and some of his medications had to be changed.

I certainly understand we don't have a medical doctor. That doesn't necessarily preclude the Court from finding actual injuries as defined under the current law.

Both of these plaintiffs also testified that the actions caused them harm, although the amount that their attorneys are

asking for may not have specifics associated with it. I will certainly instruct the jury that they can't use speculation or guesswork in determining damages. There is sufficient evidence to allow the damage claims to go forward with respect to them.

All of this evidence, while essentially subjective, is sufficient under *Carey*. The case is similar in nature to *Turic*. The plaintiff testified that she suffered nightmares, weight loss, et cetera, in addition to excessive nervousness.

For all these reasons, the defendant's motion for directed verdict on all four plaintiffs' damages claims will be denied.

Madam Clerk, I'm not going to issue a written order. You can reflect in the minutes that for reasons stated, the defendant's oral motion with respect to all four plaintiffs was denied.

COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: I did have my clerk provide you with the draft set of instructions. Instruction 12, I made one additional edit after you were given the original set via email, and that's consistent with damages in civil cases. I had neglected to add that from the first set.

So we'll have a conference regarding jury instructions at the end of the proof. I've been thinking about the process of closing. Plaintiffs bear the ultimate burden of proof by a

preponderance of the evidence.

In civil cases, the way I do it, since each side will have 20 minutes for closing argument, if the plaintiffs want to go first, you can reserve up to five minutes for rebuttal. Or we can just have the defendant go first, and then the plaintiffs go second.

So have you all thought about that? In a criminal case, of course, I usually give the prosecutor an initial opening or closing, and then the defendant, and then rebuttal.

Have you given that any thought?

MR. MIHET: Your Honor, we assumed we'd go in the same order the case would be presented. They'd go first, we would go second. We wouldn't object to them having some rebuttal time if they wanted, but we would like for them to go in the same order that the proof has been submitted.

THE COURT: Either one is my general practice. Are you going to be giving the closing, Mr. Gartland?

MR. GARTLAND: Yes. I think that they should go first, and we should go last.

THE COURT: Well, they should be able to respond to what you say.

What's your thought on that?

MS. HEINRICH: Your Honor, I don't care either way.

THE COURT: Okay. We're going to go with, since we have one, one, and one -- in fact, no matter what you said,

probably wouldn't have broken the tie. I'll do what I usually do, which is both plaintiffs will go first. You'll have five minutes for rebuttal at the end. So if you want five minutes, you can have 15 minutes for your original opening. They'll have 20, and each of you will have up to five minutes for rebuttal.

MR. MIHET: Your Honor, I don't think I'll need it, but if I need 22 or 23 or 25 minutes, since I'm responding to two cases, would the Court grant me a little bit of additional leeway above my 20, or will the Court stop me at 20 on the dot?

THE COURT: Well, you seem like, Mr. Gartland, since I'm stopping you at 15, you probably started knowing you'd have 20. What's your view?

MR. GARTLAND: Are both juries going to hear both closings at the same time?

THE COURT: No. A will hear A's closing, B will hear B's closing, and then both juries will hear the closing of the defendant together.

MR. GARTLAND: So it doesn't make sense that he gets more time than we get. Should be 20 and 20.

THE COURT: How about if I give you 25. Is it really that big of a deal?

MR. MIHET: I was thinking I have to address proof for two cases.

THE COURT: You knew that.
MR. MIHET: I did. If I needed an extra couple minutes, I was hoping the Court would be lenient.
THE COURT: I'll be lenient to both.
MR. MIHET: Thank you.
THE COURT: Anything else to take up while we wait for the jury?
Hearing nothing, we'll be in recess until the jury is here.
(Recess from 8:27 a.m. until 8:33 a.m.)
THE COURT: I understand all the jurors are present. If you'd bring in Panel A and Panel B, please.
(Jury Panels A and B entered the courtroom at 8:34 a.m.)
THE COURT: All right. Good morning, everyone. I hope to be able to wrap up the proof this morning and then get you the case by around the lunch hour, perhaps a little bit after. But we have additional proof by the defendant. You may call your next witness.
MR. SCHMID: The defendant calls Defendant Kim Davis, Your Honor.
THE COURT: All right. You were sworn the other day. You don't need to be sworn a second time.
KIM DAVIS, DEFENDANT, previously sworn
THE COURT: You may proceed, sir.
MR. SCHMID: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SCHMID:

Q. Good morning, Ms. Davis.

A. Good morning.

Q. You heard a lot of testimony yesterday about what occurred back in 2015. I'd like to walk you through some of those recollections and memories, if that's okay.

A. Okay.

Q. Can you tell the jury a little bit about your history as the Rowan County clerk?

A. I was deputy clerk for my mother for 27 and a half years. And when she retired, I ran for office and won the primary election and then won the general election. I took office on January 5th, 2015.

Q. Did you have a prior history in the Rowan County Clerk's Office?

A. I just worked there 27 and a half years as a deputy, and then the chief deputy.

Q. Upon taking office as the Rowan County clerk, were you responsible for instituting and implementing the policies of the Rowan County Clerk's Office?

A. I was.

Q. And did that responsibility include policies relating to the issuance of marriage licenses?

A. Yes. It related to all policies of the clerk's office,

including marriage license.

Q. Did you enact and implement a marriage license policy for the Rowan County Clerk's Office after the *Obergefell* decision in 2015?

A. I did. When I first got elected, I was put on a committee of fellow clerks that was assigned to kind of brainstorm about what we could do as clerks when the *Obergefell* decision came down. You know, we talked about accommodations, regional hubs, all sorts of things. But we had never come to any conclusion.

So when the *Obergefell* decision was given, I walked down my line of clerks after we closed that day of business, and I told them as of right now, we're not going to issue any further license until we can get some sort of accommodation for clerks like myself that had, you know, conscientious objections.

Q. Did the policy you enacted apply to all individuals who would seek a marriage license from the Rowan County Clerk's Office?

A. Yes. I said we won't issue license to anybody, same-sex or man-and-woman couples, because I didn't want to discriminate against anybody.

Q. So was that policy related only to the marriage licenses of same-sex couples?

A. Oh, no, no, no.

MS. HEINRICH: Your Honor, I'm going to object at this point.

THE COURT: Sustained. Asked and answered. She just answered that.

BY MR. SCHMID:

Q. Ms. Davis, did you have a reason for not issuing any marriage licenses?

MR. GARTLAND: Objection.

MS. HEINRICH: Objection, Your Honor.

THE COURT: Sustained. She's already answered that. She said she had a conscientious objection.

BY MR. SCHMID:

Q. Was the policy enacted by you, as the Rowan County clerk, targeted at discriminating against same-sex couples?

MS. HEINRICH: Objection.

MR. GARTLAND: Objection.

THE COURT: Sustained.

MR. SCHMID: Your Honor, the plaintiffs are seeking damages based on the policy. I think the jurors are entitled to see what the parameters and what the purpose of the policy was.

THE COURT: She's already explained it. I've allowed a couple questions and now are not going to allow any more.

BY MR. SCHMID:

Q. After you implemented the policy of denying marriage

licenses to all individuals in Rowan County, did you issue any marriage licenses to any individual or couple that applied for one?
A. No.
Q. After you implemented the policy that precluded individuals from obtaining marriage licenses from the Rowan County Clerk's Office, did you deny marriage licenses to opposite-sex couples that had applied for one?
A. I did.
Q. After you implemented the policy that precluded individuals from obtaining a marriage license from the Rowan County Clerk's Office, and aside from the four plaintiffs that are present here today, did you deny a marriage license to any same-sex couples that applied --
MR. GARTLAND: Objection, Your Honor.
MS. HEINRICH: Objection, Your Honor. Relevance.
MR. GARTLAND: It's been asked and answered.
MR. SCHMID: It hasn't been asked and answered. This is the first time I've asked it.
THE COURT: You're just going to ask it in a different way, aren't you?
Sustained.
BY MR. SCHMID:
Q. Aside from the four plaintiffs that are present here today, did any individuals who were denied a marriage license

file a lawsuit against you?

MR. GARTLAND: Objection.

THE COURT: Sustained. Several did.

MR. SCHMID: Yes, Your Honor, and I think the jury is entitled to hear what that lawsuit was.

THE COURT: It has nothing to do with this case. They're not considering other lawsuits. They're considering this lawsuit.

MR. SCHMID: The plaintiffs all thought that it had something to do with this lawsuit, Your Honor, when they asked you to take judicial notice of --

THE COURT: Look, you're now talking in front of the jury. What someone may have done in a motion that was for the Court, not for the jury, is really not something the jury needs to hear about.

BY MR. SCHMID:

Q. Do you recall the *Miller versus Davis* lawsuit, Ms. Davis?

MR. GARTLAND: Objection.

THE COURT: You can ask about other injunctions. Why do we need to --

Ladies and gentlemen, there were other lawsuits involving other plaintiffs that sought injunctive relief and wanted their licenses. I ruled on all of those. The case went up to the Court of Appeals. He mentioned various stays. Some of the plaintiffs identified why they may have taken action on

certain days. That involved actions for related lawsuits which are not before you for your consideration.

If you want to ask generally about injunctions and things like that, I think when you mention other plaintiffs' names, it's confusing. I am going to allow some inquiry about that because you all brought that up.

When you bring up other lawsuits, I think it's confusing to the jury, and I'll exclude that under Rule 403.

Go ahead.

MR. SCHMID: Yes, Your Honor. I'll be more general.

THE COURT: That's fine.

BY MR. SCHMID:

Q. Ms. Davis, did the Court issue an injunction against you in relation to your marriage license policy?

A. It did.

Q. And after that injunction, did an opposite-sex couple obtain a marriage license from your office?

A. No.

Q. Did a same-sex couple receive a marriage license from your office --

A. No.

Q. -- during that injunction?

Why not?

A. I did not want to issue a license to a heterosexual couple and discriminate -- and not issue one to a same-sex

couple because I could not have my name affixed to a same-sex marriage. It would be my authorization. The license states that the county clerk is authorizing that these two parties that have applied for a license meet the constitutional Kentucky state requirements for applying for a marriage license.

And for me to do that, it was -- it was -- I had a conscientious objection. I could not do that. But I didn't, you know, I didn't want to -- I was seeking an accommodation from the very beginning back in January.

MS. HEINRICH: Your Honor, objection.

MR. GARTLAND: Objection. Move to strike all of that testimony.

THE COURT: I understand. I'm not going to strike it, but that's the end of this inquiry.

MR. SCHMID: Okay. In relation to the entire case, or just the history?

THE COURT: I mean, you can ask questions, but her --

MR. SCHMID: I want to be respectful of --

THE COURT: I appreciate it, but if they object and you ask a question, we'll deal with the objection. I'm not here to give advisory opinions.

BY MR. SCHMID:

Q. After the Court issued an injunction against you, did you issue the marriage licenses to anyone?

A. No.
Q. And what was the result of that decision?
A. I ended up going to jail.
Q. And after that, did individuals in Rowan County obtain the marriage licenses they were seeking?
A. While I was incarcerated, they did.
Q. Did the marriage licenses that were issued during your time that you were incarcerated contain your name?
A. No. They had been altered to take my name off the license to protect my conscientious objection.
Q. And did the individuals who brought the lawsuit that resulted in an objection -- or in your incarceration and the injunction against you seek money damages against you?
MS. HEINRICH: Objection as to relevance, Your Honor.
THE COURT: Sustained.
THE WITNESS: No.
THE COURT: You're to disregard the answer.
THE WITNESS: Oh, I'm sorry. I apologize.
BY MR. SCHMID:
Q. I'd like to move now to the specific interactions that were discussed yesterday with the plaintiffs who were present in this courtroom. Is that okay?
A. Yes.
Q. Did you have the occasion to discuss the marriage license policy that's at issue in this case with any of the four

plaintiffs who were present in this courtroom today?
A. I never met Mr. Smith and Mr. Yates. I'd never seen them before the first day they were here in court.
I had waited on Mr. Ermold and Mr. Moore and had talked to them face-to-face.
Q. And the jury heard testimony yesterday from Mr. Ermold and Mr. Moore that they went to the Rowan County Clerk's Office on July 6th, 2015.
Do you recall that testimony?
A. I do.
Q. Mr. Ermold and Mr. Moore testified yesterday that during the discussion on July 6th, 2015, that they were referred to by the words -- and forgive me. I don't like to use this language, but this was the testimony that was presented to you: Sodomite, rapist, murderer, and adulterers.
Do you recall that testimony?
A. I do.
Q. Ms. Davis, have you ever referred to any plaintiff in this room or any individual as a sodomite, a rapist, a murderer, or a pedophile?
A. No.
Q. Have you ever condoned anyone who would have used that language against the plaintiffs in this courtroom?
A. No.
Q. Why not?

A. Because for just not being nice, but it's -- you know, they are made in the image of God. They're fearfully and wonderfully made, and nobody, nobody should be called that ever.

Q. You heard testimony from Mr. Ermold and Mr. Moore they visited the clerk's office on August 13, 2015.

Do you recall that testimony?

A. I do.

Q. Mr. Ermold and Mr. Moore testified about media being present on that day.

Do you recall that testimony?

A. I do.

Q. And one of the media outlets that was present on the August 13th date was 90.3 FM.

Does that sound familiar?

A. Yes.

Q. Does 90.3 FM have an office in the same building as the Rowan County Clerk's Office?

A. No, they don't.

Q. You testified a moment ago that you've spent 31 years working in some capacity in the Rowan County Clerk's Office, correct?

A. Yes.

Q. During your 31 years in the Rowan County Clerk's Office, did 90.3 FM have a habit of being present at the clerk's

office to record the events that occurred that day?
A. No. The only time the media ever came to my office was, like, election nights for primary elections, general elections to get results.
Q. So would it have been unusual for 90.3 FM to be present at your office during the middle of the day?
A. It would have been very unusual.
Q. During your 31-year tenure working in the Rowan County Clerk's Office, did you ever invite 90.3 FM?
A. No.
Q. We also heard testimony that on the August 13th date we were discussing that there were a number of other photographers and videographers and news media outlets present on that day.
Do you recall that testimony?
A. Yes.
Q. During your 31-year tenure working at the Rowan County Clerk's Office, can you ever recall an instance where there were numerous photographers, videographers, and news media outlets present on the day to record the business dealings of individuals with the Rowan County Clerk's Office office?
A. No.
Q. During your 31-year tenure at the Rowan County Clerk's Office, did you ever invite photographers, videographers, or news media outlets to cover the general business of the day?

A. No.
Q. So would it have been unusual that there were a number of media outlets and videographers and photographers present on that day?
A. Yes.
Q. The jury also heard testimony from Mr. Moore and Mr. Ermold that they came to your office on September 1st, 2015.
Do you recall that testimony?
A. Yes.
Q. Do you recall speaking with Mr. Ermold and Mr. Moore on that day?
A. I do.
Q. And during his testimony with Mr. Mihet, Mr. Moore testified that he wore a wired microphone to the clerk's office on that day.
Do you recall that testimony?
A. I do.
Q. During your 31-year tender working -- tenure working at the Rowan County Clerk's Office, do you ever recall an individual wearing a microphone into the Rowan County Clerk's Office?
A. No.
Q. Can you tell the jury a little bit about the conversation that took place on September 1st, 2015, with Mr. Moore and

Mr. Ermold?

A. To the best of my recollection, they came in and they wanted to see me. So I walked up to them. They had come to a -- it was like down toward the middle of the line of our front counter, and they had people all around them. I mean, there was cameras and microphones and everything.

He asked -- Mr. Ermold or maybe Mr. Moore, I don't remember, but one of them asked if I was going to issue licenses that day. And I told them that, no, we still weren't issuing license, that I was still waiting on accommodation. And if what they were trying to accomplish to get a marriage license, they could --

MR. GARTLAND: Objection, Your Honor.

MR. SCHMID: Your Honor, we heard multitudes of testimony yesterday about the interactions on September 1st. I think the jury is entitled to hear Ms. Davis's perspective on it.

MR. GARTLAND: This goes to the issue excluded in limine.

THE COURT: Well, they don't -- I will tell you, ladies and gentlemen, that when we get to the jury instructions eventually, I am going to give you instructions on mitigation. However -- however -- mitigation did not require any of these four plaintiffs to go to another county to get their license. That wasn't -- that's not a mitigation

that they were required to do.

MR. GARTLAND: With that, I'm satisfied.

MR. SCHMID: And that wasn't the purpose -- I was just trying --

THE COURT: I know. I'm explaining to them that that's not a mitigation that's required.

MR. SCHMID: Fair enough, Your Honor. Thank you.

THE COURT: You may answer.

A. I proceeded to tell them that if what they wanted to accomplish was get a marriage license that all the other counties around our county, they were issuing license. And Mr. Ermold asked me, he said, "Under what authority are you not going to issue a license?"

MR. GARTLAND: Objection, Your Honor.

THE COURT: I'll sustain that.

BY MR. SCHMID:

Q. During your discussion with -- I'm going to streamline this a little bit. During your discussion with Mr. Moore and Mr. Ermold on that day, did you inform them that you weren't issuing marriage licenses to any couple?

A. I did. I said we're not issuing any license straight across the board.

Q. So did you inform them that your policy was not to preclude only same-sex couples from issuing the marriage license?

A. Yeah, when I said we're not issuing license to anyone, same couples or heterosexual couples.
Q. I want to switch gears for a minute and discuss your interactions with the Yates and Smith plaintiffs, if that's okay.
A. That's fine.
Q. We heard testimony and the jury saw a couple videos yesterday concerning Mr. Yates and Mr. Smith's visits to the Rowan County Clerk's Office. Do you recall those videos and that testimony?
A. I do.
Q. Did you appear in any of those videos?
A. No.
Q. Prior to the institution of Mr. Yates and Mr. Smith's lawsuit against you, have you ever met either one of them in person?
A. No.
Q. Have you ever spoken to Mr. Yates or Mr. Smith?
A. No.
Q. To your knowledge, did you ever personally deny Mr. Yates or Mr. Smith the marriage license they were seeking?
A. No.
Q. I want to switch back now to Mr. Ermold and Mr. Moore and discuss some of the testimony that involved other encounters that you had with these individuals. Do you remember that

testimony from yesterday?
A. Yes.
Q. Have you ever had any other interactions at the Rowan County Clerk's Office with Mr. Ermold or Mr. Moore?
A. I have. I helped Mr. Ermold file papers to run for office during election in -- I guess it was either the last part of 2017 or the first part of 2018. He wanted to run for the office of county clerk, and he came in, and some of his paperwork wasn't right, and so I asked him if we could sit down and go over it. And I helped him get it fixed so he would be -- so that his declaration of candidacy would be accepted by the Secretary of State. Got the paperwork filed, and I stood up and shook their hands and told them, "May the best candidate win."
Q. And was the paperwork you helped them fill out related to an election for the position that you held at the time?
A. Yes. It was for -- he was -- he wanted to run for county clerk.
Q. Did you have any objections to assisting Mr. Ermold or Mr. Moore with the paperwork --
MR. GARTLAND: Objection, Your Honor.
BY MR. SCHMID:
Q. -- to run for replacement -- to run for your replacement as county clerk?
MR. GARTLAND: Objection. Has nothing to do with our

case.

THE COURT: Look, you brought it up during your case so overruled.

MR. GARTLAND: I didn't bring this subject matter up.

THE COURT: Someone -- Mr. Ermold testified that she had interaction with him in 2017, 2018.

Overruled.

I know you individually didn't bring it up because you weren't a witness.

Go ahead.

BY MR. SCHMID:

Q. Did you have any objections to assisting Mr. Ermold with the filing of his paperwork to run an election to unseat you as the Rowan County clerk?

A. No, not at all. I was happy to help him.

Q. Can you explain to the jury the difference between helping Mr. Ermold with election paperwork to replace you as the Rowan County clerk and issuing a marriage license?

A. Well, the difference for me is the marriage license issue, that, for me, was a -- it was an issue I thought about long and hard, and I prayed --

MS. HEINRICH: Objection, Your Honor.

THE COURT: Sustained.

BY MR. SCHMID:

Q. Ms. Davis, we heard testimony from Mr. Ermold and

Mr. Moore concerning a book yesterday.
Do you recall that testimony?
A. I do.
Q. Was there a book published concerning your story?
A. There is and has been.
Q. Did you help write that book?
A. I did.
Q. Did you ever receive any proceeds or profits from that book?
A. No. Nothing.
Q. Mr. Yates and Mr. Smith are seeking $300,000 from you in this lawsuit. Did you receive $300,000 from the proceeds of the book?
MS. HEINRICH: Objection, Your Honor.
THE COURT: Asked and answered?
MS. HEINRICH: Yes.
THE COURT: Sustained. She received no profits from the book.
BY MR. SCHMID:
Q. Ms. Davis, did you ever receive any personal compensation for your denial of marriage licenses during your time as the Rowan County clerk?
A. No.
Q. The plaintiffs' counsel, during testimony and throughout the trial so far, have referred to an old expression that a

rule without consequences is just a suggestion.

Do you recall that?

A. I do.

Q. Have you suffered any consequences as a result of your marriage license --

MS. HEINRICH: Objection, Your Honor.

THE COURT: Sustained.

MR. SCHMID: Your Honor, can we have a sidebar on this --

THE COURT: You can.

MR. SCHMID: -- issue?

THE COURT: Sure.

(Sidebar conference.)

THE COURT: Let the record reflect we're at the bench. She's already said she's gone to jail. Why do you need to ask it again?

MR. SCHMID: I think that the entire theme of their case is a rule without consequences is to suggest to the jury she hasn't suffered any consequences, and you should punish her with monetary damages.

THE COURT: Hold on. We're not punishing. Punishing is punitive damages. They're not seeking punitive damages.

You've already established -- and I have allowed you to have a little bit of leeway in some of the questions. I've kind of stopped you from going too far, in my view.

This is a situation where they've already heard that she went to jail two or three times. So that's before the jury. Having her characterize it as consequence, do you really need that? You've already -- this is something that, as a judge -- I was a lawyer for many, many years. You ask a question, you get the information, you write it down, and you put it in your pocket to use later for closing.

You already have that. Why do you need to have more? Maybe because you want the jury to see how she reacts when she says it, perhaps.

But, again, I'm going to sustain the objection. You've already --

MR. SCHMID: Not in the context of what the consequences are, though. It's directly related to the arguments that both of them gave during opening.

THE COURT: Okay. Well --

MR. SCHMID: And they said, without consequence, it's this. To suggest that there have been none, is she not entitled to answer a question related to that specific theme of the entire thing?

THE COURT: You've already established that based upon answers to other questions that she has had a consequence. Remember? She said she went to jail.

MR. SCHMID: Which is not the only consequence, and that's where I intend to go with this line of questioning if

Your Honor will permit me. Yes, Your Honor issued an injunction and held her in contempt and she went to jail. That is one consequence, but there have been others.

THE COURT: What would they be? Give me a proffer of what other consequences you believe she would say.

MR. SCHMID: I think her testimony is going to elicit not only -- and we heard yesterday, which came out in the opening statement, which were there was a circus, and there was this, and there was slurs hurled, and there were these -- I think the jury is entitled to hear it. It wasn't her that did it, and she was also subject to some of those consequences.

THE COURT: I'll allow some of that. I will. Go ahead.

MS. HEINRICH: If I could just --

THE COURT: Sure.

MS. HEINRICH: Putting something on the record, Your Honor, because I feel like we're doing this in front of the jury. The Court made very clear rulings about how we weren't going to get into the whys of why she violated the law because of the summary judgment being granted, and I really think that we're getting put into a position where plaintiffs' counsel has to continuously object to these things that counsel knows are not supposed to be coming into the record, and it's putting us at somewhat of a disadvantage.

THE COURT: I agree. Now, I feel like I went back and I'm using this -- we don't try cases in a vacuum. There has to be some level of context. I've allowed a little bit of the context. You can explain -- I'm going to -- the why. The why is mostly out. I have allowed a little of it in for context. But the issue of circus, there's been a discussion of circus, discussion of what was going on outside of the courthouse or the clerk's office. Those are things you can elicit some testimony about because they're not otherwise prohibited under the ruling on the motion in limine.

But the issue of consequence, we've already -- that road's been paved already. I'm not going to allow you to ask her that question.

MS. HEINRICH: Your Honor, in regard to the circus, while I don't have an objection to just a sentence that I think my client's already said that they were saying things pro and against, I don't think going into a diatribe about all the horrible things that were said to her are relevant in any way to our clients' damages.

MR. GARTLAND: To the extent --

THE COURT REPORTER: I can't hear you.

THE COURT: You need to --

MR. GARTLAND: I don't want them to hear me.

THE COURT: They won't hear you. They don't hear me now.

MR. GARTLAND: To the extent he wants to get into death threats, if she was going to be raped, her husband killed in front of her, that has nothing to do with this case. I would object to any of that type of testimony. They're trying to get the jury to feel sorry for her for violating the Constitution. That has nothing to do with the damages to our clients.

So I would request you instruct him not to ask any question that gets into that kind of stuff. It's nonsense.

THE COURT: Are you planning on getting into that?

MR. SCHMID: I'm not planning to directly ask her.

THE COURT: Are you going to indirectly, perhaps, ask and hopefully she says it?

MR. SCHMID: I think, Your Honor, the question that she suffered no consequences, which they opened the door to all day long yesterday, I think the jury is entitled to hear it. Maybe there were some consequences for her.

THE COURT: They've already heard that.

MR. SCHMID: About jail.

THE COURT: Have any of us been to jail? I haven't. Well, I've been to jail, but not in the jail.

MR. SCHMID: I have, but not as a result of Judge Bunning's injunction, no, or any other --

THE COURT: Here's what we're going to do.

MR. SCHMID: I will be very limited. I'm trying to

keep this in a box, Judge. I'm honestly am trying to.

THE COURT: I'm going to give you a lot of leeway on leading questions so you stay inside the box. I will sustain objections going forward regarding what they've discussed because, frankly, I've tried to be reasonable in the contextual scenario here of what happened. They have identified certain things that occurred, "they" being plaintiffs, and I think some reasonable inquiry regarding her testimony regarding those things is appropriate.

But the fact that she may have had other consequences just isn't that relevant. It's just not relevant.

So go ahead.

MR. SCHMID: So I can have a little bit of leeway?

THE COURT: A tiny bit, yes.

(Sidebar concluded.)

THE COURT: I apologize, ladies and gentlemen. If I knew it would be five minutes, I would have sent you out.

Go ahead, sir.

MR. SCHMID: I'll join the judge's apology to you.

BY MR. SCHMID:

Q. Ms. Davis, there was testimony elicited yesterday that there were statements made about you that said "a nasty bitch who deserves to be cut off at the knees."

Do you recall that testimony?

A. I do.

MS. HEINRICH: Your Honor --

THE COURT: That was shown to the jury.

MR. STILZ: It has nothing to do with our case.

MS. HEINRICH: It wasn't in our case.

THE COURT: It was in their case?

MR. STILZ: Yes.

THE COURT: Ladies and gentlemen, this is a good time to segue into this. In order to try to save some time, I want you to make -- well, I've had the defendant's presentation with both of you in the box at the same time.

Those of you in the back row, to the extent that there's something that comes up in the trial that was not something you heard about during the evidence relating to Smith and Yates, it's not relevant.

Similarly, anything that came out during the testimony of Smith and Yates, Panel A shouldn't consider because they're only considering the alleged damages regarding Mr. Moore and Mr. Ermold.

So rather than have two direct examinations with two different juries, I've decided to have one direct examination with the defendant's case. You just need to make sure, you're not permitted to consider something that was not presented when you weren't in the box, I guess, is the best way to put it.

Go ahead.

And I'll call on you to follow that instruction.

BY MR. SCHMID:

Q. I'll reask my question. There was testimony elicited yesterday about you, Ms. Davis, that said you were a nasty bitch who deserves to be cut off at the knees.

Do you recall that testimony?

MR. GARTLAND: Your Honor, objection, only because they introduced that exhibit. That's not a statement made by my clients. It's in a Facebook post.

THE COURT: I know it's a Facebook post. I understand. Your client liked it. I understand. Or it was a smiley face. I can't remember which one.

Go ahead.

Overruled.

BY MR. SCHMID:

Q. Do you recall that testimony?

A. I do.

Q. There was also testimony admitted yesterday, supported by one of the plaintiffs, that said --

THE COURT: Can you identify which plaintiff?

MR. SCHMID: Supported by Mr. Ermold.

THE COURT: Thank you.

BY MR. SCHMID:

Q. It said they would like to see you hang slowly.

Do you recall that testimony?

A. I do.
Q. Do you recall the evidence that was presented yesterday in the Ermold case that Mr. Ermold laughed and thought it was funny to suggest that you're a nasty bitch who should be cut off at the knees and that you should hang slowly?
A. I do recall that.
Q. Considering all of that, do you recall you've suffered no consequence as a result of the proceedings in this case?
MR. GARTLAND: Objection, Your Honor.
THE COURT: Sustained.
BY MR. SCHMID:
Q. We heard testimony yesterday from all four plaintiffs that stated they believed they were subjected to horrific slurs and verbal condemnations directed at them.
Do you recall that testimony?
A. I do recall that.
Q. Have you personally ever referred to Mr. Ermold, Mr. Moore, Mr. Yates, or Mr. Smith by any of the vile representations that were uttered to the jury yesterday?
A. Never. I wouldn't do that.
Q. Some of the representations that were elicited in testimony yesterday stated that Mr. Ermold, Mr. Moore, Mr. Yates, and Mr. Smith were called such words -- and I apologize, ladies and gentlemen -- as fag, queer, pedophile, rapist, murderer, sodomite, and the like.

Do you recall that testimony?

Have you ever, Ms. Davis, referred to any individual in this room or any individual at all by any of those words or anything like them?

A. Never.

Q. Have you ever endorsed anyone who has used such language against anyone, including the four plaintiffs in this room?

A. No, never.

Q. Did you ever condone or approve any such comments?

A. No. I would never.

Q. Why not?

A. Because they are children of God.

MR. GARTLAND: Objection, Your Honor.

THE WITNESS: That's the reason.

THE COURT: Overruled. Go ahead.

BY MR. SCHMID:

Q. Please continue, Ms. Davis.

A. They are children of God, and they need to know that God loves them. I love them. That's just cruel. That's not right.

Q. During this trial and throughout the events that have led to it, have you prayed for Mr. Ermold and Mr. Moore or Mr. Yates and Mr. Smith?

MR. GARTLAND: Objection.

THE COURT: Sustained.

MR. SCHMID: I have no further questions.

THE COURT: All right. Mr. Gartland, do you want to go first?

Cross-examination.

CROSS-EXAMINATION

BY MR. GARTLAND:

Q. Ms. Davis, is it true, when my clients testified yesterday, that they asked you if you would issue a marriage license to a pedophile, a rapist, or a murderer, you said if they were heterosexual, yes. Is that true?

A. I said if it was a man and a woman, yes.

Q. Did that seem to upset them, the fact that you basically said they were lower than rapists, murderers, and pedophiles?

MR. SCHMID: Objection.

THE COURT: Overruled.

BY MR. GARTLAND:

Q. You talked about the media storm that was there on August 13, 2015, correct?

A. Yes.

Q. You realize -- do you agree with me that the media storm was there covering a story because you had a policy to refuse to issue licenses to any couples in Kentucky?

A. Mr. Gartland, I can't answer as to why they were there, what their purpose was.

Q. Well, before your no-marriage policy, the media storm had

never taken place, correct?
A. That's correct, sir, but I didn't announce and publish my no policy.
Q. But after your no-marriage policy, the media storm started to happen in July and August and September, correct?
A. It did.
Q. Do you think there's any relationship between your no-marriage policy and the media covering it?
A. I think there is a relation, yes.
Q. Do you understand why Mr. Ermold was angry with you for not issuing him a marriage license?
A. We are emotional creatures, yes.
MR. GARTLAND: That's all I have, Your Honor. Thank you.
THE COURT: Ms. Heinrich.
MS. HEINRICH: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. HEINRICH:
Q. Good morning, Ms. Davis.
A. Good morning, Ms. Heinrich.
Q. Now, I think we've heard testimony, just to make it clear for the jury, you never met Will and James at any point, did you --
A. No, I did not.
Q. -- during the marriage license part?

A. No, I did not.
Q. And you were in charge of the office at that time, though, correct?
A. Yes.
Q. And your staff never complained about them being loud or obnoxious or rude or any kind of negative thing about their interactions with your staff when they went down there those five times, correct?
A. No.
Q. And we had met before when we took your deposition back in '21. At that time, you told me that you had prayed for my clients' safety; isn't that correct?
A. I did.
Q. And at that time, we were talking about how your life had changed and how their lives had changed as a result of everything that had happened, something to that effect. And you, I think, told me that you were praying prayers of protection for them because you knew things had been so hard on them, correct?
A. I did. Can I tell you how that came about?
Q. No, ma'am. I'm just asking you a yes or no question.
A. Okay.
Q. Now, you also said during that same deposition that if they were going through even a portion of, I think you said, the nth of what you were going through, you hated that for

them because you didn't want them to suffer or have fear like you had had; is that correct?
A. Yes.
Q. And you've heard a lot about suffering and of fear sitting here for the last day and a half, haven't you, that's happened between the four plaintiffs here?
A. I've heard their testimony, yes.
Q. I think I saw you maybe even tear up for them once when one of them was talking.
A. Of course. I'm human.
Q. Okay. And you would agree, wouldn't you, that the suffering that they have experienced and in their way of explaining that to the jury is just as sincere as what you have experienced and what you've explained so far?
A. I'm sure their --
MR. SCHMID: Objection, Your Honor. Speculation.
THE COURT: I'll overrule the objection.
BY MS. HEINRICH:
Q. Go ahead and answer, please.
A. I'm sure what they're feeling is real, just as what I'm feeling is real.
Q. Sure. Now, despite all of the hassle that everybody's gone through in the last eight years, looking back on it, you had some benefits that came out of this. I think we mentioned the book before. There's some, I don't know, silver lining to

the cloud, maybe, of what happened as a result of you choosing not to issue those marriage licenses. Would you agree?
A. The book, I don't think, has been much of a benefit, and I really don't think that anything I've ever went through could -- or anything that happened because of this could be considered a silver lining.
Q. Well, you went on a free trip to Romania, correct --
A. I did.
Q. -- as a result of that? You wouldn't have known your Florida lawyers before this had happened, correct?
A. That's correct.
Q. And you went on a free trip to Washington, D.C., correct?
A. Yeah. I don't know who paid for it.
Q. You didn't pay for it?
A. No, I did not.
Q. Free to you, I guess, is what I should say. You went on a trip to New York City?
A. That was all with the D.C. trip, I think.
Q. Okay. And I believe you went to Virginia at some point; is that correct?
A. I did.
Q. And all of those things happened because of your decision that you made, right?
A. I don't know if they necessarily happened because of the decision I made, but they were brought about to bring

attention, I guess, to -- like Romania, to bring attention to the situation as to what happened to me so it wouldn't happen to anybody else.
Q. You met with the Pope as well. Wasn't that the trip to New York City? Was that New York or D.C. where you met the Pope?
A. That was an all around trip thing, yeah, with D.C.
Q. That was you trying to bring attention, like you just said, to this situation, correct? Yes or no.
A. No.
Q. Okay. Now, your Florida lawyers also opened some doors for you. They handled media for you; isn't that correct?
A. Yes.
Q. I think I saw --
A. Sometimes.
Q. -- one of your lawyers who is not here today on George Stephanopolous, on "Good Morning, America" with your consent, correct?
MR. SCHMID: Objection, Your Honor. If we're going to --
THE COURT: I'll sustain the objection.
You can move on to something else.
MS. HEINRICH: Sure, Your Honor.
BY MS. HEINRICH:
Q. You also appeared on several interviews yourself,

correct?

MR. SCHMID: Objection, Your Honor. Same one. The entire objection is of the --

THE COURT: Hold on. Let's approach.

(Sidebar conference.)

THE COURT: All right.

MR. SCHMID: Every time I get an objection when I'm asking her a question, the objection is what does this have to do with the plaintiffs' damages? What does Ms. Davis's interviews with the media have to do with monetary damages for the plaintiffs? I will go back to what Your Honor said first. It's a goose and a gander.

THE COURT: Go ahead.

MS. HEINRICH: Your Honor, I disagree. Ms. Davis has clearly set up a defense at this point that media circus was caused by the plaintiffs and that that was something that they brought on to themselves. I believe that that is what we'll be hearing in closing argument.

I think it's equally as important to hear that she gave a lot of interviews and had her counsel going out and making a lot of noise during this period of time and to hear how, rather than try and tamp down this situation, she ended up creating more of a hubbub and more of a circus.

Now, during the motion in limine that you heard or the directed verdict motion you heard yesterday, I believe it was

specifically stated that we hadn't heard anything that Ms. Davis had actually done to create that crowd.

I would argue that we absolutely are going to hear today that there's a lot that she did to create that crowd. And I think it's very fair for us to talk about that.

Now, I'm not going into the specifics of what happened during those interviews, but I think giving the interviews and showing up for certain events and, you know, the crowd at the courthouse in Carter County at the end of her detention, all of that created the hubbub that had the Oath Keepers and the Proud Boys and all of the people coming down to the courthouse.

THE COURT: I'm going to allow it. Overruled.

MR. SCHMID: Will Your Honor allow me a little leeway on redirect?

THE COURT: We'll see what comes out. I can't -- no advisory opinion.

(Sidebar concluded.)

BY MS. HEINRICH:

Q. Back to my question. You had a lot of interviews with the media yourself, correct?

A. Yes. None that I sought out myself.

Q. You talked to Megyn Kelly once?

A. I did.

Q. And I think you did a whole lot of other interviews as

well as time went on, both in the local media and also in the national and international media, correct?
A. There was people wanting to know my story.
Q. Yeah. And about how many people would you say that you gave interviews to, if you remember, during that period of time?
A. I honestly couldn't tell you.
Q. More than ten?
A. Maybe ten.
Q. Okay.
A. I don't know.
Q. Now, to the best of your knowledge, I think Will and James testified yesterday they didn't get anything out of this. They didn't get a trip to Romania or a honeymoon trip or anything like that, correct?
A. No.
Q. And to the best of your knowledge, they didn't get a book deal, correct?
A. I don't know.
Q. Okay. Let's talk a little bit about your book deal. You said that you didn't receive any money from that. The book's being sold currently, right, for money?
A. I suppose.
Q. Who gets the money?
A. I have no idea. It's sold through Liberty Counsel.

Q. Through Liberty Counsel?

And was there money or checks or anything that came to your office while all this was going on in support of you?

A. There was.

Q. And where did that go?

A. I would send that to Liberty Counsel because people said that they wanted to help support my --

Q. That's another way --

MR. SCHMID: Your Honor --

MR. MIHET: She didn't finish.

MR. SCHMID: And I have an objection. You said it was asked and answered when I asked whether she received any proceeds and wouldn't allow me to ask any other questions. Here we are asking individualized questions about the damages or potential proceeds that she received.

THE COURT: I'm going to overrule the objection. This is cross-examination.

BY MS. HEINRICH:

Q. So people had sent you personally money, and that was money that you turned around to your lawyers, correct? Yes or no.

A. It was sent with the intent to help with my defense.

Q. You didn't ask people whether or not it was okay that's what you were going to do with the money. The money went to you, correct?

A. No. A lot of times they were made out to Liberty Counsel.
Q. Oh, okay. You also had local and national celebrities show up for you at the rally after you were released from jail, correct?
A. They were there. I didn't know any of them.
Q. Well, I mean, there was a stage that was set up outside of the Carter County Jail. I mean --
A. And I had --
Q. -- takes some time to set up a stage? Wouldn't you agree that's not something that comes out of the blue?
A. I'm sure, but I was incarcerated at the time. I had no idea.
Q. Do you know for a fact that nobody working on your behalf set that up?
A. I don't know what they did. Like I said, I was incarcerated at the time.
Q. And we had, I believe, Mike Huckabee show up. That was in the news?
A. He did.
Q. And we had you cheering with the crowd when you got out, correct?
A. I was so happy to be out of jail.
Q. I believe "Eye of the Tiger" was playing, and Mike Huckabee got sued for that later?

A. I heard that.
Q. Had to pay $25,000, didn't he?
A. I don't know.
MR. SCHMID: Objection. What's the relevance of that?
THE COURT: Sustained.
MS. HEINRICH: I'll withdraw the question.
THE COURT: Sustained.
MR. SCHMID: I'm going to move to strike it too, please.
THE COURT: We'll strike Mike Huckabee having to pay 25,000. The rest of it you can consider among all the evidence.
Go ahead.
BY MS. HEINRICH:
Q. The then-candidate but now past Governor Bevin was also there at some point around that time taking pictures with you, correct?
A. He was.
Q. Both of them used you as kind of an icon for their campaign --
MR. SCHMID: Objection, Your Honor.
THE COURT: Sustained.
BY MS. HEINRICH:
Q. Now, I already asked some of these questions.

You knew at that time and even before how nasty both sides were getting, didn't you?
A. Yes.
Q. You heard Brian Mason testify in our case, for kind of jury 2, that he could hear the protests and the nasty things that were being screamed from his desk inside the clerk's office?
A. Yes.
Q. Okay. And there were a bunch of scary people out there, and I'm not picking sides one or the other. There were a lot of scary people making a lot of scary comments, weren't they?
A. They were. I had people with bullhorns right beside my window yelling and screaming at me.
Q. When you had that opportunity on the dais outside of the courthouse or the jail at Carter County, when you were coming out with the media in front you, in front of your office, you never once said anything to the media or to the crowd to show a little kindness to the people that had been trying to get a license or to tamp things down, that things were getting out of control, did you?
A. I wouldn't say that.
Q. I mean, you didn't bring here any evidence, did you, of any videotapes of anything that you did during any of those rallies to try and get people less worked up and more calmed down?

A. Ms. Heinrich, I came to work before the protesters got there, and I usually left work after they left. But I did offer those protesters on the side against me to come in and have water in my -- I had a water fountain in my office, that they would come and get water and cool off, that they could sit on my benches and cool off because I didn't want them to get overheated.
Q. Well, that's public property, right? I mean, the public's allowed to come into the clerk's office --
A. Sure. But I invited them in.
Q. Okay. Other than inviting them in, the protesters that were there, to offer them some water that they could get anyway because they're citizens or it's a public space, you never made a public press release or a public statement of any kind that said, This is getting out of hand. I'm a Christian. I love all people. Please don't do this against these people because it's not a personal thing, like you've been saying all morning?
A. I couldn't control what went on out there.
Q. You didn't do it, did you?
A. No.
Q. Now, you understand, do you not, that all of that hubbub came as a result of the one simple thing that could have been changed by you, which was to issue a marriage license, correct?

MR. SCHMID: Objection.
THE COURT: Overruled.
BY MS. HEINRICH:
Q. All of it could have been avoided, but you wouldn't have gotten the book deal and stuff if you would have issued the marriage license, correct?
A. Ms. Heinrich, it all could have been avoided if I had got the accommodation I asked for.
Q. Let's talk about that for a minute. So I read in your testimony when I was preparing for trial that your son eventually changed the form, and that was how the licenses ended up getting issued.
A. That's while I was incarcerated.
Q. You could have done that a whole lot earlier too, couldn't you?
A. Well, I didn't think I could for the simple fact that the --
Q. Yes or no question.
MR. SCHMID: No. Objection. Asked --
THE COURT: Hold on. One at a time.
MR. SCHMID: If I may, Your Honor, if she's going to ask her why she didn't change the form, she ought to be able to explain why she didn't do it. It's her question.
THE COURT: Understood, understood. Ask the question, and I'll allow you to explain your answer.

BY MS. HEINRICH:

Q. You could have avoided everything by changing it in the same way you changed it at the very end of all this, couldn't you?

MR. SCHMID: Objection.

THE COURT: The objection, that's a compound question.

BY MS. HEINRICH:

Q. Ms. Davis, your son ended up changing the form, I think you just said, correct?

A. Yes.

Q. And that could have been done earlier to avoid all of this, couldn't it have?

A. I did not think it could because the statute that controls the marriage license has penalty phases or penalty clauses that also states that all of the license had to be uniform, and they had to be produced by the KDLA, which is the Kentucky Department of Library and Archives. They are responsible for printing those marriage license, and it has to be a uniform license across the state.

And I -- I thought that if I did that, I would be in trouble more than, you know -- I didn't -- it carries a penalty of a misdemeanor, and I'm not sure exactly, a fine and some other stuff.

Q. And that still was done, even with those same concerns,

after Judge Bunning decided that you were in contempt of court and put you in jail for not following the law?
A. He did that while I was in jail because he knew that I did not want my name on the license so he gave me an accommodation.
Q. Who is "he"?
A. My son.
Q. Your son gave you an accommodation?
A. While I was in jail, they changed the form.
Q. So that I understand this correctly, your son did the same thing you had thought about doing at the very beginning but thought you couldn't do?
A. No. I had never even really contemplated changing the marriage license form because I just knew that wasn't the proper thing to do. The proper thing to do was to let the legislature change the form and give the accommodation to other clerks like myself --
(Indiscernible crosstalk.)
MS. HEINRICH: -- going to ask you instruct the witness --
THE COURT: You know what? You're asking the questions.
MS. HEINRICH: Okay.
BY MS. HEINRICH:
Q. So your marriage license -- well, let's talk about

marriage licenses for a second. We've made a whole lot about them, but they didn't say that a marriage has been performed and that it is completed, correct?
A. What the customers get from my office is an application, and I am the clerk that issues the license that is affirming and authorizing that these two parties meet the statutory requirements to get a marriage license in the state.
Q. And so the clerk really is the person who says kind of to the government or as part of the government, these people are over the age of 18, correct?
A. Yes.
Q. These people are not already married, correct?
A. Yes.
Q. And that these people are not related within, I think, second cousins; is that correct?
A. Yes.
Q. And that's the requirement, right, as a clerk that you're supposed to take a look at?
A. There's one you've --
Q. Did I -- what was the other one that I forgot?
A. The other one is at the time, before the *Obergefell* decision, it still stated that marriage had to be between one man and one woman.
Q. It said that on the form?
A. No. That's in the statute, ma'am.

Q. Okay. Well, I'm talking about the form that you're filling out. The form, when you're signing it, you're saying that those things --

(Indiscernible crosstalk.)

A. The form --

(Indiscernible crosstalk.)

A. The form states bride and groom.

Q. Okay. And those forms hadn't been changed during that time frame, right? Other clerks across the country -- or across Kentucky that didn't have the issue you had were going ahead and still issuing marriage licenses to same-sex male couples and same-sex female couples, even though the form said husband and wife or man and --

A. Bride and groom.

Q. Bride and groom, I'm sorry. Right?

A. I suppose.

Q. And so the forms that they changed were changed without incident. They didn't have a misdemeanor. They didn't go to jail on some kind of criminal related charge when you heard they were doing those changes to allow those marriage certificates to be issued, correct?

A. I didn't hear that they had changed -- that anybody had changed any form. The only one that really has the authority to change the form would be the KDLA upon, you know, just like the governor gave an executive order to change the form. And

then after that was done, we issued license no problem.
Q. But they were also issued while you were in jail on a new form or the same form that your son had just stricken the language without incident, correct?
A. They were. And also, when I got out of jail, I also added, I think it was Judge Bunning's court order on there that those licenses were issued pursuant to the court order that he had issued so that they could be -- so they could be issued, and my authority wouldn't be on them.
Q. So just so I'm getting this correct, after the fact, you felt fine with changing the forms. But before the fact, you were afraid you were to get sanctioned by some kind of criminal misdemeanor charge?
A. Yes, because the attorney general and the governor had confirmed that the license that were issued while I was incarcerated were going to be valid. So if that was the case, you know, I felt safe that I could do that.
MS. HEINRICH: No further questions, Your Honor.
THE COURT: Redirect.
MR. SCHMID: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHMID:
Q. Ms. Davis, I'll start briefly with some of the questions that Mr. Ermold and Mr. Moore's counsel brought to you. Did you ever state, imply, infer, or otherwise reference

Mr. Ermold, Mr. Moore, Mr. Yates, or Mr. Smith as any of the derogatory terms that were raised and that I stated earlier? I won't reuse them.

MR. GARTLAND: Objection, Your Honor.

THE COURT: Overruled.

BY MR. SCHMID:

Q. Would you like me to restate the question?

A. Please.

Q. Mr. Ermold and Mr. Moore's counsel asked you if you ever referred to them or implied that they were less than pedophiles, rapists, murderers, and sodomites.

MR. GARTLAND: Objection, Your Honor. You overruled my question so I didn't ask the question. I never got an answer.

THE COURT: There was a question asked about whether or not she said -- I didn't overrule. You asked it. You asked the question.

MR. GARTLAND: No, no --

THE COURT: Hold on. There was a question asked about this, and she admitted to you what -- the answer you sought.

So I'm going to overrule the objection. Go ahead.

BY MR. SCHMID:

Q. I'll ask it one more time.

THE COURT: Third time.

MR. SCHMID: Third time's the charm.
THE COURT: Not always.
MR. SCHMID: I hope the third time will be the charm, Ms. Davis, and for all of you so you don't have to hear me again.
BY MR. SCHMID:
Q. Did you ever state, imply, infer, or reference any of the individuals in this room as rapists, sodomites, murderers, or pedophiles?
A. No, never.
Q. Did you ever state, imply, or infer that they were less than rapists, murderers, or sodomites?
A. No, never.
Q. I asked the question during direct examination, and I will ask it again because you were asked about it on cross. Did you pray for the plaintiffs in this matter, during their case?
A. Yes, I did.
Q. Why?
A. It has to do with a lady that came into my office. Her neighbor was one of the other couples that sued me, and she told me that she felt like she had a -- her neighbor had told her that she felt like she had a target on her back. And that really spoke my heart, and I thought, you know what? They need prayer too. They need protection too, and so that's why

I started.
Q. Did you pray for anything else related to the plaintiffs during this case?
A. Sure. I prayed blessings in their life. I prayed for their attorneys. I don't want any harm to anybody.
Q. Why?
A. Because we're all God's children.
Q. Ms. Davis, there were questions about trips you took to Romania, Washington D.C., New York City, and even a visit with the Pope. Why did you take those trips?
A. Well, I didn't seek them out. They sought me out. I talked to my pastor about every one of them. The Pope I wanted to meet because my mom and dad are Catholic. I got to meet him on my dad's birthday, and I just thought that was kind of special. How many times do you have an opportunity to meet somebody like that?
And then the trip to Romania, I had -- I had never thought I would ever be able to, you know, go overseas or anything like that. And they were dealing with kind of the starting of the same situation I was dealing with. I wanted to give them my perspective and my take and just kind of, you know, let them know to be prepared, and I didn't want anybody else to go through what I went through. If I could help, you know -- if I could help that, then I wanted to.
Q. What do you mean by "help that"? What were you trying to

accomplish on those journeys?
A. Just to simply know that there are people of conscientious objection that are in a public sector, that are in government seats that while, you know, they can be friends with -- you know, I'm sure that the plaintiffs are very nice people, and I could be friends with you. I could. I can love you and -- but there are certain things you can't support in your life.

You know, you always don't have to agree. You can agree to disagree. I have a friend that's a lesbian. She came in and she told me, she said, You know the kind of lifestyle I live.

I said, Yeah, and I pray for you. I said, I love you.

And she said, you know, it's going to be okay. She said, Just hang tight. It's going to be okay.

For me, it's always been a marriage issue. It's never been a gay or a lesbian issue. It's always been a marriage issue, and so I wanted to help people see that.
Q. What did you want them to see?
A. That we all can have our different lifestyles, and we can coexist. I wanted an accommodation, and I -- I never wanted to discriminate against anybody. That's why I quit issuing marriage license altogether. And, you know, we all can coexist, but we have to be respectful of each other, I think.
Q. Plaintiffs' counsel asked you a couple times about what

you did to try to stop the protests.

Do you remember that question?

A. I do.

Q. And at the time, you were a government official, correct?

A. Yes.

Q. Is it your understanding that a government official can stop people from speaking on the public sidewalk or government property?

A. No. I couldn't have stopped that -- what did happen, though, is that the sheriff's office came down to offer some crowd control to try to keep things safe. I asked them to come down, that we needed some help. But other than that, I mean, as far as controlling the crowd outside, there was nothing that I could have done.

Q. Why not?

A. Because you can't control what people say on a public lawn or a --

Q. Is it because they have a First Amendment right to protest on government property?

A. I would assume so.

Q. So some First Amendment lawyer, not unlike myself, would probably have sued you for a different reason had you tried to shut down the protests --

MR. GARTLAND: Your Honor. Objection.

THE COURT: Sustained.

MR. SCHMID: Your Honor, they asked the question as to what she did.

THE COURT: Some government First Amendment lawyer other than yourself would sue her? Come on now.

Sustained.

BY MR. SCHMID:

Q. Is it your understanding the First Amendment prohibited you from prohibiting individuals from protesting on the Rowan County Clerk's Office property?

THE COURT: I'll allow that. Overruled.

A. Everybody has a right to protest.

Q. So the law doesn't allow you to shut down the protests --

A. No.

Q. There were some questions about changing the form and why you didn't do that. I'd like to explore that a little bit. Is the reason you didn't change the form because you thought it was illegal for you to do so?

A. That's correct.

Q. And do you know what the penalties were for doing that?

A. I'm not sure. I think it was probably maybe a misdemeanor, Class A misdemeanor with a fine. I don't really know. But I do know that there was a penalty. There's always a penalty, you know, for all those statutes.

Q. And did the form eventually get changed anyway?

A. It did.

Q. And was the change exactly what you were seeking from the beginning?
A. When Governor Bevin took office, he did an executive order, simply a pen stroke, and he ordered the KDLA to remake the marriage license to remove the clerk's authorization and name off of it and made it a state-issued license. So yes.
Q. So in relation to the question of your son changing the form and going all the way back to the very beginning, since before *Obergefell* was released, the form was changed in exactly the manner that you sought from the very beginning with the accommodation?
MR. GARTLAND: Objection, Your Honor. Asked and answered several times.
THE COURT: Sustained on two grounds. That and leading.
BY MR. SCHMID:
Q. When the form was changed, did it comply with the accommodation you were seeking from the very beginning?
A. Yes.
Q. Did you have any objection to issuing a marriage license to anyone after the form was changed?
A. No.
Q. Why not?
A. Because my authorization -- my name was not on it.
Q. And why is that so important?

MS. HEINRICH: Objection, Your Honor.

MR. GARTLAND: Objection.

THE COURT: Sustained. I think this is maybe the eighth or ninth time that we've gone over this. I realize they brought it up on cross.

MR. SCHMID: Can we have a two-minute timeout?

THE COURT: Sure. You have enough time left.

(Sidebar conference.)

MR. SCHMID: So three or four times, they asked her about the form being changed, and I'm not allowed to ask her why that was important?

THE COURT: You already have. You already have. I mean, look, they brought up things -- primarily Ms. Heinrich, on cross-examination, things that probably they wouldn't have brought up if I'd not allowed the little contextual portion because I felt like it was important for the jury to understand that.

I am allowing you a little bit of leeway to follow up. I mean, goose/gander being what it is, they kind of did open the door slightly, even though I -- look, she's explained why multiple times: Conscientious, she didn't want her name on the form. The jury's heard that over and over. I don't know why they need to hear it again.

Everybody wants to get that last ounce of testimony out so that the testimony finishes on a high note because of what

they asked. I appreciate that. I was a lawyer for many years. But the objection that they're raising here -- and I'm not going to put words into your mouth.

Go ahead. What specifically are you objecting to here?

MS. HEINRICH: It's asked and answered. She said the same thing three or four different times, which I think is all in opposition with your motion for summary judgment ruling. I have --

THE COURT REPORTER: I can't hear you.

MS. HEINRICH: Sorry. I don't want to make the jury angry.

Number two, I know the Court said she would have some leeway so I kind of have been objecting when I feel like it's going over again, over the same stuff that's already been decided by the Court that we're not going to go into.

THE COURT: Sir, do you want to have your two cents heard? If so, speak up.

MR. GARTLAND: I second everything she said.

THE COURT: What she said, okay.

I'm going to sustain the objection.

(Sidebar concluded.)

MR. SCHMID: Thank you for your time.

THE COURT: You're welcome. All three of you.

BY MR. SCHMID:

Q. Just a couple final questions, Ms. Davis, and then we'll

be done.

You were asked about various media interviews you did, Megyn Kelly and others.

Do you recall that?

A. I do.

Q. What did you tell Megyn Kelly and the others that you did media interviews with?

A. She just asked my story. I didn't even --

MS. HEINRICH: Objection, Your Honor.

THE COURT: This is an open-ended question that allows her to get into all kinds of things.

I'm going to sustain the objection.

MR. SCHMID: Your Honor, may I have a moment?

THE COURT: You may.

BY MR. SCHMID:

Q. The questions relating to your book a moment ago referred to it as a "book deal."

Do you recall that?

A. Yes.

Q. Do you believe you have a book deal?

A. I don't think it's a book deal. I wanted my story to be heard. I had been portrayed as a lot of things, and I wanted people to know who I was and why I did what I did, and I thought it was important that people knew.

Q. Just to ask it again, did you ever receive any

proceeds --

MR. GARTLAND: Objection.

THE COURT: Sustained. Asked and answered.

BY MR. SCHMID:

Q. Was the intent behind the authoring of the book to pay for your legal fees?

A. No, never.

Q. Have you ever invited others to pay for your legal fees?

A. No. I've never asked.

Q. Is there anything else you would like for the jury to hear before we conclude this morning?

MR. GARTLAND: Objection.

MR. STILZ: Objection.

THE COURT: Sustained.

MR. SCHMID: Thank you for your testimony, Ms. Davis.

THE WITNESS: You're welcome.

THE COURT: Anything further?

MS. HEINRICH: No, Your Honor.

THE COURT: Mr. Gartland?

MR. GARTLAND: Pass. Thank you.

THE COURT: Thank you, ma'am. You may step down.

Mr. Mihet, Mr. Schmidt, any further proof on behalf of the defendant?

MR. SCHMID: Defendant rests, Your Honor.

THE COURT: I'm going to have to take a recess until

10:20 at this point. It may be a little bit longer than that.

Just procedurally, how this is going to work, we obviously have two panels, A and B. We have two sets of plaintiffs, the Ermold/Moore plaintiffs and the Yates/Smith plaintiffs.

For closing arguments, we're going to have, in essence, three different closings. We'll have closings for Plaintiffs Moore and Ermold with Panel A. Then we'll have a closing argument on behalf of Plaintiffs Yates and Smith with Panel B. Then we'll probably take a very brief recess, and we'll have a closing argument collectively with Ms. Davis.

Then because the plaintiffs bear the burden of proof by a preponderance of the evidence, they will have a brief amount of rebuttal, up to five minutes, and we'll have A and B in at those various times.

Once we finish that, I'll bring you all in and give you the instructions. So it's going to be a little choppy here. The water will be choppy for the next hour or two, two hours maybe. I still hope we'll get you the case by 12:30, and then we'll go from there. But I do need to discuss the jury instructions with the attorneys.

Before I ask, is there any rebuttal proof? I forgot to ask that.

MR. GARTLAND: No.

MS. HEINRICH: No, Your Honor.

THE COURT: So we'll be in recess with the juries until 10:30. Don't discuss the case. Don't talk about it. The time for that will be soon. It's just not yet. See you back at 10:30.

(Jury Panels A and B exited the courtroom at 9:58 a.m.)

THE COURT: I will be in recess for five minutes, and then we'll come back and have an opportunity for you to make any arguments regarding the instructions, the draft set that was given to you.

So we'll be in recess for five minutes.

MR. MIHET: Your Honor, can we make it ten minutes? We got these on the way to the courthouse, and I still need a few minutes to finish reading them.

THE COURT: We'll do ten minutes.

(Recess from 9:59 a.m. until 10:12 a.m.)

(A jury instructions conference was held; transcript filed separately.)

MR. SCHMID: May I note something for the record?

THE COURT: We're always on the record.

MR. SCHMID: I'd just like to renew the motion for judgment as a matter of law.

THE COURT: Oh, yes.

MR. SCHMID: I know you don't like the procedural niceties, you said, that they teach in law school. But I have to renew it, understanding that you already overruled it.

THE COURT: Okay. Same ruling.

MR. SCHMID: Thank you, Your Honor.

MS. HEINRICH: For clarification, because I don't want to have the jury in here and make a mistake, is it okay to talk about the crowds or not?

THE COURT: Sure. Reasonable foreseeability. You've got to tie it under the current context of the law.

MR. MIHET: And I just would note my objection that if they're trying to ascribe damages based on what was said outside by people other than Ms. Davis, we think that is not permitted by *Snyder v. Phelps*.

THE COURT: You can certainly point that out.

MR. MIHET: Okay.

THE COURT: That's not something that this instruction allows. It wasn't reasonably foreseeable.

(Jury Panel A entered the courtroom at 11:29 a.m.)

THE COURT: Good morning. Again, I apologize. I think I've done that half a dozen times. You'd think after 20-plus years I'd build in enough time to make changes to things, but I haven't.

So you will have a set of the instructions I'll read at the end. I'm going to bring in both panels together and read instructions. You'll also have a verdict form. Just one page for Panel A. At this point, the lawyers may talk about the instructions in their closing arguments. Certainly fine. If

what they say is different than the instructions, you have to follow the instructions.

Who is giving the closing on behalf of -- you are, Mr. Gartland.

By agreement, I've given each side 25 minutes. The plaintiffs, because they bear the burden of proof, go first. So you're going to be hearing only from Mr. Gartland. Then Panel B will hear from counsel for Mr. Yates and Mr. Smith. Then both panels will hear from Mr. Mihet, and then we'll have rebuttal individually for you and then for Panel B.

So be patient as the instructions -- as the closing arguments are given.

Are you requesting any time for rebuttal?

MR. GARTLAND: I'm going to be very short on this presentation so --

THE COURT: You can reserve up to five minutes for rebuttal. You can't take 5 and 20. Doesn't work that way.

MR. GARTLAND: Five minutes, please.

THE COURT: Thank you. You may proceed.

MR. GARTLAND: I guess it's late morning. Thank you for participating in this trial. I never thought we'd go this long. When Mr. Buckles gave his opening, he said he'd be short. He kept his promise. I'm going to make a promise. I'm going to be short because I think this case is like the simplest case I've ever been involved with because the Court's

already told you Ms. Davis violated constitutional rights. She didn't just violate the constitutional rights of these four gentlemen. She violated the constitutional rights of anyone who wanted a marriage license in Rowan County, which is 23,000 residents.

It was her job to issue the licenses. She was the clerk. She took an oath to uphold the Constitution. She got paid $84,000 the year she violated the Constitution. And she was told by the governor, the county attorney, she was told she'd be sued. She was told she had to issue the licenses. She had Judge Bunning tell her, you have to issue the license. She wasn't entitled to an accommodation. She went to jail.

That's not what this case is about. That's probably the case you heard back in 2015. You probably never heard about this case because this case hasn't gotten that much media attention. The other case that led to these cases, that got a lot of attention.

Now, I think it's important to know what this case is not about. This is a case that's -- this is not a case about whether or not Ms. Davis had a right to an accommodation. It's not a case about whether or not the Constitution allowed her to do what she did because it doesn't.

She told you in testimony she was entitled to an accommodation, but the Court told her no. That's been appealed, and the answer is still no. No right to an

accommodation.

So whether or not you feel sorry for her, the situation she was in, is completely irrelevant to the damages suffered by my two clients. So I would hope that you put that out of your mind when you deliberate because that has nothing to do with this case. It never did.

Ms. Davis tried to turn this into a case about her pain and suffering. Well, that's not what this case is about, and it's never been about that. She wanted to -- she wanted to get in a lot of evidence about her pain and suffering. But really, I don't even understand that. Think about it.

She also said, which I found interesting, that she would hope that nobody would go through even an iota of the pain and suffering that she went through, but my clients went through as much or more.

Then I asked her today if she thought there was a connection between the media circus that started showing up at the courthouse, August 13 and thereafter, when my clients and the other people went down to get a license, and she said there probably was a connection. Well, think about it. Why was the media there? They were there because there was a county clerk who was the government -- she was the government in Rowan County. She was the person you had to get your license from. She refused to issue that license. Her reasons are irrelevant, but the media found that story interesting.

So they descended upon this little community called Morehead, and my clients went down there. On July 6, we already know what happened. I want to get to the 13th. That's really interesting.

On the 6th, they went down there. They wanted to talk to her. They waved *Obergefell* in front of her face. They put it down on the counter. They had every right to be angry when she said she wouldn't issue the license. Then they asked the question, and she didn't deny it. They never called -- they never said that she attributed any words to them. They said, and she agreed, they asked her, Would you issue a marriage license to a pedophile, a rapist, or a murderer? And she said, As long as it's a man and a woman, yes.

Now, they testified how that made them feel. Made them feel less than human. It humiliated them. And, quite frankly, they were angry. And I think any reasonable person would say they had absolute right to be angry because their constitutional rights were being violated, and they didn't care what the reason was. The reason's irrelevant. It's irrelevant in this case. It's irrelevant when you deliberate. It's not this case.

Then they went down there on the 13th of August. You heard about that, and there was a media circus. And the judge is going to instruct you that -- you don't have to take my word for it because he's going to instruct you, like I said,

but I'm going to tell you what I think he's going to tell you. I'm not going to read it because he'll read it to you, and you'll have it in the jury room.

Basically, when a defendant creates a situation, and the situation was created by the refusal to issue the licenses, and then basically events occur as a result of that, and damages are suffered by somebody as a result of that, then the defendant's liable for that.

So the media circus, my clients testified there were people holding guns. They feared for their lives just to go down there and exercise a constitutional right. Just to have it denied. It was a media circus.

Then I'm glad Ms. Heinrich asked the questions today on cross. This is a person who wants you to believe she's kind, caring, and prays for people. Did she go out there once and say, Wait a minute. Disperse. This is getting out of hand. There's people with guns. This could get violent.

Not once did she go out there and try to disperse or calm the crowd, and that had an effect on my clients too. They feared for their lives. That's what this case is about.

I'm not big on reading from notes. I'm just looking at little bullet points.

So whatever anguish she thinks she suffered, irrelevant. Let's focus on my clients.

So what is this case about? This case is about two

things. This case is about a knowing violation of the Fourteenth Amendment by Ms. Davis. It's about the denial to my clients of a right to get married after the United States Supreme Court -- it doesn't get any better than that -- says you have that right. That's what this case is about.

Now, they want you to believe -- and, quite frankly, this kind of offends me personally, and it should -- I'm hoping it bothers you folks. They want you to believe, because she had proclaimed this office will not be issuing licenses, that they never should have gone down there on July 6th. How dare they come down to my office and demand a license when they've been told they're not going to get it? That's the defense. That's their mitigation defense. That's nonsense. It offends me.

She's saying, If I tell you I'm not going to issue the license, you have no right to come down and try to exercise a right that the Constitution gives you as confirmed by the Supreme Court. That is offensive. That is nonsense. It's craziness, in my view, but that's their defense. That's their defense.

Now, Judge Bunning told you they had no duty to go to another county and get a license. They paid taxes in Rowan County. They lived in Rowan County for almost two decades. They had no duty to go anywhere except to the Rowan County Clerk's Office to get their license. That's what they wanted, that's what they were entitled to, and that's

what they were denied.

So now we look at the damages they suffered. Well, you had an opportunity to hear them both testify. Do you think they were making this up? I don't think so. Do you think they wanted to become famous? Because that's the suggestion here. They told you they didn't seek out media attention. They didn't get any money. They didn't write a book.

And when GQ wanted to interview them and they were on that magazine where Obama is on the cover, they didn't get paid money. It would have been nice to get the photographs of their wedding. But GQ said, nope, you gotta pay for them. Does that sound like somebody looking to be famous?

These people would have been happy -- these two gentlemen would have been happy if they went down there on July 6th, they got their license, they went home, they got married, and we wouldn't be here today. None of you would be.

We're here because of one person's conduct. I say misconduct. A constitutional violation brings us here today. And mitigation, I throw it out the window. It's nonsense. They had no duty to not go down there.

So when they went down there on the 13th of August and again on September 1, they told you they went because of certain things that were happening in injunctions. They thought that because of what was going on in this court in another case that she might change her mind and give them a

license.

But no, she stood firm. She went to jail for that, and that's on her. Because in our society, we have laws. And when you violate the law, and you tell a federal judge, "I ain't issuing a license," he has every right to put you in jail. You're not entitled to an accommodation. Otherwise, she wouldn't have been in jail. Proof positive. End of story.

So Ms. Davis's conduct was lawless, and lawless conduct must be not punished, but compensated. This is not about punishment. I think Judge Bunning would agree with that. This is about compensatory damages.

Now, this is the toughest part of the case, I think. What we do as lawyers, this is easy stuff. I could do this in my sleep. I've been doing it for 34 years. My first jury closing ever, even though it's 34 years. But our job is simple.

Your job is the toughest job of all here because you took an oath. You're going to come in here, you're not going to prejudge the case. You're not going to have biases. You're going to listen to the evidence, and then you're going to -- the judge is going to instruct you. You're going to go into a room, and then you're all going to start to talk about this case. You probably won't all agree.

But they want you to come back with a goose egg. They

say a violation of constitutional rights doesn't matter. It's not worth anything. Now, do you think our founding fathers that wrote the Constitution would agree with that?

Do you think they would think, wow, this is great. We're going to have a trial. We're going to prove a constitutional violation. You heard testimony by people. They were emotional. They were upset. They were harmed. One of them testifies to this day it's harming him. I think they'd roll over in their graves if they thought that that was not compensatory.

So I'm not going to sit up here and tell you what to award my clients. That's not my job. My job is to request that you do whatever is in your heart. I speak from the heart. Now I want you to do whatever your heart tells you to do.

Whatever that number is, we can live with it because we know you paid attention, and you're going to deliberate, and you're going to do what the judge says. This case is not a valueless case. If it is, I have to really consider do I want to keep practicing law. And I do for several more years.

So with that, I'll thank you for your time. You'll hear from me again at the end.

Thank you.

THE COURT: All right. We're going to go ahead and swap out the juries now. Ladies and gentlemen of Panel A,

even though you've heard the opening closing statement on behalf of Plaintiffs Ermold and Moore, you're not to talk about anything that the lawyers said you need to wait until all the closings are complete and the instructions and we'll finally allow you to later deliberate.

I understand that we are ordering lunch for you so we'll be able to provide you lunch at some point.

We'll be in recess with Panel A and swap out Panel B.

(Jury Panel A exited the courtroom at 11:45 a.m.)

(Plaintiffs Yates/Smith closing arguments were presented to Jury Panel B in Case No. 15-cv-62; transcript not requested.)

THE COURT: At this point if you'd bring Panel A in.

(Jury Panel A entered the courtroom at 12:10 p.m.)

THE COURT: Mr. Mihet, you may proceed with closing argument on behalf of Ms. Davis.

MR. MIHET: Thank you, Your Honor.

Vengeance and retribution. Ladies and gentlemen of the jury, I told you at the beginning of this trial that that's what this case is actually all about. And I submit to you, as we're closing today, that the evidence has shown that to be true.

The evidence presented in this case has shown you that Kim Davis did not intend to harm, humiliate, or degrade anyone. She did not wage war on the Supreme Court's marriage

decision. She did not try to prevent same-sex marriages altogether. She did not try to stop these four plaintiffs from getting married altogether.

All that Ms. Davis tried to do was to get a simple accommodation for her conscience that will remove her name from the marriage licenses so that they would not be issued with her name.

Now, you heard that, ultimately, she received that very thing. Her name was taken off. For the relatively short period of time that it took to accomplish that, she stopped issuing marriage licenses. All marriage licenses, for same-sex couples and for straight couples. And why? Because she said she did not want to discriminate or humiliate anyone. You heard that, and no one disputed it.

Now, yes, this Court has found that the delay that happened in issuing licenses did violate the rights of these plaintiffs, and so we're not here to decide that or to relitigate that. We all agree on that.

But we are here for you, ladies and gentlemen of the jury, to decide whether these four plaintiffs, who long ago got their marriage licenses, should now receive hundreds of thousands of dollars from a retired grandmother for the short time that they had to wait, for the short time that they could not get those licenses with her name on it.

And on this question, your answer should be "no" for

three reasons:

"No" because the plaintiffs have not met their burden of proving their alleged damages.

"No" because the plaintiffs have not met their burden of proving proximate causation; that is, that Ms. Davis proximately caused their damages.

And "no" because the plaintiffs have not met their legal duty to mitigate any damages that they might have had.

Now, I know there are some fancy lawyer words in those three reasons, and so I will explain them a little more as I talk about each one in turn.

First, you should return a zero verdict in this case because both sets of plaintiffs have not met their burden of proving their alleged damages. And it is their burden. As the Court has already mentioned and as you will be instructed again, it is their burden to prove their damages.

There are several things that I need to point out here. We've heard a lot of talk, first of all, about the supposed circus at the Rowan County Clerk's Office. One of the questions I want you to be asking yourself, ladies and gentlemen of the jury, where is the actual proof of that?

I mean, you heard testimony that all four plaintiffs filmed their visits to the clerk's office, and you heard that they shared those videos with the entire world. Did you see any videos in this trial depicting a circus?

Panel A, for the Ermold plaintiffs, did you see any videos in this trial? They've got them. The videos have great audio because they were miked up. They shared them with the entire world. Did they share them with you?

Did they show you any video of alleged conversation between Kim Davis and Mr. Ermold and Mr. Moore? Do they not trust you to watch the videos and to decide for yourselves whether it was traumatizing for them or whether it was traumatizing for Ms. Davis? Why in the world would they hide their videos from you after showing them to the world when it's their burden to prove that that interaction caused them damages?

Panel B, for the Yates plaintiffs, you saw three short videos of the Yates plaintiffs' visit to the clerk's office. Did you see any circus on those videos? I sure didn't. The plaintiffs admitted that the interactions inside the clerk's office, in the situation that Ms. Davis could actually control, were calm and polite, and you heard the tone of voice was so low that we could hardly, barely even hear them on the videos that we watched.

Where are the videos of the circus? Why did they not show them to you?

The other thing I want to point out to you on the failure to prove damages is the completely arbitrary and random nature of the damages numbers that the plaintiffs have presented to

you. I mentioned this in my opening. And now that the evidence has come in, I'm going to spend a little bit of time on this.

Panel A, you heard Mr. Moore and Mr. Ermold tell you that they don't know how to calculate their damages. Mr. Moore said on the stand, and I quote -- I hope you remember this. He said, "I don't know what the value it is." He even said, "Maybe it has no value."

Did you catch that?

Panel B, you heard both Mr. Yates and Mr. Smith tell you that they can't determine how much each one of them was damaged individually. They brought this lawsuit not as a unit, but as separate plaintiffs, each one claiming to have been damaged. Each one has an individual burden to tell you what their damages are, and they told you on the stand that they can't apportion -- they just want 300,000 lumped in together. They have to tell you how much each one of them was claim- -- is claiming to have been damaged.

They also admitted that they can't tell you how much, within the four or five categories of damages that they want you to award, like embarrassment, humiliation, emotional, mental distress, they told you they can't actually tell you how much they incurred in damages in each one of those categories. They just want you to lump it all together.

And they essentially admitted that they just kind of

picked that number out of a hat. They said on the stand, We talked with our lawyers, and we decided on $300,000. They admitted that they didn't talk with any experts; no economists, no accountants, no medical doctors. Nobody.

Now, ladies and gentlemen of the jury, for both juries, while the plaintiffs may be content to pick random numbers out of a hat, the Court will instruct you that you cannot do that. You cannot guess as to what their damages might be. You have to be sure. And you can't be sure here because they haven't given you the tools and the information that you need.

You know, if the plaintiffs are going to ask you to bankrupt a grandmother with a debilitating jury award, something that will affect her for the rest of her life, they owe it to you to give you the information that you need to make that somber and life-altering decision. It is simply not fair to you for the plaintiffs to say to you, essentially, "We can't figure out what our damages are. You guys figure it out for us. Pick a number." That's not fair to you.

These numbers mean something. And if they don't know how to calculate their damages, how in the world are you supposed to do that?

Now, the Court will instruct you in a few minutes on the law that you are to apply, and the Court will instruct you that you cannot use speculation or guesswork in coming up with a damages number. You'll hear that.

The Court will also tell you that you cannot base damages on sympathy. There's all this talk about how Ms. Davis wants you to feel sympathy for her. Clearly, the plaintiffs want you to feel sympathy for them and to award damages based on sympathy. The Court will tell you you cannot award damages based on sympathy.

So that's the number one reason why you should return a zero verdict, because the plaintiffs have failed to meet their burden to prove their damages.

The second reason why you should return a zero verdict, because both sets of plaintiffs have not met their burden of proving that Kim Davis was the proximate cause for their alleged injury, and the Court is going to instruct you what this fancy word of "proximate cause" means.

You'll hear the Court tell you that the plaintiffs must show that the defendant's acts or omissions played a substantial part in bringing about the plaintiffs' damages and that the damages were either a direct result or a reasonably foreseeable consequence.

In other words, just because two things happened does not mean that Ms. Davis is liable for it. They have to prove proximate causation. They have to prove that she was a substantial factor. You'll see this on the verdict form as well.

Now take, for example, Panel A with the Ermold

plaintiffs, you heard testimony from Mr. Ermold and Mr. Moore that the only way they could calculate their damages was by reference to the whole debacle or the whole event that happened with Mr. Ermold's job at University of Pikeville.

It was that and it was also the church sign in their neighborhood. Those were the only two ways they said on the stand under oath that they could approximate their damages for you.

So ask yourselves: Is there any evidence that Ms. Davis proximately caused those two events, the only two events that they said that they could try to affix their damages to? And I submit to you the evidence clearly indicated that Ms. Davis was not at all the cause for those. It's undisputed.

Did they ask the representative from University of Pikeville, Mr. Pacheco, did they ask him any questions? No. Because they cannot dispute the testimony that he presented, which is that Mr. Ermold's nonrenewal of his contract had nothing whatsoever to do with Ms. Kim Davis.

Did that stop them from trying to put that at her feet and trying to ask you to award them damages for that reason? No. But you cannot do so because the evidence is clear and undisputed, and Ms. Davis had nothing whatsoever to do with that.

Same for the church sign. The church sign had been there forever. That arrow had always pointed to that church, not to

Mr. Ermold's house. And so there's no suggestion whatsoever that somehow Ms. Davis is responsible for that church sign. I mean, after the marriage decision, there were churches all across this country that put up signs. Is she responsible for those too? There was no evidence that she ever stepped foot in that church, that she ever talked with anybody in that church. No evidence of proximate causation whatsoever.

Speaking of proximate causation, you've also heard -- Panel B especially and Panel A -- you've heard a lot of testimony about worsening medical conditions. Panel A, you heard Mr. Ermold say that he had PTSD before Ms. Davis and somehow the interactions with her made it worse.

And Panel B, you heard a lot of testimony about how Mr. Smith had a number of serious mental health challenges before Ms. Davis and how both he and Mr. Yates want you to award them money because they got worse.

I mean, even Ms. Heinrich, when she was talking to you a few minutes ago, she said that Mr. Smith had panic attacks before Ms. Davis. They got better. And then after Ms. Davis, they got worse. Over and over again, you've been presented with that basis for awarding them damages.

Here's the problem: The Court is going to instruct you on this, and the instruction from the Court that you're going to receive is, "You may not award damages for an exacerbation of a preexisting condition of any plaintiff."

I'd ask you to write that down. It's page 17. You'll get a set of these instructions that you'll hear from the Court. You'll get a set to take to the jury room. Please write down page 17 on the very bottom and please make reference to this in your deliberations.

You may not award damages for an exacerbation of a preexisting condition of any plaintiff. Exacerbation means a worsening medical condition. So all of that evidence you've heard is not relevant because you can't award damages for it.

But why did they present it to you? Because they don't have anything else. They want you to award it based on sympathy, not based on the law. But the law as you will hear it says you may not award damages for that.

Ladies and gentlemen, you took an oath to follow the law, and I know that you will. I know that you will. Please pay particular attention to that instruction.

And even if they could somehow collect those kinds of damages, they never brought any medical experts here to try to make that causation link, that proximate causation between anything that Ms. Davis ever did and the worsening of those conditions.

You're not doctors, I assume. Maybe most of you are not doctors or have medical training. Wouldn't it have been nice to hear from an expert on these issues? The Court gave them the opportunity to bring in all kinds of experts. They didn't

provide you with those tools that you need.

Now, another very important thing that I want to mention to you on this. Both panels, A and B, you've heard a lot about slurs and insults and vile and mean things that other people have said. I mean, Ms. Heinrich, in her opening statement, said some things that just took my breath away and shocked my conscience, and I'm sure she shocked yours.

It's heartbreaking and heart-wrenching to hear how cruel some people can be with their words. It really is. But in this country, ladies and gentlemen of the jury, we hold every person accountable for only his or her own words. We do not hold someone accountable for the words of others.

Everyone on that witness stand agreed that Ms. Davis has never uttered a slur, has never condoned others saying mean or vile things about people, has never encouraged others to say hateful things. It's simply not in her nature, and there is no evidence that she did anything of the sort.

Here's the really, really important part, and I'll ask you to write down one more thing. You're going to hear an instruction from the Court on this as well. The Court is going to instruct you, "In deciding whether to award any damages to any of the plaintiffs, you may not award damages based upon the insults or derogatory speech of others. It is the conduct of the defendant, not the actions of others, that you shall consider in deciding the issues of damages."

If you want to write down, it's going to be on page 16, in the middle of the page. I think it's so important, I want to read it again because it's critical. "In deciding whether to award any damages to any of the plaintiffs, you may not award damages based upon the insults or derogatory speech of others. It is the conduct of the defendant, not the actions of others, that you shall consider in deciding the issues of damages."

Ladies and gentlemen, you heard all those mean and vile things that other people said, and you can't consider any of it under the law you're sworn to uphold in this courtroom.

So why did they say those things to you? Because they want you to award money on sympathy. Because they want to trigger your passions. They want you to say that Ms. Davis should be punished. You heard it right in the opening statement of both of these plaintiffs when they said a rule without a consequence is only a suggestion. They want you to punish Ms. Davis because this case is about retribution and vengeance.

THE COURT: Five more minutes.

MR. MIHET: Third and finally, you should return a zero verdict in both cases because both sets of plaintiffs have not met their legal duty to mitigate their alleged damages.

Judge Bunning will instruct you on this important issue

as well. The duty of mitigation, another fancy lawyer word. And he will tell you, "Each plaintiff has a duty under the law to mitigate his damages." That means that the plaintiff must take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or to minimize the loss or damage caused by the defendant.

And there were many reasonable opportunities here to reduce or eliminate the alleged loss. Number one, they could have gone to the clerk's office only once. And I have to take issue with what you heard from Mr. Gartland. We're not claiming they shouldn't have gone the first time. But they went the first time, and they were denied, and that was all that was needed for them to bring a lawsuit.

And they could have waited until all of that was resolved and until licenses were being issued again to go back. They didn't have to go back three times or five times while they knew that licenses were not yet issued and while they knew that there was a circus out there that they say they didn't want to be subjected to.

So, yes, they had a right to go once, and they did. But that was all that was necessary for them to be able to bring a lawsuit to challenge the policy that they disagreed with. They did not have to go back five times.

They could have called the clerk to find out if licenses were being given out before they went. If the answer is no,

they could have come directly back to court. They didn't have to go back there. They could have gone without the cameras and the media.

Mr. Gartland asked, Why was the media there? The media was there because his client's videos that he made and that he posted overnight garnered over 200,000 views. That was his client that caused the media frenzy. If they had just come in and gotten denied and walked away quietly and filed a lawsuit, things would have been very different.

They could have not posted their videos online to make them go viral to bring so much attention. There's talk about only a few views. The evidence is that there were hundreds of thousands of views.

Ladies and gentlemen, as I close my remarks, you've heard a lot about consequences. Again, I submit to you the whole mantra of rules having consequences is just an attempt to get you to punish Ms. Davis. This case is not about punishing Ms. Davis. They're not asking -- they can't ask for punitive damages. So why are they presenting all these things to you then? Because they want you to punish her for breaking a rule.

And even if you could consider that, Ms. Davis has already been punished enough. You've heard the mean and vile things that have been said about her, including the things posted on Mr. Ermold's Facebook page that he liked and that he

laughed at. He agreed that it was degrading and humiliating to say she should be hung slowly.

You heard that she went to jail, and you heard that her life was turned upside down about this. She's been punished enough.

At the end of the day, everyone got what they needed. Plaintiffs got their marriage licenses. Ms. Davis's name was taken off and her conscience was protected. We're still here eight years later.

We're asking you today to put a stop to this and to allow the parties to go home and go their separate ways. We're asking you, both panels, to bring back a verdict of zero damages.

Thank you.

THE COURT: Thank you Mr. Mihet.

Ladies and gentlemen, we're going to now dismiss Panel B. This will be relatively short because each side has five minutes for rebuttal. Don't begin deliberations yet. I haven't given you the instructions. We'll dismiss Panel B. If you could wait right here in the jury room, we'll call you back in as soon as we're done with the rebuttal for Panel A.

(Jury Panel B exited the courtroom at 12:35 p.m.)

THE COURT: You may be seated. Mr. Gartland, you'll have five minutes for rebuttal.

MR. GARTLAND: I guess there's one thing we agree on.

Ms. Davis is not here to be punished. My clients are here to be compensated. Now, what I found interesting in today's testimony, and I objected to one of the questions, but I was actually glad that the judge let him answer it.

The question was: Could you have gone out there and told people to quit railing and screaming and saying nasty things?

She said: No. As a government official on government property, they had a First Amendment right to do that. So no, I never thought -- I should never even have thought about doing it because it would have been a violation of consti- -- a constitutional violation of the protesters' rights, yet she violated my clients' Fourteenth Amendment rights in her capacity as a government official on government property.

So I find it interesting she would even bring that up because it's almost like hypocritical. It's ridiculous to say it's okay to do it in this context but not in the First Amendment context. I just want you to remember that when you deliberate.

We heard three reasons why you should award no money. We've not proven our damages because my clients tied, in a written answer, their damage claim to the loss of Mr. Ermold's nonrenewal of his contract with UPIKE. He was making almost 50,000 a year, and he didn't work for five years. You heard that. We never said you should award us $250,000. I've never said you should award us any number. I said it's up to you.

They say, well, you got to bring in an expert. You got to have some kind of a calculation. You got to be able to divide it between two people. That's nonsense. You're here to award, you'll be instructed, for personal humiliation, mental anguish, and suffering.

They told you what their experience was on three occasions and how it's affected their marriage. Even to this day, this matter is a topic of discussion, and it causes strife between a married couple because of the events in question.

It's been going on for eight years. We're finally here, and now you're to decide -- and I told you it's a very difficult task -- how much should we award these people? Don't award it for the contract he didn't get. I'm asking you not to do that. Don't award it for a church sign. Award it for what they've suffered as a result of a constitutional violation that was knowing. That's what I want you to do.

They say we haven't met our burden. I couldn't disagree more. Then they said there's no proximate cause. The judge will instruct you, and he read a sentence I actually like. When someone initiates a chain of events, that person is liable for the result of that chain of events if that result was a reasonably foreseeable consequence of their act or reasonably foreseeable that the defendant's actions would cause damages to plaintiffs.

It was reasonably foreseeable. When a government official in one of the 120 counties in Kentucky would refuse to issue marriage licenses to people, that was newsworthy. That was newsworthy because it had never happened, and that's when the media came.

They want to say our clients went down there to film it. They told you why. They wanted to have a record of it. They also were worried that maybe they would not be perceived correctly.

He says, well, where are the videos? They're hidden videos. They're not hidden. They're on their witness list. If they wanted to play you those videos, they could have done it. They chose not to. We didn't hide the videos. We gave you testimony about what happened on those three encounters. We weren't required to show the videos. They could have shown them if they were good for them, but they weren't, so they didn't show them. But they could have.

So the nonsense about the videos is just noise. We've proved our case. We proved it through the testimony of two people. That's all we're required to do, and the judge will instruct you number of witnesses is irrelevant. You'll hear it.

Finally, on the no mitigation, now I'm hearing for the first time because I heard -- the evidence was they shouldn't have showed up on July 6 because she told them I wouldn't

issue the license. They heard about it. I heard them today. Cross-examine. You shouldn't have showed up. Now they're conceding they had a right to show up.

They told you they showed up on the 13th of August and September 1 because they thought she'd issue the licenses because of certain events that happened in court proceedings in this very court. That's why they showed up on those dates. They weren't random dates. They had every right to show up. They had every right to get the license, and one person's "no marriage policy" in Rowan County said you're not getting your license.

He says it went on for a short time. It went on for 60 days plus. 23,000 residents. If you were a resident, you couldn't get a marriage license. That's on Ms. Davis.

I heard the words they're trying to bankrupt a grandmother. I didn't hear -- I'm a bankruptcy lawyer, among other things. Did you hear the word bankruptcy? Did you hear anybody's testimony about somebody's trying to bankrupt Ms. Davis? I didn't hear it. You didn't hear it. It's just creating sympathy for a defendant who's guilty of the conduct charged, the misconduct.

And if you award a verdict and it's in a large amount and she can't pay it, that's just the way life is. That's just the way it is. Again, trying to get sympathy for the defendant. That's not what this case is about. It's about

compensation for two people that have been injured. That's what this case is about.

Now, I looked up the word "injustice" last night. Injustice is defined as a violation of the right or the rights of another. That's injustice.

We're here today to seek justice done. They've been wronged. The Court's told you she violated the law. Now it's time to compensate them in whatever amount your heart tells you to award them.

But I want to close with the last thing I want to tell you about or say. Martin Luther King, one of his famous quotes, and I actually like it. My partner gave this to me back in January, not knowing if we've ever get to trial in this case. It was: "Injustice anywhere is a threat to justice everywhere."

I want you to think about that. Her injustice was a threat to justice everywhere in the United States of America. We live in a country of laws. Should be a law abiding citizen. I will stand, and I have no problem saying her conduct was lawlessness as to my clients' rights. That needs to be compensated.

Thank you for your time.

THE COURT: Thank you, Mr. Gartland.

(Jury Panel A exited the courtroom at 12:43 p.m.)

(Jury Panel B entered the courtroom at 12:45 p.m.)

(Plaintiffs Yates/Smith rebuttal closing argument was presented before Jury Panel B in Case No. 15-cv-62; transcript not requested.)

(Jury Panel A entered the courtroom at 12:56 p.m.)

THE COURT: Ladies and gentlemen, I'm going to give you a set of the instructions. After I read them to you, you'll also have two copies of the verdict form. Panel A will decide the issues relating to Ermold and Moore. Panel B, the issues relating to Yates and Smith.

Instruction Number 1.

Now that you have heard the evidence, it becomes my duty to give you the instructions of the Court as to the law applicable to this case. It is your duty as jurors to follow the law as stated in the instructions of the Court and to apply the rules of law so given to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but you must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in the instructions of the Court, just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the

evidence in the case.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case, or what that opinion is. It is not my function to determine the facts, but rather yours.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

Instruction 2, Evidence Defined.

You must make your decision based only on evidence that you saw and heard here in this court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of this court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath and the exhibits that I allowed into evidence. Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. Any comments and questions I made are not evidence.

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked. You must completely ignore this. Do not even think about it. Do not

speculate about what a witness might have said. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based on only the evidence, as I have defined it here, and nothing else.

Instruction 3, Consideration of Evidence.

You are to consider only the evidence in the case. You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion. In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this an "inference." As a jury, you are allowed to make reasonable inferences, unless otherwise instructed. Any inferences you make must be reasonable and must be based on the evidence in the case.

Instruction 4, Direct and Circumstantial Evidence.

Now, some of you may have heard the terms direct evidence and circumstantial evidence. Direct evidence is simply evidence, like the testimony of an eyewitness, which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining. It is your job to decide how much weight to give the direct and circumstantial evidence.

The law makes no distinction between the weight that you should give either one or say that one is any better than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

Instruction 5, Lawyers' Objections.

There is one more general subject that I want to talk to you about. The lawyers for both sides objected to some of the things that were said or done during the trial. Do not hold that against either side. The lawyers have a duty to object whenever they think that something is not permitted by the rules of evidence. Those rules are designed to make sure that both sides receive a fair trial. And do not interpret my rulings on their objections as any indication of how I think the case should be decided. My rulings were based on the rules of evidence, not on how I feel about the case. Remember that your decision must be based only on the evidence that you saw and heard here in court.

Instruction 6, Credibility of Witnesses.

Another part of your job as jurors is to decide how credible or believable each witness was. This is your job, not mine. It is up to you to decide if a witness's testimony was believable, and how much weight you think it deserves. You are free to believe everything that a witness said, or only part of it, or none of it at all. But you should act reasonably and carefully in making these decisions.

Let me suggest some things for you to consider in evaluating each witness's testimony.

Ask yourself if the witness was able to clearly see or hear the events. Sometimes even an honest witness may not have been able to see or hear what was happening and may make a mistake.

Ask yourself how good the witness's memory seemed to be. Did the witness seem able to accurately remember what happened?

Ask yourself if there was anything else that may have interfered with the witness's ability to perceive or remember the events.

Ask yourself how the witness acted while testifying. Did the witness appear honest, or did the witness appear to be lying?

Ask yourself if the witness had any relationship to the plaintiffs or the defendant, or anything to gain or lose from

the case, that might influence the witness's testimony.

Ask yourself if the witness had any bias or prejudice or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.

Ask yourself if the witness testified inconsistently while on the witness stand, or if the witness said or did something or failed to say or do something at any other time that is inconsistent with what the witness said while testifying.

If you believe that the witness was inconsistent, ask yourself if this makes the witness's testimony less believable. Sometimes it may, other times it may not. Consider whether the inconsistency was about something important or about some unimportant detail. Ask yourself if it seemed like an innocent mistake or if it seemed deliberate.

And ask yourself how believable the witness's testimony was in light of all the other evidence. Was the witness's testimony supported or contradicted by other evidence that you found believable?

If you believe that a witness's testimony was contradicted by other evidence, remember that people sometimes forget things, and that even two honest people who witness the same event may not describe it exactly the same way.

These are only some of the things that you may consider in deciding how believable each witness was. You may also

consider other things that you think shed some light on the witness's believability. Use your common sense and your everyday experience in dealing with other people and then decide what testimony you believe and how much weight you think it deserves.

Sometimes jurors wonder if the number of witnesses who testified makes any difference. Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers

Instruction 7, Use of Notes.

Remember that if you elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely upon your own independent recollection of the evidence or lack of evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror.

Whether you took notes or not, each of you must form and express your own opinion as to the facts of the case.

Instruction 8, Prior Inconsistent Statements.

You have heard the testimony of witnesses who may have made statements that may be different from their testimony

here in court.

With respect to the prior statements made by witnesses who testified under oath before trial, you may consider those statements as evidence of the truth of what the witness said in the prior statement, as well as in deciding what weight to give the witness's testimony.

Instruction 9, All Available Witnesses Or Evidence Need Not Be Produced.

The law does not require any party to call as witnesses all persons who might have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters at issue in this trial. Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in the case.

Instruction 10, Burden of Proof, Preponderance of the Evidence.

The plaintiffs bear the burden of proof on their claims. If they fail to prove any element of their claim by a preponderance of the evidence in this case, you should find for the defendant.

To establish by a preponderance of the evidence means to prove that something is more likely so than not so. In other words, a preponderance of the evidence in the case means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds

belief that what is sought to be proved is more likely true than not true.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Instruction 11, Damages.

The plaintiffs bring their claims under the federal statute 42 United States Code Section 1983, which provides that any person or persons who, under the color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party for redress.

In this case, the only remaining redress sought by the plaintiffs is damages, which means the amount of money that will reasonably and fairly compensate each plaintiff for any injury you find was caused by the defendant, if any.

The Court has already found that the defendant's actions violated the plaintiffs' constitutional rights so the only issue for you to decide is whether this violation caused any damages to the plaintiffs and, if yes, the amount of damages, if any, the defendant should have to pay each plaintiff.

Simply because these instructions contain a section on

damages should not be construed by you that you are required to award damages. Rather, the Court must instruct you on the law of damages in the event that you decide that any one of the plaintiffs is entitled to recover damages. Only then must you know how to go about computing damages. The Court is not expressing any views, one way or the other, as to whether David Ermold, David Moore, James Yates, and/or Will Smith should recover damages in this case.

The Court also instructs you that any attorney's statement to you of the amount that you should return in your verdict is not evidence and is not binding upon you. It is only the lawyer's statement, which is not evidence. It is your sole and exclusive function to determine the sum of money, if any, that will justly and fairly compensate David Ermold, David Moore, James Yates, and Will Smith for any injuries or damages you believe they have sustained.

You will make that determination based on the evidence in this case and the law the Court has given you, and not on the basis of any attorney's statement, claim, or argument.

Instruction 12, Compensatory Damages.

The plaintiffs in this case are permitted to recover compensatory damages if they are able to prove actual injury caused by the defendant's actions. In actions under 42 United States Code Section 1983, for violations of civil rights such as this case, any damages award must be focused on

compensation for a particular injury that is proved.

"Rights, constitutional or otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests." Thus, a plaintiff who alleges the violation of a constitutional right is not entitled to compensatory damages unless he can prove actual injury caused by the violation. Where no injury is present, no compensatory damages can be awarded.

In deciding whether to award any damages to any of the plaintiffs, you may not award damages based upon the insults or derogatory speech of others. It is the conduct of the defendant, not the actions of others, that you should consider in deciding the issues of damages.

In considering plaintiffs' claim for damages, the plaintiff must show that defendant was the proximate cause of the damages they have sustained. Plaintiffs must show that defendant's acts or omissions played a substantial part in bringing about plaintiff's damages and that the damages were either a direct result or a reasonably foreseeable consequence of the defendant's act or omission.

When someone initiates a chain of events, that person is liable for the result of that chain of events if that result was a reasonably foreseeable consequence of their act or reasonably foreseeable that defendant's actions would cause damages to plaintiffs

Compensatory damages are thus only those which a plaintiff proves by a preponderance of the evidence that reflect "in money the value of the harm done to him."

Compensatory damages include those damages, the value of which has been proved by a preponderance of the evidence, for out-of-pocket losses or other monetary harms and also for injuries such as personal humiliation, mental anguish, and suffering.

In reaching your determination, it is imperative that you award only those damages, if any, that have been proved by the plaintiffs by a preponderance of the evidence. No compensatory damages may be awarded by the jury unless there is proof of an actual injury proved by a preponderance of the evidence, and abstract injuries to constitutional rights do not form the basis for an award of compensatory damages in the absence of such proof. Your award for damages may not be based upon speculation or sympathy.

Any damages need not be mathematically exact, but there must be enough evidence for you to make a reasonable estimate of damages without speculation or guesswork.

The fact that a plaintiff may be unusually emotionally sensitive and allegedly incurred great emotional harm from defendant's conduct will not absolve defendant from responsibility for the greater emotional harm. However, you may not award damages for an exacerbation of a preexisting

condition of any plaintiff.

One thing I want to mention, you may notice case names, Sixth Circuit pattern instruction such and such. That's for court purposes. You don't need to be concerned with any of those. I just noticed that because there's a number below this one.

Instruction 13, Mitigation of Damages.

Each plaintiff has a duty under the law to mitigate his damages. That means that the plaintiff must take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage caused by the defendant.

It is defendant's burden to prove that any plaintiff has failed to mitigate. So if the defendant persuades you by a preponderance of the evidence that any of the plaintiffs failed to take advantage of an opportunity that was reasonably available to them to mitigate his damages, then you must reduce the amount of plaintiff's damages by the amount that could have been reasonably obtained if he had taken advantage of such an opportunity

Instruction 14, Introduction, Deliberation and Verdict.

Let me finish up by explaining some of the things about your deliberations in the jury room and your possible verdicts. The first thing you should do in the jury room is choose someone to be your foreperson. How you choose your

foreperson is entirely up to you. This person will help to guide your discussions and will speak for you here in court.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked so it may take some time for me to get back to you. Any questions or messages normally should be sent to me through your foreperson.

One more thing about messages. Do not ever write down or tell anyone, including me, how you stand on your votes. For example, do not write down or tell anyone that you are split 4-3, or 6-1, or whatever your vote happens to be. That should stay secret until you are finished.

Instruction 15, Experiments, Research, Investigations, and Outside Communications.

Remember that you must make your decision based only on the evidence that you saw and heard here in court.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic devices or media, such as a telephone, cell phone, smartphone, iPhone, Blackberry, or computer, the internet, any internet service, or any text or

instant messaging service, any internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in the courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss this case with your fellow jurors during deliberations because they have seen and heard the same evidence you have.

In our judicial system, it is important that you are not influenced by anything or anyone outside this courtroom. Otherwise, your decision may be based on any information known by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

A juror who violates these restrictions jeopardizes the

fairness of these proceedings and a mistrial could result, which would require the entire trial process to begin from scratch.

Instruction 18, Court Has No Opinion. Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You decide for yourselves if any plaintiff has proven his case against the defendant by a preponderance of the evidence.

Instruction Number 17, Charge to the Jury.

Having heard my instructions regarding the law, you will answer the following questions. Your verdict on each question is to be unanimous. All seven must agree. Therefore, all of you must agree whether the answer to each of the following questions is yes or no. Please signify your agreement by having the foreperson you have selected check the appropriate answer and place his or her juror number where indicated.

Now, this is not a yes or no question. Both of the verdict forms are identical with the exception of the plaintiffs' names.

They state: Please state the sum of damages, if any -- insert plaintiff -- has proven by a preponderance of the evidence he experienced as a proximate cause of defendant Kim Davis's conduct. There's a place for an amount and the verdict form for Panel A has both Plaintiff Ermold and

Plaintiff Moore. The verdict form for Panel B has a verdict form for Plaintiff Yates and Plaintiff Smith.

And then at the bottom, it says your deliberations are complete and you should return to the courtroom. That is where the foreperson should put his or her number and put the date on it. And then you can let the court security officer know you've completed your deliberations.

Instruction 18, Duty to Deliberate.

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it will be your duty to talk with each other about the evidence, and make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that, your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say so you

should all feel free to speak your minds.

Listen carefully to what the other jurors to say, and then decide for yourself if the plaintiff has proven his case against the defendant.

At this point, I'll release you from prior admonitions. I'll call on each panel to deliberate. I understand lunches have been delivered. Any exhibits -- and there weren't many, but any exhibits, I'll call on the attorneys to make sure that whatever exhibits may have been admitted in the various cases, Panel A, Panel B, those will be given to you as well.

Before we deliberate, why don't we give the court security officer going back with each one a copy of the instructions and two sets of verdict forms.

If Panel A reaches a verdict first, we'll return Panel A, vice versa.

We'll call on you to begin deliberation as at this time. We'll be in recess.

(Jury Panels A and B retired to deliberate at 1:19 p.m.)

THE COURT: Both panels have left to begin deliberations. I would ask that you get with the clerk and make sure whatever exhibits were admitted are part of the group that will go back with deliberations. You can grab a bite to eat for lunch. Make sure we have a way to get ahold you in the event the jury has a question has reached its verdict.

MR. STILZ: My understanding is our exhibits are on a thumb drive, the videos. I think they have to come back in to watch them if they want to. Is that accurate?

THE COURT: That's not usually how we do it, but I guess that's true. I told them something different. I used to try cases with an overhead projector. While I know how to log on to a computer, I'm not as savvy as that.

MS. HEINRICH: I want to remind the Court that I have to leave so when you release us, then I probably will not be back. But I wanted to thank everybody here for the hospitality. Your staff's been great. Mr. Stilz will remain.

MR. STILZ: I'll be here.

MS. HEINRICH: Absolutely. My clients and paralegal are still here.

THE COURT: I understand. Counsel for Mr. Ermold, Moore, anything?

MR. GARTLAND: Nothing further, Judge.

MR. SCHMID: Do you need extra copies of the exhibits?

THE COURT: I guess I misspoke when I said the exhibits would be sent back. I guess the video exhibits, they'll need to come back in and look at them.

MS. HEINRICH: Madam Clerk said they'd have to come into the courtroom.

THE COURT: They'd have to review it with no one in

here. If they're reviewing evidence, they can't deliberate if we're sitting in here.

(Off-the-record discussion.)

THE COURT: None the exhibits on the thumb drive can go back to the jury. If they request to be able to view the videos, we'll make accommodations.

We'll be in recess.

(Recess from 1:22 p.m. until 2:32 p.m.)

(Jury Panel B returned their verdict at 2:32 p.m.; transcript not requested.)

(Jury Panel B was released from duty. Mr. Stilz and Ms. Heinrich were excused.)

(Recess from 2:32 p.m. until 3:40 p.m.)

THE COURT: I understand that Panel A has reached its verdict.

COURT SECURITY OFFICER: Yes, sir.

THE COURT: Go ahead and bring them in, please. I'll give them the same instructions regarding polling of the jury as well when they come in.

(Jury Panel A entered the courtroom at 3:42 p.m.)

THE COURT: I understand that you all have reached a verdict; is that right?

JURY FOREPERSON: Yes.

THE COURT: Hand the verdict to the court security officer.

I'll go ahead and publish the jury verdict. I will go ahead and advise you that either side can ask for a poll of the jury, which means you'll have to individually identify the verdict being your individual verdict. Either party is entitled to ask for that.

Secondly, as far as talking to anyone, we have a longstanding rule that indicates that you're not permitted to -- people aren't permitted to reach out to you. You're members of the jury. They know you by your juror number. We talked about that on Monday.

So, ultimately, if you choose to reach out and talk to anybody about the case, you can do that, but they're not permitted to reach out to you. The clerk's office isn't going to give your information out so people can reach out to you. I wanted to let you know that.

I'll read the verdict. Please state the sum of damages, if any, David Ermold has proven by a preponderance of the evidence he experienced as a proximate cause of Defendant Kim Davis's conduct. $50,000 is entered.

Please state the sum of damages, if any, David Moore has proven by a preponderance of the evidence he experienced as a proximate cause of Kim Davis's conduct. $50,000 is entered for a total of $100,000.

Signed by Juror 49, dated today.

So does either side wish a poll of the jury?

MR. MIHET: Yes, Your Honor.

THE COURT: If you'd poll the members of the jury.

(The jury was polled by the courtroom deputy and affirmed their verdict.)

THE COURT: I'll go ahead and order that the verdict be filed of record.

Ladies and gentlemen, I want to thank you for your time and attention during the trial. We will likely be seeing you again at some point. I'm not scheduled to be here in Ashland for a trial until later this fall. I want to thank you for your time and attention. You're free to go at this time with the thanks of the Court.

(The jury exited the courtroom at 3:45 p.m.)

THE COURT: Both panels having reached their verdicts, we'll go ahead and order that the verdict be filed of record. What else do we need to take up here today regarding these matters?

MR. GARTLAND: Your Honor, I have one request. Even though you're going to publish the verdict, can you hold off on entering the final judgment until we get our attorney's fee motions filed and granted?

THE COURT: Sure. I planned on doing that. The fee petition is going to be quite extensive because of the length of time and the number of appeals and that type of thing. Sure, I can do that.

MR. GARTLAND: We want one final judgment to go up one time.

THE COURT: I would prefer that everything go up at once, yes.

MR. GARTLAND: Thank you.

THE COURT: What about your side. Anything we need to take up today?

MR. MIHET: Not at this time, Your Honor.

THE COURT: What is your intention as far as appealing the judgment?

MR. MIHET: We will appeal.

THE COURT: Okay. I knew you would. I think as far as the petition for the attorney fees, in this and in the other case, what is your position on withholding final judgment so that everything can go up together?

MR. MIHET: May we have time to consider that, Your Honor, and advise you of a position in writing in a few days?

THE COURT: Yes. Why don't you file a notice within ten days regarding that.

Okay. Very well. We'll be in recess.

(Proceedings concluded at 3:47 p.m.)

- - -

C E R T I F I C A T E

I, LISA REED WIESMAN RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

_/s/ Lisa Reed Wiesman_
LISA REED WIESMAN, RDR-CRR
Official Court Reporter

January 7, 2024
Date of Certification

INDEX

**DEFENDANT'S WITNESS**

**KIM DAVIS**

Direct Examination.............................. Page 12
Cross-Examination............................... Page 40
Cross-Examination............................... Page 41
Redirect Examination............................ Page 59

- - -